IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN DOE #1, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:15-CV-606-WKW |
| | ) | [WO] |
| STEVEN T. MARSHALL, | ) | |
| Attorney General of the State of | ) | |
| Alabama in his official capacity, *et* | ) | |
| *al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

With an eye toward protecting its citizenry from recidivist sex offenders,

Alabama imposes a registration scheme on all state residents who have been

convicted of certain sex crimes. The Alabama Sex Offender Registration and

Community Notification Act ("ASORCNA," or the "Act"), Ala. Code § 15-20A-1

*et seq.*, is one of the most "comprehensive, debilitating" sex offender statutes in the

country. *McGuire v. Strange*, 83 F. Supp. 3d 1231, 1236 (M.D. Ala. 2015).

Protecting the vulnerable from the depredations of sexual predators is a laudable

legislative goal—this much is beyond cavil. But the State, in setting out to achieve

this goal, must stay within the boundaries of liberty and dignity enshrined in our

constitutional tradition. Plaintiffs, five anonymous ASORCNA registrants,

brought this action to challenge the portions of the Act that allegedly trespass on their constitutional protections.

Before the court is the motion to dismiss filed by Defendants Steven Marshall, Charles Ward, Hal Taylor, John Richardson, and Stan Stabler (collectively, the "State").[1] (Doc. # 87.) The State seeks, for the second time, total dismissal of Plaintiffs' challenge to ASORCNA. Upon consideration of the pleadings, the arguments of counsel, and the relevant law, the motion is due to be granted in part and denied in part. Given this resolution, Plaintiffs' motions for leave to file a third amended complaint are due to be denied at this time. (Docs. # 118, 119.)

## I. JURISDICTION AND VENUE

Subject-matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331, 1343, and 2201. The parties do not contest personal jurisdiction or venue.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of the complaint against the legal standard articulated by Rule 8 of the Federal Rules of Civil Procedure. Rule 8 provides that

---

[1] By operation of Federal Rule of Civil Procedure 25(d), Steven Marshall has been "automatically substituted as a party" for the former Attorney General, Luther Strange; Charles Ward for John Richardson in his official capacity as Director of the Alabama Department of Public Safety; and Hal Taylor for Stan Stabler in his official capacity as Secretary of ALEA. (Doc. # 122.)

the complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012). The court need not, however, accept mere legal conclusions as true. *Id.* at 1325.

To survive a 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### III. BACKGROUND

The facts, procedural history, and statutory scheme at issue were spelled out in depth in the Order disposing of Defendants' first motion to dismiss. (Doc. # 51.) The court will not rehash all the facts of this case, which, save for a few exceptions to be discussed below, remain largely the same. After the State's motion to dismiss the first amended complaint was granted in part and denied in part, Plaintiffs obtained leave to again amend their complaint. Plaintiffs filed their second amended complaint on August 22, 2016, adding three claims to the three

that survived Defendants' first motion to dismiss. (Doc. # 81.) Four weeks later, on September 12, 2016, Defendants filed their second Rule 12(b)(6) motion to dismiss, asking the court to dismiss all six counts of the operative complaint. (Doc. # 87.)

While this second motion to dismiss awaited resolution, the statutory landscape shifted dramatically. On March 14, 2017, the Alabama Senate introduced SB 301, a far-reaching rewrite of the challenged ASORCNA provisions. Once it passed both chambers of the Alabama Legislature, the bill was christened Alabama Act No. 2017-414 (the "Amendment") and signed into law by Governor Kay Ivey. The parties filed supplemental briefs regarding the Amendment's impact on the State's pending motion to dismiss. (Docs. # 110, 113, 114.)

A brief overview of these statutory and factual changes is in order before addressing the parties' legal arguments.

## A.   The Challenged Statutory Provisions

ASORCNA inserts the State into various aspects of registrants' daily lives. The current version of ASORCNA applies to adult offenders convicted of any of thirty-three infractions designated as sex offenses under Alabama law. Ala. Code § 15-20A-5. It also makes its provisions applicable to any adult offender convicted in another jurisdiction of a crime that, "if it had been committed in

[Alabama] under the current provisions of law, would constitute" an enumerated offense. *Id.* § 15-20A-5(35). The statute applies retroactively such that it sweeps offenders under its control regardless of when the conviction occurred or the duty to register arose. *Id.* § 15-20A-3(a). Unless they are relieved from its requirements due to medical need or through one of the Act's other narrow exceptions,[2] qualifying offenders are subject to the statute's requirements for life. *Id.* § 15-20A-3(b).

## 1. *Duty to Register and Reporting Requirements*

A sex offender must register with certain law enforcement agencies upon (1) release from incarceration (or at the time of conviction if not incarcerated), or (2) upon entering the state. *Id.* § 15-20A-10. ASORCNA requires an in-person appearance before local law enforcement of the county in which the sex offender resides, accepts employment, or attends school. *Id.* When registering, sex offenders must provide law enforcement with their residential address, the name and address of their employer and/or the school they attend, the license number and registration for any vehicle they own, and all telephone numbers they use. *Id.* § 15-20A-7(a)(4)–(8). Registrants must also provide information relating to their internet communications. Namely, email addresses, instant-message

---

[2] For example, ASORCNA offers some limited relief for juvenile offenders, Ala. Code § 15-20A-28, and for those offenders whose crimes were a result of their victim's age, if the offender was less than five years older than his victim, *id.* § 15-20A-24.

usernames, "designations or monikers used for self-identification in Internet communications or postings," and "any and all Internet service providers used by the sex offender" must be reported. *Id.* § 15-20A-7(a)(9), (18). The Amendment carves out a small exception: An internet identifier need not be reported if "used exclusively in connection with a lawful commercial transaction." *Id.* § 15-20A-7(a)(9). ASORCNA does not define "lawful commercial transaction," or how such internet use differs from a registrant's typical internet access.

Registrants have an enduring obligation to update their registration, in person, at the time of any change in residence, employment, or educational enrollment. *Id.* § 15-20A-10(b), (c). Changes to phone numbers, internet identifiers, or internet service providers ("ISPs") may be reported in person, online, or over the telephone, "as required by the local law enforcement agency." *Id.* § 15-20A-10(e). All updates must be made "immediately," which the Act defines as within three days. *Id.* § 15-20A-4(9). ASORCNA further requires homeless registrants to report in person to local law enforcement on a weekly basis. *Id.* § 15-20A-12(b).

Law enforcement uses this information to establish a registry, which it makes available to the public.[3] *Id.* § 15-20A-8. ASORCNA also requires local

---

[3] Certain information, such as email addresses, internet identifiers, and ISPs, is not published. Ala. Code § 15-20A-8(b).

law enforcement to notify the community of a sex offender's presence by distributing flyers to nearby residents. *Id.* § 15-20A-21. If a registrant intends to leave his county of residence for a period of three or more consecutive days, he must complete a travel permit[4] request and provide the details of his travel plans. *Id.* § 15-20A-15.

## 2. *Residency and Employment Restrictions*

ASORCNA strictly limits the areas in which sex offenders may live and work. The residency provision proscribes the establishment or maintenance of a residence within 2,000 feet of a school, childcare facility, or resident camp.[5] *Id.* § 15-20A-11(a). ASORCNA also prohibits sex offenders from establishing or maintaining a residence within 2,000 feet of the property on which a victim's immediate family members reside. *Id.* § 15-20A-11(b). The 2,000-foot exclusion zone[6] is measured in a straight line from nearest property line to nearest property

---

[4] The Amendment rebranded ASORCNA's travel permits as "travel notification document[s]." Ala. Code § 15-20A-15. The change appears to be entirely semantic: On pain of felony, a registrant is not permitted to leave his county for more than three days unless he obtains and completes a notification document. *Id.* It is not clear how this provision meaningfully differs from a permitting system.

[5] "[A] resident camp facility includes any place, area, parcel, or tract of land which contains permanent or semi-permanent facilities for sleeping owned by a business, church, or nonprofit organization used primarily for educational, recreational, or religious purposes for minors and the location of the resident camp has been provided to local law enforcement. Resident camp does not include a private residence, farm, or hunting or fishing camp." Ala. Code § 15-20A-11(a).

[6] The State quibbles with the phrase "zone of exclusion," claiming it does not accurately describe the zones from which registrants are excluded from residence and employment.

line.  *Id.* § 15-20A-11(h).  Those sex offenders who were released or convicted and established a residence within an exclusion zone prior to ASORCNA's effective date were not required to relocate.  *See, e.g.*, *id.* § 15-20A-11(a) ("No adult sex offender shall . . . maintain a residence *after release or conviction* . . . within 2,000 feet of the property . . . ." (emphasis added)).  Plaintiffs contend that the geographical residency restrictions preclude registrants from residing in over eighty percent of the available housing in Montgomery, Alabama.

In addition to imposing geographical limitations on living arrangements, ASORCNA prevents sex offenders from residing with certain minor children (the "minor-cohabitation rule").  No sex offender may "reside or conduct an overnight visit with a minor."  *Id.* § 15-20A-11(d).  The Act defines "overnight visit" as "[a]ny presence between the hours of 10:30 p.m. and 6:00 a.m."  *Id.* § 15-20A-4(14).  The minor-cohabitation rule generally does not apply if the sex offender is the parent, grandparent, sibling, stepparent, or stepsibling of the minor.  *Id.* § 15-20A-11(d).  Under certain circumstances in which the sex offender's victim was a child, however, even these familial exceptions do not apply.  *Id.* § 15-20A-11(d)(1)–(5).

---

(Doc. # 110-2, at 1.)  For purposes of this Opinion, the court is satisfied that "zone of exclusion" accurately and appropriately refers to such areas.

Deciphering the statutory meaning of "residence" is no small feat—it takes four statutory cross-references to pin down the term's definition.[7] "Residence" is defined as "[a] fixed residence . . . or other place where the person resides, regardless of whether the person declares or characterizes such place as a residence." *Id.* § 15-20A-4(21). ASORCNA then defines the operative term "reside" as "be[ing] habitually or systematically present at a place," a matter which "shall be determined by the totality of the circumstances." *Id.* § 15-20A-4(20). In addition to this catch-all, the Act specifies three circumstances under which a

---

[7] Set out in full, the four relevant provisions read as follows:

(6) FIXED RESIDENCE. A building or structure, having a physical address or street number, that provides shelter in which a person resides.

….

(14) OVERNIGHT VISIT. Any presence between the hours of 10:30 p.m. and 6:00 a.m.

. . .

(20) RESIDE. To be habitually or systematically present at a place. Whether a person is residing at a place shall be determined by the totality of the circumstances, including the amount of time the person spends at the place and the nature of the person's conduct at the place. The term reside includes, but is not limited to, spending more than four hours a day at the place on three or more consecutive days; spending more than four hours a day at the place on 10 or more aggregate days during a calendar month; or spending any amount of time at the place coupled with statements or actions that indicate an intent to live at the place or to remain at the place for the periods specified in this sentence. A person does not have to conduct an overnight visit to reside at a place.

(21) RESIDENCE. A fixed residence as defined by Section 15-20A-4 or other place where the person resides, regardless of whether the person declares or characterizes such place as a residence.

Ala. Code § 15-20A-4.

person resides at a place: first, if the person spends four hours there on three consecutive days; second, if the person spends four hours there on ten days out of a month; and third, if the person spends any length of time there and has indicated an intent to remain for the named periods of time. *Id.* These three circumstances, as the Act makes clear, are illustrations rather than limitations of the definition. *Id.* Should a registrant fail to notify law enforcement or obtain a travel permit prior to "spend[ing] three or more consecutive days" away from his residence, he will be deemed to have changed residences and will be required to report the change to law enforcement. *Id.* §§ 15-20A-11(e)(2), 15-20A-10(e)(1).

The statute does allow for a limited reprieve from these restrictions. As of August 1, 2017, ASORCNA offers registrants a safe harbor in the form of residential preapproval. *Id.* § 15-20A-11(g). Should law enforcement preapprove an address as ASORCNA compliant before a registrant moves in, his residence there will not violate the residential-exclusion rules. *Id.* Registrants also may petition a state circuit court for relief based on terminal illness, permanent immobility, or other debilitating medical condition. *Id.* § 15-20A-23(a). To grant this relief, the state court must find that the petitioner does not pose a substantial risk of engaging in future sexual misconduct. *Id.* § 15-20A-23(g).

The employment provision, like the residency provision, imposes a geographical limitation on sex offender activity. No sex offender may "accept or

maintain employment or a volunteer position" within 2,000 feet of a school or childcare facility. *Id.* § 15-20A-13(b). Registrants also may not accept or maintain employment within 500 feet of a playground, park, or athletic facility with a principal purpose of serving children. *Id.* § 15-20A-13(c). The exclusion zone is measured from nearest property line to nearest property line. *Id.* § 15-20A-13(h).

This provision further precludes sex offenders from working at any facility or organization that provides services primarily to children. *Id.* § 15-20A-13(a). Plaintiffs allege, with respect to the Montgomery area, that ASORCNA's employment restrictions render eighty-five percent of jobs unavailable to sex offenders. These employment restrictions apply regardless of whether the sex offender's victim was a minor child.

**3.** ***Branded Identification Requirement***

To ensure easy identification of registrants, ASORCNA requires all sex offenders to carry branded identification cards. Specifically, the statute provides that a sex offender must "obtain . . . and always have in his or her possession, a valid driver license or identification card issued by the Alabama State Law Enforcement Agency." *Id.* § 15-20A-18(a). These registrant-specific driver's licenses must "bear[ ] a designation that enables law enforcement officers to identify the licensee as a sex offender." *Id.* § 15-20A-18(b), (c). The Alabama Legislature delegated to the Secretary of the Alabama Law Enforcement Agency

("ALEA") the exclusive power "to promulgate any rules as are necessary to implement and enforce" the Act. *Id.* § 15-20A-44(c). The ALEA, in turn, has required the face of the identification cards to bear the inscription "CRIMINAL SEX OFFENDER" in bold, red letters. Registrants must also relinquish any other identification previously issued to them "by a state motor vehicle agency" that does not bear the sex offender inscription. *Id.* § 15-20A-18(d).

### 4. *Penalties for ASORCNA Violations*

ASORCNA's various duties and limitations are enforced under penalty of criminal prosecution. A violation of its requirements may constitute a Class C felony. *See, e.g., id.* § 15-20A-11(i). The statute does impose a scienter requirement, however, such that registrants are only liable for knowing violations of any provision. *See id.*

## B. <u>The Parties</u>

### 1. *Plaintiffs*

Plaintiffs John Doe 1, John Doe 3, John Doe 7, John Doe 9, and John Doe 10 ("Doe 1," "Doe 3," *etc.*) wish to proceed anonymously in this action; their hopscotch numbering reflects former Plaintiffs who have since been dropped from the case. (*See* Doc. # 41.) Each Plaintiff's experience as an ASORCNA registrant has already been summarized, except for Doe 10, who was joined as a Plaintiff in the second amended complaint. (Doc. # 51, at 10–17; *see* Doc. # 81.)

Doe 10 is an adult ASORCNA registrant living within the Northern District of Alabama. A long-time drug addict, Doe 10 visited his children at their mother's house in 1990 while he was under the influence of drugs. When the children's mother refused entry to Doe 10, he kicked in the door and got into a fight with her. The police were called, Doe 10 was arrested and charged, and he ultimately pled guilty to sexual abuse in the second degree, a misdemeanor. Doe 10 was sentenced to twelve months' imprisonment and required to register under ASORCNA's predecessor statute, the now-repealed Alabama Community Notification Act.

After unsuccessfully fighting his demons for two decades, Doe 10 decided to seek professional help for his addiction. He received that help in 2009, in the form of a twelve-month, free-of-charge inpatient program in Kansas.[8] On his return to his hometown in Alabama, Doe 10 was arrested for, and convicted of, a felony violation of ASORCNA: He had failed to report to local law enforcement his relocation from Alabama to Kansas.

Once he served his time, Doe 10 resumed residency with his mother in an ASORCNA-compliant zone. But the city soon condemned their home, and Doe 10's mother could not find affordable housing outside of ASORCNA's zones of exclusion. Doe 10 was left homeless, subject to the weekly reporting requirement, until he found temporary housing in an ASORCNA-compliant area in late 2015.

---

[8] Since completing the program, Doe 10 claims he has not used drugs or alcohol.

After failing to report his updated address within the three-day period mandated by ASORCNA, Doe 10 was charged with violating the Act's immediate in-person reporting requirement. After pleading guilty to this violation, Doe 10 finally found permanent housing in February 2016 that was approved by local law enforcement as ASORCNA compliant—though this approval may have been accidental, owing to a nearby, decades-old childcare facility. Thus, Doe 10 may currently be living in a zone of exclusion.

Doe 10 enjoys traveling, especially on fishing trips. But his friends often schedule their fishing trips on less than a day's notice, forcing Doe 10 to decline invitations for fear of violating ASORCNA's requirement of immediate in-person reporting of his travel. Similarly, Doe 10's girlfriend will soon retire from her job, and he hopes to travel with her when she does. Doe 10's precarious living situation also puts him at risk of homelessness and the weekly reporting requirement, should local law enforcement revoke the approval of his residence.

2. *Defendants*

Plaintiffs bring their first five claims against Defendants Steven Marshall, Charles Ward, and Hal Taylor in their official capacities as Attorney General of the State of Alabama, Director of Alabama Department of Public Safety, and Secretary

of ALEA, respectively.[9]  Plaintiffs' sixth claim seeks damages against Defendants

John Richardson and Stan Stabler, former secretaries of ALEA, in their individual

capacities.

## C.    The Causes of Action

Plaintiffs' second amended complaint names six causes of action against

Defendants.  They allege as follows:

1.    The residency restriction violates Plaintiffs' substantive due
      process right to family association, *see* Ala. Code § 15-20A-
      11(a)–(e), (g);

2.    ASORCNA    creates    an    irrebuttable    presumption    of
      dangerousness in violation of the Fourteenth Amendment
      through its restrictions on residency, *id.* § 15-20A-11(d),
      employment, *id.* § 15-20A-13(a)–(b), and travel, *id.* § 15-20A-
      15(a), (b), (d); the weekly reporting requirement for the
      homeless, *id.* § 15-20A-12(b); and the community-distribution
      provision, *id.* § 15-20A-21(b), (d);

3.    The residency exclusion zones, *id.* § 15-20A-11(a)–(e), (g),
      employment exclusion zones, *id.* § 15-20A-13(b), (d), (f), and
      reporting requirements, *id.* §§ 15-20A-7(a)(5)–(9), (18); 15-
      20A-10(a)–(c), (e), are void for vagueness;

4.    The    branded-identification    requirement    unconstitutionally
      compels speech, *id.* § 15-20A-18(d);

5.    The reporting requirements are overbroad in violation of the
      First Amendment, *id.* §§ 15-20A-7(a)(8)–(9); 15-20A-10(e);
      and

---

[9]  As explained above, *supra* note 1, Plaintiffs' operative complaint named as defendants
the former Attorney General of the State of Alabama, Luther Strange; the former Director of the
Alabama Department of Public Safety, John Richardson; and the former Secretary of ALEA,
Stan Stabler, in their official capacities.  Those officials' successors have been "automatically
substituted as a party."  Fed. R. Civ. P. 25(d).  (Doc. # 122.)

6.    Defendants Richardson and Stabler are liable in their individual capacities under 42 U.S.C. § 1983 because their use of the "CRIMINAL SEX OFFENDER" inscription violates Plaintiffs' clearly established constitutional rights.

Counts 1, 3, and 4 are substantially similar to claims in Plaintiffs' first amended complaint that survived the State's first motion to dismiss.[10]  (*See* Doc. # 39.) Counts 2, 5, and 6 were newly alleged in the second amended complaint. (Doc. # 81.)

## IV.  DISCUSSION

Defendants seek dismissal of the second amended complaint in its entirety. Each count of the complaint will be analyzed in turn to determine whether Plaintiffs have stated a cognizable claim.   More broadly, the court divides its analysis by the constitutional protection claimed by Plaintiffs.

## A.    Fourteenth Amendment Claims

The Due Process Clause of the Fourteenth Amendment protects against state action that "deprive[s] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  There are two sides to this constitutional promise, one procedural and one substantive.  *See Doe v. Moore*, 410 F.3d 1337, 1342 (11th Cir. 2005).  Procedural due process "guarantees that a state will not deprive a person of life, liberty, or property without some form of notice and

_____

[10] As will be discussed below, Count 3 differs slightly from its analogue in the first amended complaint.

opportunity to be heard." *Id.* (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004)). Substantive due process, on the other hand, "protects fundamental rights that are so 'implicit in the concept of ordered liberty' that 'neither liberty nor justice would exist if they were sacrificed.'" *Id.* (quoting *Palko v. Connecticut*, 302 U.S. 319, 325, 326 (1937)). The first count of Plaintiffs' complaint implicates substantive due process; the second and third counts challenge the constitutional sufficiency of ASORCNA's procedures.

### 1.    *Count I: Family Association*

The protection of substantive due process reaches its apogee in the domain of the family. *Lawrence v. Texas*, 539 U.S. 558, 574 (2003) ("[O]ur laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education."). In the touchstone case of *Moore v. City of East Cleveland*, the Supreme Court recognized a fundamental right to associate with extended family. 431 U.S. 494, 504–05 (1977). Owing to its fundamental nature, a state may only infringe on this right if it narrowly tailors the restriction to serve a compelling governmental interest. *Reno v. Flores*, 507 U.S. 292, 302 (1993).

The State argues that the residency restriction does not encroach on any fundamental right and that, alternatively, the restriction is narrowly tailored so as to survive judicial review. To this end, the State tries to resurrect three arguments

it made in its original motion to dismiss. These arguments, all of which were rejected (Doc. # 51, at 33–40), remain unconvincing and merit no further analysis. The State makes two additional arguments, but neither holds water.

First, the State alleges error in the court's "disregard[ ] [of] the role that sex offenders' 'transgressions' play in [the fundamental-right] analysis." (Doc. # 87, at 18.) After all, reasons the State, why else would the Eleventh Circuit in *Doe v. Moore* have spent so much time explaining that there is no fundamental right to be free of registration requirements? *See* 410 F.3d 1337.

To be sure, the Eleventh Circuit in *Moore* did hold that sex offenders enjoy no fundamental right to be free of registration requirements. *Id.* at 1344–45. In that case, the court heard a challenge to the Florida analogue of ASORCNA. The plaintiffs, a collection of sex offenders in that state, framed the law's registration requirement as violating generalized fundamental rights, including the right to family association. Looking to the statutory text, the Eleventh Circuit refocused the inquiry: Rather than the litany of generalized rights claimed by the plaintiffs, the court determined that the sole issue was "the right of a person, convicted of 'sexual offenses,' to refuse subsequent registration." *Id.* at 1344. *Moore*, in other words, did not deal with "the private realm of family life which the state cannot enter," *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); rather, it dealt with an alleged right of sex offenders to be unburdened by registration requirements.

Therefore, the court's holding did not limit sex offenders' right of family association. *See also Waldman v. Conway*, 871 F.3d 1283, 1292–93 (11th Cir. 2017) (same).

"[C]rafting a 'careful description of [Plaintiffs'] asserted right'" reveals the flaws in the State's reasoning.[11] *Moore*, 410 F.3d at 1343 (quoting *Flores*, 507 U.S. at 302). Plaintiffs claim that ASORCNA violates their specific right to family association; they do not claim a violation of the sort of generalized rights as alleged by the *Moore* plaintiffs. Plaintiffs' status as sex offenders does not receive "equal billing" in this analysis, as the State urges it should (Doc. # 87, at 18), because they seek only to assert their right to live with extended family—a right enshrined as fundamental by the Supreme Court in *City of East Cleveland*. There is no support in that case or its progeny for an "except-for-sex-offenders" rule, and the court declines to create such an exception out of whole cloth on a motion to dismiss.

Second, the State suggests that the court "overlooked" its argument that the burden on Plaintiffs' familial-association rights is only incidental to the State's

---

[11] Where a party "seek[s] recognition of a right neither mentioned in the Constitution nor encompassed within the reach of the Supreme Court's existing fundamental-right precedents," a two-step analysis requires the court carefully to describe the asserted right and then determine whether that right merits constitutional protection. *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1239 (11th Cir. 2004) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)). In this case, such an analysis is unnecessary because *East Cleveland* held fundamental the right to family association that Plaintiffs claim is infringed upon by ASORCNA. *See* Ala. Code § 15-20A-11(d) (prohibiting residence with minors outside of a narrow group of enumerated family members).

legitimate regulation of sex offenders. (Doc. # 87, at 19.) The State offers, as ASORCNA's saving grace, Plaintiffs' ability to enjoy "unlimited visits" with minor children and overnight stays with relatives above the age of majority. (Doc. # 87, at 19.) By virtue of these visits, the State argues that ASORCNA "does not 'slic[e] deeply into the family itself.'" (Doc. # 87, at 19 (quoting *City of East Cleveland*, 431 U.S. at 498 (plurality opinion)).)

But *City of East Cleveland* itself dooms this argument. The Supreme Court there heard a challenge to a city ordinance that prohibited the cohabitation of certain extended family members. Like ASORCNA, the ordinance neither separated nuclear families nor limited day visits by prohibited residents. *Compare* 431 U.S. at 496 n.2 *with* Ala. Code § 15-20A-11(d). Yet the Supreme Court, reasoning that the housing regulation "slic[ed] deeply into the family itself," struck down the ordinance. 431 U.S. at 498 (plurality opinion).

The State now uses *City of East Cleveland*'s language to bless the same sort of restricted family living arrangements the Supreme Court held unconstitutional. True, the Supreme Court in *City of East Cleveland* did not specifically discuss the plaintiff's "unlimited" ability to visit her "minor distant relatives" (Doc. # 87, at 19)—though the same was just as true for the plaintiff there as it is for the sex offenders here. But this is because the Court had no need to do so: It would be strange indeed if a law that infringed on the fundamental right to *live* with family

members could be saved by occasional—or even unlimited—day visits. Accordingly, the State's motion to dismiss Count 1 will be denied.

## 2.    *Count II: Irrebuttable Presumption*

Plaintiffs claim that ASORCNA conclusively determines that registrants pose a threat to society. Because it does so without giving registrants a chance to prove their non-dangerous nature, Plaintiffs argue that the law violates the Fourteenth Amendment's guarantee of due process of law. Specifically, Plaintiffs invoke the irrebuttable-presumption doctrine as articulated in *Vlandis v. Kline*, 412 U.S. 441 (1973).

At the doctrine's zenith, the Supreme Court struck down statutes that imposed a burden on a class of people without providing for some determination of individual merit or demerit. *Turner v. Dep't of Emp't Sec.*, 423 U.S. 44 (1975) (per curiam); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632 (1974); *Vlandis*, 412 U.S. 441. Over the years, the Court has walked the doctrine back in recognition of its potential for abuse. *See, e.g.*, *Weinberger v. Salfi*, 422 U.S. 749, 772 (1975) (explaining that the doctrine, if overextended, would turn "into a virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with the Fifth and Fourteenth Amendments to the Constitution"). But the judicial retreat "has not been wholesale," *Martin v. Houston*, 176 F. Supp. 3d 1286, 1305 (M.D. Ala. 2016), and the doctrine's

viability remains a topic of hot debate. *See* 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 17.6 (5th ed. 2017) (casting the doctrine as "a conceptually confused, if not dishonest, method of justifying independent judicial review of legislative classifications"). Thankfully, binding precedent from the Supreme Court and Eleventh Circuit obviates the need for a deep dive down the irrebuttable-presumption rabbit hole. *See Conn. Dep't of Pub. Safety v. Doe* (*Connecticut DPS*), 538 U.S. 1 (2003); *Moore*, 410 F.3d 1337.

In *Connecticut DPS*, the Supreme Court heard a challenge to Connecticut's sex offender registration law. 538 U.S. 1. Connecticut operated a sex offender registry much like Alabama's, under which the state publicly posted registrants' personal information. A convicted sex offender brought a challenge to the law, claiming that he was entitled to a pre-publication hearing to determine whether he posed a danger to the community. The trial and appellate courts both ruled that, by failing to provide for such a hearing, Connecticut's sex offender law violated the Due Process Clause. The Supreme Court reversed, explaining that the plaintiff was not entitled to a hearing because "the fact that [he] seeks to prove—that he is not currently dangerous—is of no consequence under Connecticut's [sex offender law]." *Id.* at 7. Rather, "the law's requirements turn on an offender's conviction alone—a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest." *Id.* As the Court put it, "Plaintiffs who assert a right to a

hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant under the statutory scheme." *Id.* at 8.

Two years later, the Eleventh Circuit read *Connecticut DPS* to preclude a procedural due process challenge to Florida's sex offender law. *Moore*, 410 F.3d at 1342, 1342 n.3. The plaintiffs in *Doe v. Moore* argued that, because Florida law required sex offenders to register regardless of their risk of re-offending, the law "creat[ed] an irrebuttable presumption of dangerousness" in violation of the Due Process Clause. *Id.* at 1342 n.3. The Eleventh Circuit rejected this argument as "foreclosed" by *Connecticut DPS*. *Id.* at 1342. Florida's sex offender law—just like Connecticut's—"d[id] not turn on the dangerousness of the offender, [but] merely the fact that he or she was convicted." *Id.* at 1342 n.3. Therefore, it did not offend due process to require registration without giving the offenders a chance to be heard.

So too here. Like its Connecticut and Florida analogues, ASORCNA requires registration of "every adult sex offender convicted of a sex offense." Ala. Code § 15-20A-3(a). In an effort to distinguish ASORCNA from the laws upheld in *Connecticut DPS* and *Doe v. Moore*, Plaintiffs point to the Act's legislative findings, arguing that Alabama's "[l]egislature explicitly cites (purported) dangerousness of all sex offenders as the *primary purpose* for all ASORCNA registration, restrictions, and requirements." (Doc. # 94, at 7 (emphasis added).)

But this argument conflates two distinct questions: Why did the legislature enact ASORCNA, and which Alabamians must comply with its requirements? Even if the Act's legislative findings reflected a presumption of danger, that presumption would be entirely collateral to the question of the Act's applicability. And because the question of applicability turns solely on conviction of a sex crime, the fact that Plaintiffs would seek to establish at a hearing—their non-dangerousness—plainly is not relevant to the statutory scheme. *See Connecticut DPS*, 538 U.S. at 8. Therefore, the State's motion to dismiss Count 2 is due to be granted.

### 3. *Count III: Void for Vagueness*

Plaintiffs claim that ASORCNA's residency exclusion zones, employment exclusion zones, and reporting requirements are void for vagueness. Vague laws trespass on the constitutional guarantee of due process. *See Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). A statutory provision is void for vagueness if it either (1) fails to provide people of ordinary intelligence with fair notice of what conduct it proscribes, or (2) is so unclear that it authorizes or encourages discriminatory enforcement. *United States v. Williams*, 553 U.S. 285, 304 (2008).

Prior to the enactment of Alabama Act No. 2017-414, the court found that Plaintiffs had stated a claim with respect to their vagueness challenges to the residency and employment restrictions. (Doc. # 51, at 21–28.) This decision rested on registrants' inability to determine whether a certain property was

ASORCNA compliant, and on the potential for disparate readings (and therefore disparate enforcement) of the Act's loosely defined provisions. Because the Amendment assuages these concerns of fair notice and discriminatory enforcement, Plaintiffs' vagueness challenge to ASORCNA's residency restrictions is due to be dismissed. However, because the Amendment does not sufficiently clarify the employment restrictions, Defendants' motion to dismiss is due to be denied as to that portion of Count 3.

Plaintiffs can no longer state a claim that ASORCNA fails to put registrants of ordinary intelligence on notice of its residential zones of exclusion. Plaintiffs point to the web of statutory cross-references that comprises the definition of "residence," claiming that their interpretation is a "baffling . . . impossible exercise." (Doc. # 114, at 6.) Baffling though it may be, the statutory complexity alone does not compel a finding of vagueness.[12] And to the extent the heightened standard of review for a vagueness challenge to criminal laws could make mere complexity into a fatal flaw, the preapproval provision ensures that registrants have fair notice of their exclusion from certain properties. *Cf. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (justifying the less-stringent test for vagueness of economic regulations by explaining that "[t]he

---

[12] If it did, the Internal Revenue Code would have been invalidated long ago. *See* 26 U.S.C. § 1 *et seq.*

regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry").

A law is less likely to fail for vagueness if it offers some procedure to clarify its reach. Where such a clarifying mechanism is available, even a clumsy, imprecisely drafted law can survive a vagueness challenge. *See, e.g.*, *id.*; *Arnett v. Kennedy*, 416 U.S. 134, 160 (1974) (rejecting vagueness challenge to a statute and highlighting availability of advisory opinions to offer guidance on statutory meaning); *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 580 (1973) ("It is also important in this respect that the Commission has established a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the law, at least insofar as the Commission itself is concerned."); *Mason v. Florida Bar*, 208 F.3d 952, 959 n.4 (11th Cir. 2000) ("[T]he availability of advisory opinions to gauge the application of [the challenged enactment] to specific situations bolsters its validity."). To be sure, preclearance is no panacea; "such a procedure lessens the amount of precision in definition required by due process," but it does not eliminate the requirement altogether. *Am. Dog Owners Ass'n v. Dade Cty.*, 728 F. Supp. 1533, 1540 (S.D. Fla. 1989). But courts broadly recognize that clarifying

mechanisms help solve problems of fair notice.  *E.g.*, *Hoffman Estates*, 455 U.S. at 498.

ASORCNA's new preapproval provision pushes the law across the constitutional line.  It offers registrants a resource to determine the boundaries of the zones of exclusion—and in so doing, it corrects one of the Act's glaring infirmities.  *See Doe v. Snyder*, 101 F. Supp. 3d 672, 684 (E.D. Mich. 2015) (finding that Michigan's sex offender registration law failed to put registrants on fair notice, in part because registrants lacked "the necessary data to precisely determine the geographic exclusion zones"), *rev'd on other grounds*, 834 F.3d 696 (6th Cir. 2016).  Moreover, the provision presents a total safe harbor:  Registrants who establish a residence at a preapproved address "shall not be found in violation [of ASORCNA] on the basis of" their residence there.  Ala. Code § 15-20A-11(g).  When coupled with ASORCNA's *mens rea* requirement, the preapproval provision suffices to give fair notice of the residential zones of exclusion.  *See Hill v. Colorado*, 530 U.S. 703, 732 (2000) (explaining that a statutory scienter requirement "ameliorated" concerns of facial vagueness).

Of course, fair notice is not the *sine qua non* of vagueness; rather, a law may still be unconstitutionally vague if it fails to provide guardrails against discriminatory enforcement.  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) ("[T]he more important aspect of vagueness doctrine 'is not actual notice, but the

other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'" (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974))). Prior to the Amendment, vague terms like "overnight" and "residence" presented the potential for such disparate enforcement. (*See* Doc. # 51, at 26.) These terms have now been defined, *see* Ala. Code § 15-20A-4(14), (21), and the safe harbor of preapproval helps protect against uneven application of the law. Accordingly, the Amendment has assuaged concerns of arbitrary enforcement, and Plaintiffs' vagueness challenge fails to state a claim as to the residency restriction.[13]

As for the employment restrictions, the Amendment has not prevented Plaintiffs from stating a claim. Despite its refined statutory definitions, *see* Ala. Code § 15-20A-4, ASORCNA still fails to put ordinary people on notice of the extent or effect of the employment exclusion zones. *See Johnson*, 135 S. Ct. at 2556. Without a safe-harbor provision[14] or a publicly available land-use database, registrants can only guess at whether their place of employment falls within a zone of exclusion. *See Snyder*, 101 F. Supp. 3d at 684 (striking down geographic

---

[13] In their operative complaint, Plaintiffs allege that law enforcement agencies have not applied the residency restrictions uniformly. Although the vagueness challenge will be dismissed in part, the dismissal will be without prejudice so that Plaintiffs can re-plead their claim if these uneven enforcement practices have persisted past the Amendment's effective date of August 1, 2017.

[14] The preapproval provision discussed above applies only to the residential zones of exclusion. *See* Ala. Code § 15-20A-11(g).

exclusion zones in part because "Michigan has not provided registrants with a map of exclusion zones or a list of all school properties"). Similarly, while the Amendment responds to multiple concerns highlighted by the court—registrants are no longer barred from applying to prohibited employers, and "employment" now excludes necessary travel, Ala. Code §§ 15-20A-13, 15-20A-4(5)—the employment restriction remains confoundingly opaque. For example, the law offers no guidance whatsoever for registrants whose employer is located in a compliant zone, but who have to perform service calls or other intermittent work in zones of exclusion. Defendants' motion to dismiss will be denied as to this portion of Count 3.

Finally, in their second amended complaint, Plaintiffs added a vagueness challenge to ASORCNA's reporting requirements, which Defendants have also moved to dismiss. That motion is due to be granted.

Plaintiffs challenge the provisions that require registrants to report to law enforcement in person following their release from jail and their establishment or termination of residency, employment, or school attendance. Ala. Code § 15-20A-10(a)–(c), (e); *see also id.* § 15-20A-7(a) (detailing the information to be reported). But not only does the statutory text give "people of ordinary intelligence a reasonable opportunity to understand" what they can and cannot do, it also offers the requisite guidelines for uniform enforcement. *United States v. Wayerski*, 624

F.3d 1342, 1347 (11th Cir. 2010) (quoting *Hill*, 530 U.S. at 732). These provisions clearly state what to report, where to report it, and when to report it. While some uncertainty remains regarding what it means to "establish[ ] a new residence," *see* Ala. Code § 15-20A-10(b), the examples offered in the definition of "reside" help give fair notice of the statute's requirements and prevent arbitrary enforcement, *id.* § 15-20A-4(20). "[B]ecause we are 'condemned to the use of words, we can never expect mathematical certainty from our language.'" *Hill*, 530 U.S. at 733 (alteration omitted) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). While the challenged language may be somewhat murky and uncertain, it is clear enough to pass constitutional muster.

The internet reporting requirements are also clear enough to provide registrants sufficient direction about what to report and how to report it. As recounted above, ASORCNA mandates that a sex offender report all email addresses or other "monikers used for self-identification in Internet communications"—other than those used "exclusively in connection with a lawful commercial transaction"—as well as "any and all Internet service providers used by the sex offender." Ala. Code § 15-20A-7(a)(9), (18). While it does not provide specific definitions of these terms, their ordinary meanings provide offenders with adequate notice.

Plaintiffs contend that the requirement is ambiguous, and as an example point to Doe 10's confusion about whether he needs to report his use of his girlfriend's computer or phone to access the internet. "He is also unsure whether he is required to report the phone number immediately each time he uses the phones or computer of other friends and family members." (Doc. # 81, at 39–40.) This confusion is in some ways understandable, because it derives from disbelief that the arm of ASORCNA can actually reach so far. Must a registrant who connects to the wifi at a coffee shop really report that within three days? What about when he accesses the internet from a computer terminal at the public library? When he borrows his neighbor's smartphone to check the weather?

Yet no matter how intrusive the statute is, the ordinary meaning of its commands are clear. An "Internet service provider" is "a company or other organization which provides access to the Internet and related services." "Internet Service Provider," *OED Online* (accessed December 1, 2017); *see also* "Internet Service Provider," *Black's Law Dictionary* (10th ed. 2014) (defining the term as "[a] business or other organization that offers Internet access, typically for a fee"). Thus, a registrant "uses," and therefore must immediately report, the services of the ISP when he or she uses offerings of the "company or other organization which provides access to the Internet." A "use" can be by someone other than a direct customer. Hence, as the State points out, Doe 10's worries constitute "rather clear-

cut violations of the reporting requirement." (Doc. # 87, at 22.) So, too, do the other hypotheticals listed above. Since the statutory provision at issue clearly proscribes some conduct in which Plaintiffs engage, they cannot complain of vagueness. *Alabama Educ. Ass'n v. State Superintendent of Educ.*, 746 F.3d 1135, 1139–40 (11th Cir. 2014).

Plaintiffs' contention that ASORCNA unlawfully vests law enforcement agencies with unbound discretion to determine whether a registrant must report "in person, electronically, or telephonically" likewise fails to state a claim. While "[a] statute can be impermissibly vague . . . if it authorizes or even encourages arbitrary and discriminatory enforcement," *Hill*, 530 U.S. at 732, vagueness challenges outside the First Amendment context are typically reviewed "only as applied in the instant case," *United States v. Hasner*, 340 F.3d 1261, 1269 (11th Cir. 2003). *But see Ala. Educ. Ass'n*, 746 F.3d at 1139 ("[I]f the enactment implicates no constitutionally protected conduct, the inquiry on a facial challenge is whether 'the enactment is impermissibly vague in all of its applications.'" (quoting *Vill. of Hoffman Estates*, 455 U.S. at 495)). Either way, Plaintiffs have neither plausibly alleged that they are suffering from arbitrary enforcement nor shown that the discretion left to law enforcement makes the statute vague always and everywhere. Plaintiffs have thus failed to state a claim that subsection (e)(1) is void for

vagueness, and Defendants' motion to dismiss will be granted as to Plaintiffs' vagueness challenge to Ala. Code § 15-20A-10(e).

**B.**     **First Amendment Claims**

As incorporated by the Fourteenth Amendment, *see Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 707 (1931), the First Amendment prohibits state laws "abridging the freedom of speech, or of the press."   U.S. Const. amend. I. Plaintiffs allege that the branded-identification and internet reporting requirements violate this bedrock principle of democratic governance.   Each of their First Amendment challenges will be addressed in turn.

**1.**     ***Count IV: Compelled Speech***

The First Amendment's promise of freedom of speech embraces not only the right to speak, but also the right *not* to speak.  *Wooley v. Maynard*, 430 U.S. 705, 713 (1977).  At issue in *Wooley* was a New Hampshire law that required all drivers to display automobile tags bearing the state's motto.  *Id.* at 707.  Striking down the law, the Supreme Court observed that the state treads into unconstitutional territory where it requires its citizens to display an ideological message "for the express purpose that it be observed and read by the public."  *Id.* at 713.  ASORCNA's branded-identification requirements, read holistically, admit of such a purpose. Accordingly, Defendants' motion to dismiss is due to be denied as to Count 4.

Urging dismissal, Defendants, again, re-allege arguments from their initial motion to dismiss; the court, again, rejects them.  Only two aspects of this second motion warrant any further discussion: the Northern District of California's unpublished decision in *Doe v. Kerry*, No. 16-CV-654-PJH, 2016 WL 5339804 (N.D. Cal. Sept. 23, 2016), and the Amendment's clarification that registrants need only relinquish non-branded identification that was issued to them by "state motor vehicle agenc[ies]," Ala. Code § 15-20A-18(d).

The district court in *Doe v. Kerry* heard a challenge to the International Megan's Law, 34 U.S.C. § 21501 *et seq.*, which requires that passports issued to sex offenders convicted of a sex offense against a minor display a unique identifier indicating the bearer's conviction.  2016 WL 5339804, at *6.  The sex-offender plaintiffs contended that the branding of their passports constituted illegally compelled speech.  The court dismissed their claim for lack of subject matter jurisdiction because the Secretary of State had not yet implemented the "unique identifier" requirement; thus, the plaintiffs lacked standing to challenge a law not yet ripe for adjudication.  *Id.* at *12, *15.  Then the court went on to "briefly address[ ]" the plaintiffs' compelled speech claim, and found that Rule 12(b)(6) dismissal would also be appropriate since the passport identifier—once implemented—would constitute speech by the government, not by the individual passport holder.  *Id.* at *16–18.  The court distinguished the case from *Wooley*

because "[f]actual information regarding a criminal conviction is not equivalent to an ideological message on a license plate or a ballot." *Id.* at *18.

The analysis in *Doe v. Kerry* does not persuade as to the facts of this case. For one, the Supreme Court long ago rejected the distinction between ideological and factual messages in the compelled-speech arena. *Riley v. Nat'l Fed. of the Blind*, 487 U.S. 781, 797–98 (1988) ("[C]ases cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech.").

For another, simply because a speech act is by the government does not mean that private speech interests cannot be implicated. Otherwise, the Supreme Court's holding in *Wooley* would make no sense given the Court's later clarification that license plate designs "are government speech." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 139 S. Ct. 2239, 2252 (2015). Instead, the distinction between government speech and government-compelled speech can be two sides of the same pancake. As the Supreme Court explained in the context of a challenge by a private party seeking to require Texas to offer a specific license plate design, "just as Texas cannot require [the Sons of Confederate Veterans] to convey the State's ideological message, [the Sons] cannot force Texas to include a Confederate battle flag on its specialty license plates." *Id.* at 2253. So here: "The

[D]efendants' government-speech argument misses the mark . . . [because] [r]egardless of whether the [state's branding requirement] is the government's message, private First Amendment rights can still be significantly implicated." *Cressman v. Thompson*, 798 F.3d 938, 948 (10th Cir. 2015).

What matters instead is whether the government's message is "readily associated" with the private person compelled to propound it. *Wooley*, 430 U.S. at 717 n.15. And here, there are allegations to suggest it is. As the court previously noted, "a minute portion of the Alabama population carries the branded sex offender identification card," and "the information displayed on an identification card, the purpose of which is to facilitate the recognition of an individual based on his unique characteristics, is undoubtedly associated with the card's bearer." (Doc. # 51, at 46 n.11.)

This "ready association" also serves to distinguish a branded passport from a branded driver's license. Passports are a handshake between governments—a document provided by one government so that a second government will grant entry to its citizens—and are not commonly used in the interpersonal context. As the plaintiffs allege in their amended complaint, however, driver's licenses are frequently used as primary identification, presented to cashiers and tellers at banks, restaurants, gas stations, grocery stores, and movie theaters. (Doc. # 81, at 33–36);

*see also McGuire*, 83. F Supp. 3d at 1253–54 (chronicling ways registrants are affected by having to use branded identification in their everyday lives).[15]

Similarly, ASORCNA's newly clarified relinquishment provision does not save the statute from Plaintiffs' challenge. *See* Ala. Code § 15-20A-18(d). Even though registrants are no longer required to relinquish *all* identification not bearing the "CRIMINAL SEX OFFENDER" inscription, they are still required to give up driver's licenses that do not exhibit the State's chosen message. Despite the narrowed reach of the relinquishment provision, the branded-identification requirement still mandates that registrants' driver's licenses display the inscription. Without further fact-finding, it is impossible at this stage to determine whether the State's modification constitutes the narrow tailoring required to pass constitutional muster.[16] Thus, because the plaintiffs have alleged a plausible compelled-speech claim, a Rule 12(b)(6) dismissal is inappropriate.

---

[15] Though in *McGuire* the court included these details as part of its analysis of whether the branding requirement constituted unconstitutional public shaming—which, the court concluded, it did not—the court noted that "there may be other constitutional concerns with requiring registrants to carry a branded license." 83 F. Supp. 3d at 1254.

[16] For instance, instead of requiring the license to bear the inscription "CRIMINAL SEX OFFENDER," some states have instituted a more discrete marking that would indicate the classification to a police officer but not to the general public. *See, e.g.*, Del. Code Ann. Tit. 21, § 2718(e) (2015) (using the letter "Y" to denote sex offender status); *see also* Fla. Stat. § 322.141(3) (2016) (requiring a code to be printed for less serious offenders, but using the words "sexual predator" for the most serious offenders). These less-intrusive identifiers would still accord with the State's stated purpose in requiring the marking: "enable[ing] law enforcement officers to identify the licensee as a sex offender." Ala. Code § 15-20A-18(b).

## 2.    *Count V: Overbreadth*

Plaintiffs contend that the overbreadth of ASORCNA's internet reporting requirements unconstitutionally burdens their First Amendment rights.  Analysis of Count 5 entails a three-part inquiry:  First, do the internet reporting requirements implicate the First Amendment?  Second, if so, what level of scrutiny should be applied?  And third, have Plaintiffs stated a claim that the challenged provisions fail under the proper standard of review?

### a.    **The challenged internet reporting requirements burden First Amendment activities.**

ASORCNA requires registrants to report "[a]ny email addresses or instant message address or identifiers used, including any designations or monikers used for self-identification in Internet communications or postings other than those used exclusively in connection with a lawful commercial transaction."  Ala. Code § 15-20A-7(a)(9).  Registrants must also provide a list of "any and all Internet service providers used by the sex offender."  *Id.* § 15-20A-7(a)(18).  Once this information

---

Similarly, it is significant that the State has chosen to brand registrant's driver's licenses rather than some supplemental form of identification.  As discussed above, as the *de facto* default form of government ID, driver's licenses are required for entry into or to obtain service from a bevy of institutions—including this courthouse.  *See McGuire*, 83 F. Supp. 3d at 1253–54. Alternate identification, like school or employer IDs, often lacks necessary identifying information or assurances of accuracy.  (No bank teller would cash a check on the bearer's presentation of a library card.)  And passports are a poor replacement, as they are expensive to obtain, cumbersome in size, and highly sought after on the black market.  *See Stolen Passports: A Terrorist's First Class Ticket; Hearing Before the H. Comm. on Int'l Relations*, 108th Cong. 1 (2004) (statement of Rep. Henry J. Hyde, Chairman, H. Comm. on Int'l Relations) ("A stolen passport may be worth more than its weight in gold."); *accord* Rey Koslowski, *Smart Borders, Virtual Borders, or No Borders: Homeland Security Choices for the United States and Canada*, 11 L. & Bus. Rev. Am. 527, 536 (2005) (recognizing the demand for stolen passports).

has been turned over to the government, it "may only be disclosed pursuant to federal law or to law enforcement for the purpose of administering, implementing, or enforcing [ASORCNA] or to prevent or investigate a crime by the sex offender based on an articulable basis for suspicion." *Id.* § 15-20A-42(h).

Because the Act "requir[es] a narrow class of individuals to notify the government within [a short time] of engaging in online communication with a new identifier," it places a burden on "those individuals' ability and willingness to speak on the Internet." *Doe v. Harris*, 772 F.3d 563, 572 (9th Cir. 2014); *see Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965) (explaining that conditioning speech on an affirmative act of notifying the government of some condition deters expressive activity). It is no defense that the burden falls principally on online speech, *Reno v. ACLU*, 521 U.S. 844, 870 (1997), or that the Act burdens rather than bans speech, *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565–66 (2011) ("[T]he distinction between laws burdening and laws banning speech is but a matter of degree." (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000))).

Moreover, as discussed above, the statute's clarity in its reporting requirements simply serves to emphasize just how far it extends. As the State acknowledges, Doe 10's example of temporarily using his girlfriend's computer for internet research without reporting it constitutes a "rather clear-cut violation[ ]

of the reporting requirement." (Doc. # 87, at 22). So, too, would much, much else: Every time a registrant connects to a new wifi spot at a McDonald's; every time he uses a computer terminal at a public library; every time he borrows a friend's smartphone to read the news online. It is hard to imagine how such requirements could not burden registrants' First Amendment right to free speech.

Nor does ASORCNA stop there. It also requires that registrants immediately report "[a]ny email addresses or instant message address or identifiers used, including any designations or monikers used for self-identification in Internet *communications* or *postings*." Ala. Code § 15-20A-7(a)(9) (emphasis added). By its very terms the statute regulates registrants' speech. Subsection (a)(9)'s new carve-out for identifiers "used exclusively in connection with a lawful commercial transaction" adds little, if any, protection—and to the extent it privileges commercially related speech over other subjects of expression, the Amendment transforms the internet reporting requirement into a content-based restriction, the boogeyman of First Amendment jurisprudence. *See Playboy*, 529 U.S. at 813. It is clear that the challenged provisions burden registrants' First Amendment rights. *See Harris*, 772 F.3d at 573 ("[J]ust as the Act burdens sending child pornography and soliciting sex with minors, it also burdens blogging about political topics and posting comments to online news articles.").

### b. Strict scrutiny applies.

Once a burden on speech has been found, the inquiry turns to the standard under which that burden will be analyzed. In the First Amendment context, the level of scrutiny hinges on content neutrality. *Citizens United v. F.E.C.*, 558 U.S. 310, 340 (2010). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992)). Under strict scrutiny, the challenged law will be struck down unless it presents the least restrictive means of serving the government's stated interest. *Playboy*, 529 U.S. at 813 (citing *Reno*, 521 U.S. at 874). On the other hand, if the law regulates speech without reference to its content, it receives "an intermediate level of scrutiny." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994).

Because ASORCNA's reporting requirement turns on the topic of the speech at issue—*i.e.*, whether a registrant is using an internet identifier "exclusively in connection with a lawful commercial transaction," Ala. Code § 15-20A-7(a)(9)—it qualifies as a content-based restriction. *Reed*, 135 S. Ct. at 2227. And because the "law is content based on its face," it is "subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus

toward the ideas contained' in the regulated speech." *Id.* at 2228 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). "In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.*

### c. Plaintiffs have stated a claim that the internet reporting requirements cannot withstand strict scrutiny.

The State has a tough row to hoe in support of dismissal of Plaintiffs' challenge to the internet reporting requirements. "It is rare that a regulation restricting speech because of its content will ever be permissible." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011). At least as viewed at the motion to dismiss stage, ASORCNA is not one of those regulations.

It is undisputed that the State's interest is a compelling one: protecting the vulnerable from predatory sex offenders. *See* Ala. Code § 15-20A-2(4) ("The Legislature declares that its intent . . . is to assist law enforcement in carrying out their duties and, most importantly, to protect the public, especially children."). This interest cannot be gainsaid. *E.g.*, *Doe v. Shurtleff*, 628 F.3d 1217, 1223 (10th Cir. 2010) ("We have no doubt that the State . . . has a compelling interest in investigating kidnapping and sex-related crimes."). And, importantly, this interest does not stem from the suppression of free expression. *See United States v. O'Brien*, 391 U.S. 367, 377 (1968) (rejecting governmental interests in the suppression of free speech as sufficient to justify a restriction on speech).

But the hurdle for the State is proving that Alabama narrowly tailored ASORCNA's speech restrictions to choose the least restrictive means of regulating speech. *See Playboy*, 529 U.S. at 813. While the State has shown that ASORCNA puts only a minimal restriction on Plaintiffs' First Amendment right to anonymous speech—standing alone, registrants' knowledge that their speech may be monitored does not unconstitutionally burden their speech, *see Laird v. Tatum*, 408 U.S. 1, 11 (1972), and ASORCNA requires that registrants' internet activity not be disclosed to the public, Ala. Code § 15-20A-8(b)—this is not enough to prove ASORCNA's narrow tailoring. Rather, the law's requirement of an affirmative act as a condition of First Amendment activity, the wide discretion it leaves to law enforcement, the broadness of its tailoring, and its threat of serious criminal penalties combine to create a chilling effect that demonstrates the lack of a proper fit.

First, under ASORCNA, "anytime registrants want to communicate with a new identifier, they must assess whether the message they intend to communicate is worth the hassle of" immediately reporting the change to law enforcement. *Harris*, 772 F.3d at 582. This undoubtedly chills speech and deters expressive activity. *See Lamont*, 381 U.S. at 307. And since some registrants will be forced to report in person if "required by the local law enforcement agency," Ala.

Code § 15-20A-10(e)(1), the requirement "is not only psychologically chilling, but physically inconvenient," *Harris*, 772 F.3d at 582.

Second, the discretion left to local law enforcement is troubling. While insufficient for Plaintiffs to succeed in their Fourteenth Amendment void-for-vagueness challenge, the uncertainty of how registrants must report adds to the chilling effect.[17] *See Am. Booksellers v. Webb*, 919 F.2d 1493, 1499–500 (11th Cir. 1990) (First Amendment protects against both "direct *and* indirect burdens on speech" (emphasis added)). For this reason, objective, nondiscretionary criteria for implementation are especially important when First Amendment rights are in play. *Compare, e.g.*, *City of Littlejohn v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 783 (2004) (upholding "adult business" licensing scheme because it "applie[d] reasonably objective, nondiscretionary criteria") *with Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131–34 (1992) (sustaining a First Amendment challenge to county ordinance allowing administrator to assess a fee for assemblies, where "[n]othing

---

[17]     To be sure, there is some theoretical tension to the conclusion that Plaintiffs' Fourteenth Amendment vagueness challenge fails, but their First Amendment overbreadth claim succeeds, when the latter finding is based in part on the law's vagueness and broad grant of discretion. After all, the First Amendment only applies to the State because the Due Process Clause of the Fourteenth Amendment incorporates those protections. But the separate analysis is warranted: There is a difference between a "pure" vagueness challenge under the Due Process Clause, which is analyzed above, and a First Amendment-as-incorporated-by-the-Fourteenth Amendment overbreadth/vagueness challenge, which is addressed here. *See Alabama Educ. Ass'n*, 746 F.3d at 1138.

in the law or its application prevent[ed] the official from encouraging some views and discouraging others through the arbitrary application of fees").

Yet because ASORCNA leaves it up to individual law enforcement agencies to develop their own requirements on how an offender must report, there is no objective limiting principle to prevent arbitrary or discriminatory enforcement. The sheriff of Montgomery County could decide that sex offenders must report in person each time they create a new online identifier, while the sheriff of neighboring Lowndes County could conclude that offenders are free to report such changes telephonically. Indeed, nothing in subsection (e)(1) would prevent local police officers from requiring one registrant to report telephonically and another to report in person. In such a case, it would not be unreasonable for registrants to fear that engaging in online discussions critical of law enforcement or ASORCNA could contribute to different treatment. This level of discretion is thus in tension with the "stringent protection of First Amendment rights" guaranteed by the Constitution. *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983); *cf. Bell v. City of Winter Park*, 745 F.3d 1318, 1324 (11th Cir. 2014) ("A grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional." (quoting *Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1310 (11th Cir. 2003) (en banc))).

Third, the attempt at narrow tailoring in the form of excepting from the reporting requirements online communications "used exclusively in connection with a lawful commercial transaction," Ala. Code § 15-20A-7(a)(9), is, at most, a wash.  On the one hand, the carve-out seems like a good faith effort by the State to narrow the restriction to communications most likely to be problematic, and it seems reasonable to assume that communications related to lawful commercial transactions do not belong in this category.  *Cf. White v. Baker*, 696 F. Supp. 2d 1289, 1309 (N.D. Ga. 2010) ("A regulatory scheme designed to further the state's legitimate interest in protection children from communication enticing them into illegal sexual activity should consider how and where on the internet such communication occurs.").  On the other hand, it is troubling that the law's tailoring takes the form of elevating commercial speech over speech closer to the core of First Amendment protection, and that the State does so with no explanation of why less restrictive means cannot be used to serve the same interest.  As the Ninth Circuit pointed out when striking down California's version of ASORCNA, if "a sex offender establishes a username on a news outlet's website for purposes of posting comments to news articles, it is hard to imagine how speedily reporting that identifier will serve the government's interests."  *Harris*, 772 F.3d at 582.

Fourth, it is difficult to escape the underlying fact that slip-ups by noncompliant registrants can result in felony convictions under ASORCNA.  "The

severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno*, 521 U.S. at 872. Because it chills such a wide swath of protected speech under penalty of a felony, ASORCNA is not narrowly tailored, and does not present the least restrictive means of regulating speech. *See Playboy*, 529 U.S. at 813. Plaintiffs have thus stated a claim in their challenge to the internet reporting requirements.

> **d. Even applying intermediate-scrutiny, Plaintiffs have stated a claim that the Act violates the First Amendment.**

If the lawful-commercial-transactions exception were not grounds for finding the internet reporting requirement to be a content-based speech restriction—for instance, if the exception applied to all paid internet use—the challenged provisions would be reviewed under intermediate scrutiny. Applying this standard of review, the internet reporting requirement would pass First Amendment muster if it "furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner Broad.*, 512 U.S. at 662 (quoting *O'Brien*, 391 U.S. at 377). Unlike strict scrutiny, intermediate scrutiny does not require the use of the least-restrictive means of regulation. *Id.* As explained above, the State has a sufficiently weighty interest

supporting ASORCNA's speech restrictions. But because the Act is not narrowly tailored, Defendants' motion to dismiss is due to be denied.

Before discussing the cut of ASORCNA's cloth, some clarification of the narrow-tailoring standard is in order. The State argues that the intermediate-scrutiny analysis sails past the narrowly tailored prong "so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." (Doc. # 87, at 10 (quoting *Shurtleff*, 628 F.3d at 1224 n.5 (in turn quoting *Turner Broad.*, 512 U.S. at 662)).) This would be a jarringly deferential standard of review. A complete ban on registrants' online speech, for example, counterintuitively could be "narrowly tailored" because it would better protect children than would the existing ASORCNA scheme. But when returned to its original context in *Turner Broadcasting*, this quote reveals the narrowly tailored prong to be more demanding than the State thinks it is.

The Supreme Court in *Turner Broadcasting* dedicated a full paragraph to setting out the intermediate-scrutiny standard of review.[18] 512 U.S. at 662. By

---

[18] The Supreme Court explained intermediate scrutiny as follows:

Under *O'Brien*, a content-neutral regulation will be sustained if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." [367 U.S.] at 377. To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests. "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that

plucking one sentence from this paragraph-length explainer, the State invites the court to erroneously apply a more forgiving standard under the guise of intermediate scrutiny. A straightforward reading of *Turner Broadcasting* shows that the narrow-tailoring prong protects against speech restrictions that cut too deeply into protected speech, even if the overly broad sweep of that restriction makes its promotion of governmental interests more effective.[19] *Id.*

Here, Plaintiffs have shown that ASORCNA "undoubtedly chills First Amendment [a]ctivity." *Harris*, 772 F.3d at 579. For the same reasons that Plaintiffs have stated a claim under strict scrutiny, Plaintiffs have also plausibly alleged that the internet reporting requirements "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* (quoting *Ward*, 491 U.S. at 799) (holding that California's sex-offender reporting

---

would be achieved less effectively absent the regulation.'" *Ward* [*v. Rock Against Racism*, 491 U.S. 781, 799 (1989)] (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). Narrow tailoring in this context requires, in other words, that the means chosen do not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799.

*Turner Broad.*, 512 U.S. at 662.

[19] *Turner Broadcasting*'s supporting precedent echoes this conclusion. The "less effectively absent the regulation" language cited by the State comes from *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). The *Ward* Court followed that sentence with this explanation: "To be sure, this standard does not mean that a [restriction on speech] may burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* (This sentence made it into *Turner Broadcasting* as well. *See* 512 U.S. at 662.) *Ward* can be distinguished from the instant case—it dealt with a noise regulation and its analysis proceeded under the time, place, or manner rubric for speech restrictions—but its analysis of a content-neutral restriction of speech hinged on the same intermediate-scrutiny standard the court applies today. Therefore, *Ward*'s expression of the standard guides this analysis.

requirements failed intermediate scrutiny review). Therefore, Defendants' motion to dismiss is due to be denied.

### 3.     *Count VI: Individual-Capacity Claim*

In the final count of their complaint, Plaintiffs seek to hold Defendants Richardson and Stabler liable in their individual capacities under 42 U.S.C. § 1983 for their implementation of the branded-identification requirement. (In this section of the opinion, "Defendants" will refer only to Messrs. Richardson and Stabler.) Defendants moved to dismiss this claim on the basis of their qualified immunity. Because Plaintiffs have failed to clear the high bar of defeating this defense, the motion is due to be granted.

Under the doctrine of qualified immunity, "courts may not award damages against a government official in his personal capacity unless 'the official violated a statutory or constitutional right,' and 'the right was clearly established at the time of the challenged conduct.'" *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011)). This deferential standard requires more than mere proof that the official violated the complainant's rights. Rather, the contours of the right in question "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Snider v. Jefferson State Cmty. Coll.*, 344 F.3d

1325, 1328 (11th Cir. 2003) ("[I]n light of preexisting law, the unlawfulness must be apparent: plain, clear, obvious.").  Although a prior court ruling is not necessary to clearly establish a right, "the government official's act [must be] so obviously wrong . . . that only a plainly incompetent official or one who was knowingly violating the law would have committed the act."  *Snider*, 344 F.3d at 1328.

To determine whether a right has been clearly established, the court consults case law from the U.S. Supreme Court, the Eleventh Circuit, and the Supreme Court of Alabama.  *See id.*  The burden of defeating qualified immunity falls on Plaintiffs.  *See id.* at 1327 (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).

Defendants' motion to dismiss is due to be granted because Plaintiffs have failed to prove that Defendants violated a clearly established right.  It is not enough that Plaintiffs have stated a claim that their constitutional rights were violated, *see supra* Part IV.B.1; this alone does not clearly establish the right at issue.  Similarly, Plaintiffs cite cases for the proposition that it is clearly established that the First Amendment protects against compelled speech, but their precedent presents too tenuous an analogy to the instant case.  *Cf. W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004). "[T]he right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear

to a reasonable official." *Reichle v. Howards*, 566 U.S. 658, 665 (2012).[20] Brought into proper focus, the right at issue here is not the general protection against compelled speech, but the specific right to be free from compelled speech on a driver's license. *See id.* (reframing the inquiry from "the general right to be free from retaliation for one's speech" to "the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause").

The dispositive question, then, is this: Could Defendants reasonably have believed, at the time of their implementation of the branded-identification requirement, that the State could compel speech on registrants' driver's licenses? The court concludes that this is the sort of "open legal question[ ]" about which "government officials [have] breathing room to make reasonable but mistaken judgments." *Lane*, 134 S. Ct. at 2381 (quoting *Al-Kidd*, 563 U.S. at 743). Dicta in *Wooley v. Maynard* could be construed, if loosely, to justify Defendants' actions. 430 U.S. at 717 n.15 (distinguishing currency from license plates in that "[c]urrency is generally carried in a purse or pocket and need not be displayed to the public"). Plaintiffs have not identified any relevant case law that would put Defendants on notice that they were treading on constitutionally suspect ground, and the court's own research similarly has come up empty. Therefore, Plaintiffs

---

[20] Although *Reichle* was a *Bivens* action, not a § 1983 claim like this case, "the qualified immunity analysis is identical under either cause of action." *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

have failed to show that the right in question was clearly established, and as a result they have failed to state a claim as to Count 6.[21]

## V. CONCLUSION

Accordingly, it is ORDERED that Defendants' motion to dismiss (Doc. # 87) is GRANTED in part and DENIED in part. It is further ORDERED as follows:

1.      Defendants' motion to dismiss is DENIED as to Count 1.

2.      Defendants' motion to dismiss is GRANTED as to Count 2. Count 2 is DISMISSED without prejudice.

3.      Defendants' motion to dismiss is GRANTED in part and DENIED in part as to Count 3. The motion to dismiss is GRANTED as to Plaintiffs' claim that the residency restriction is unconstitutionally vague, Ala. Code § 15-20A-11(a)–(e), (g). The motion is also GRANTED as to Plaintiffs' vagueness challenge to the residency, employment, school, and internet reporting requirements, *id.* §§ 15-20A-7(a)(5)–(9), (18), 15-20A-10(a)–(c), (e). These portions of Count 3 are DISMISSED without prejudice. The motion is DENIED as to the claim that the employment restriction is unconstitutionally vague, *id.* § 15-20A-13(b), (d), (f).

---

[21] To be sure, the court has acknowledged the apparently malicious intent behind the branding decision. (Doc. # 51, at 46 ("Outside of allowing law enforcement to readily identify a sex offender's registrant status, ASORCNA's identification requirements appear to serve no other purpose than to humiliate offenders who have already atoned for their crimes.").) But Defendants must be more than malicious before individual-capacity liability attaches. Because Plaintiffs have not shown a violation of clearly established rights, Count 6 is due to be dismissed.

4.      Defendants' motion to dismiss is DENIED as to Count 4.

5.      Defendants' motion to dismiss is DENIED as to Count 5.

6.      Defendants' motion to dismiss is GRANTED as to Count 6.  Count 6 is DISMISSED without prejudice.

7.      Plaintiffs' Motion for Leave to File Third Amended Complaint (Doc. # 118) and their Amended Motion for Leave to File Third Amended Complaint (Doc. # 119) are DENIED at this time without prejudice.

DONE this 14th day of March, 2018.

/s/ W. Keith Watkins
_____
CHIEF UNITED STATES DISTRICT JUDGE
