UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHN DOE #1; JOHN DOE #3;
JOHN DOE #7; JOHN DOE #9; and,
JOHN DOE #10;

     *Plaintiffs*,

     v.

STEVEN T. MARSHALL,
Attorney General of the State of
Alabama in his official capacity;

HAL TAYLOR, Secretary of the Alabama Law
Enforcement Agency, in his official capacity;
and,

CHARLES WARD, Director of the Alabama
Department of Public Safety, in his official
capacity

     *Defendants*.

No. 2:15-cv-606-WKW

**DEFENDANTS' BRIEF IN SUPPORT OF
MOTION FOR JUDGMENT ON THE PLEADINGS,
OR, IN THE ALTERNATIVE,
MOTION FOR SUMMARY JUDGMENT**

Steven T. Marshall
  *Attorney General*

James R. Houts (ASB-1321-T77J)
  *Deputy Attorney General*

Brad A. Chynoweth (ASB-0030-S63K)
Winfield J. Sinclair  (ASB-1750-S81W)
  *Assistant Attorneys General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
(334) 242-7300
(334) 353-8440 (fax)
jhouts@ago.state.al.us
bchynoweth@ago.state.al.us
wsinclair@ago.state.al.us

**Counsel for Defendants**

# TABLE OF CONTENTS

A. Statement of Facts ........................................................................................................ 3

   1. Facts Relevant to Does 3 and 7's As-Applied Familial Association Claim ................... 3

   2. Facts Relevant to Plaintiffs' Vagueness Claim on ASORCNA's Residence Restrictions ........... 10

   3. Facts Relevant to Plaintiffs' Vagueness Claim on ASORCNA's Employment Restrictions ........................................................................................................ 13

   4. Facts Relevant to Plaintiffs' Compelled Speech Claim ................................................. 14

   5. Facts Relevant to Defendants' Statute of Limitations Defense ..................................... 16

B. Argument ....................................................................................................................... 17

   1. Defendants Are Entitled to a Judgment on the Pleadings, or, in the Alternative, Summary Judgment in Their Favor on All Claims Based on the Statute of Limitations .............................. 17

   2. Defendants Are Entitled to Summary Judgment in Their Favor on Does 3 and 7's As-Applied Challenge to ASORCNA's Prohibition on Living with Minors ..................................... 23

      a. Does 3 and 7's Intimate Association Claims Are Time-Barred ............................... 23

      b. Defendants Are Entitled to Summary Judgment on Count I Because Does 3 and 7 Wish to Live in Family Members' Residences Located in Zones of Exclusion and Thus ASORCNA Does not Directly Burden Their Right to Intimate Association ................ 25

      c. Defendants Are Entitled to Judgment as a Matter of Law on ASORCNA's Minor Prohibition Rule Because It Does Not Burden a Fundamental Right and Satisfies Rational Basis Review ........................................................................................... 29

      d. Even if ASORCNA's Minor Prohibition Rule Burdened the Fundamental Right to Intimate Association, It Satisfies Strict Scrutiny ..................................................... 33

   3. Defendants Are Entitled to a Judgment on the Pleadings, or, in the Alternative, Entry of Summary Judgment in their Favor on Plaintiffs' Void-for-Vagueness Challenge to ASORCNA's Residence and Employment Restrictions ................................................ 34

      a. Plaintiffs Lack Standing to Challenge ASORCNA's Preapproval Process for Residence Locations and Employment Restrictions on Vagueness Grounds ............ 35

         i. Plaintiffs Lack Standing to Challenge ASORCNA's Residence Restrictions Based on the Preapproval Process on Vagueness Grounds ................................. 37

         ii. Plaintiffs Lack Standing to Challenge ASORCNA's Employment Restrictions on Vagueness Grounds ............................................................................................ 40

      b. Plaintiffs' Void-for-Vagueness Challenge Fails on the Merits ............................... 43

   4. Defendants Are Entitled to Judgment on the Pleadings, or, in the Alternative, Summary Judgment in Their Favor on Plaintiffs' Compelled Speech Claim ........................ 47

   5. Defendants Are Entitled to a Judgment as a Matter of Law on Plaintiffs' First Amendment Overbreadth Claim in Count V ................................................................... 51

C. Conclusion ..................................................................................................................... 54

Defendants Steven T. Marshall, Hal Taylor, and Charles Ward, file this brief in support of their motion for judgment on the pleadings, or, in the alternative, motion for summary judgment.

A. <u>Statement of Facts</u>

1.     <u>Facts Relevant to Does 3 and 7's As-Applied Familial Association Claim</u>

Doe 3 testified that he was in prison from 1968 to 2010. (Dep. of John Doe 3 [hereinafter "Doe 3 Dep."] at 8, 17). While in custody, Doe 3 pleaded guilty to first degree sodomy. (*Id.* at 11). Doe 3 was represented by counsel when he pleaded guilty. (*Id.* at 11-12). Doe 3 acknowledged that when he pleaded guilty he pleaded guilty to the underlying facts in the indictment and that he was not questioning the validity of his guilty plea. (*Id.*). Although Doe 3's recollection as to the date of his guilty plea was hazy, his state and county online sex offender registrations report that Doe 3 was convicted of first degree sodomy in 1985. (*Id.* at 10-11, Ex. 2; Dep. of John Doe 3's Niece [hereinafter "Doe 3 Niece Dep."], Ex. 3). Doe 3's state registration posted through the Alabama Law Enforcement Agency ("ALEA") states that the victim was a thirty-two-year-old male. (Doe 3 Dep., Ex. 2). Doe 3's county registration states the details of the offense as "[f]orced anal sex with 32 year old male." (Doe 3 Niece Dep., Ex. 3). Doe 3 became subject to the state's sex offender registration requirements when he was released from prison in 2010. (Doe 3 Dep. at 14).

Doe 3 testified that he currently resides at an ASORCNA-compliant address (Doe 3 Dep. at 12, 19). Doe 3 resides in a trailer in a trailer park and has a roommate who is also a registered sex offender. (*Id.* at 25-26). His roommate helps pay the rent. (*Id.* at 26). Doe 3 testified that he has lived at his current address for about a year and intends to reside there for the foreseeable future. (*Id.* at 14). Doe 3 testified that he has a girlfriend who resides in the same trailer park. (*Id.*

at 28-29). He testified that he has no desire to reside with his girlfriend but that, if he did, no requirement of ASORCNA prevents him from residing with her. (*Id.* at 29).

Doe 3 testified that he has a niece that lives approximately twenty miles from his current residence. (Doe 3 Dep. at 21). He testified that he recalled discussing living with his niece when he was released from prison in 2010. (*Id.* at 18). He testified that he recalled being unable to reside with his niece at that time both because she lived within 2,000 feet of a restricted property and because minors lived with her. (*Id.* at 18-19). Doe 3's niece confirmed in an affidavit submitted by plaintiffs that she discussed Doe 3 living with her shortly after his release in 2010 and discovered that he could not do so "because I [Doe 3's niece] lived too close to a school and because I have children in my home." (Doc. 140-1 ¶¶ 10-11). Doe 3 testified that he has not discussed living with his niece at her current address. (Doe 3 Dep. at 19). He testified that he has no need to live with her but would like the option of living with her "as a backup." (*Id.* at 19-20). Doe 3 also testified that nothing about ASORCNA prevented him from visiting his niece. (*Id.* at 21).[1]

Doe 3's niece testified as to her current address. (Doe 3 Niece Dep. at 6-7, 9). She testified that she has been living at this address since May 2018 and intends to remain at this address for the foreseeable future. (*Id.* at 9-10). Doe 3's niece has a thirteen-year-old son and five-month-old grandson who reside with her. (*Id.* at 13-15). Doe 3's niece testified that she is willing to allow Doe 3 to live with her. (*Id.* at 22). However, Doe 3's niece's residence is located in an ASORCNA zone of exclusion because it is within 2,000 feet of a childcare facility and a school. (Declaration of Jeremy Bolton [hereinafter "Bolton Decl."] ¶ 7; Doc. 140-1 ¶¶ 11, 16).

---

[1] Doe 3 also testified that he has a sister, but he is unable to reside with her as she lives in a retirement community and does not maintain her own residence. (Doe 3 Dep. at 21-22).

Doe 7 was in prison for armed robbery when he pleaded guilty to sodomy in the second degree in 1987. (Deposition of John Doe 7 [hereinafter "Doe 7 Dep."] at 11-12). Doe 7 was represented by counsel when he pleaded guilty to his sex crime. (*Id.* at 11). Doe 7 was released from prison in 2011 and became subject to the state's sex offender registration laws at that time. (*Id.* at 13-14); (*see also Id.*, Ex. 4 (ALEA sex offender registration form noting release date)).

Doe 7 resides in a "camper trailer" or "motor home." (Doe 7 Dep. at 15). He has resided at this location for approximately three or four years. (*Id.*). Through discovery requests, Doe 7 identified a sister and a niece as family members with whom he wished to reside. (Joint Stipulation). At his deposition, in addition to his niece and sister, Doe 7 identified a second sister with whom he stated he wished to live. (Doe 7 Dep. at 16-20). Although Doe 7 testified he wished to live with this sister, he did not know her address or phone number. (*Id.* at 19). The parties subsequently entered into a Joint Stipulation that stated "[d]ue to the late disclosure of [sister #2], the parties hereby jointly stipulate that Doe 7 shall not base any alleged infringement of his right to intimate association in Count I on any purported burden to his right to reside with [sister #2] upon documents submitted during the dispositive motion stage of the proceedings." (Joint Stipulation). Doe 7 testified that there were no other family members he wished to live with other than the sister disclosed in discovery, his niece, and the second sister disclosed in his deposition. (Doe 7 Dep. at 21).

Doe 7's sister testified as to her current residence. (Dep. of John Doe 7's Sister [hereinafter "Doe 7 Sister Dep."] at 7). She testified that she had been living at this address since 2003 and that she intended to reside there for the foreseeable future. (*Id.*). Doe 7's sister testified that no minors resided with her but that her granddaughter and great-granddaughter visited her

for overnight visits on weekends when they were in school and for several days of the week during summers when school was out. (*Id.* at 9-13).

Doe 7's sister testified that she first discussed Doe 7 coming to reside with her before he was released from custody in 2011. (Doe 7 Sister Dep. at 14; Doe 7 Dep. at 13-14). Doe 7's sister testified that at that time Doe 7 informed her that he could not reside with her as a sex offender due to the proximity of her residence to neighboring schools and the presence of minors in her home. (*Id.* at 14-15). Doe 7's sister testified that her residence is in a zone of exclusion because it is near two schools. (*Id.*).  In an affidavit submitted by plaintiffs, Doe 7's sister confirms that she communicated with Doe 7 about the residence restrictions that prevented Doe 7 from residing with her prior to his release from prison in 2011. (Doc. 140-2 ¶¶ 3-6).

Doe 7's niece testified in her deposition as to her current residence. (Dep. of John Doe 7's Niece [hereinafter "Doe 7 Niece Dep."] at 11). Doe 7's niece has been living at her current address for approximately ten years and intends to remain there for the foreseeable future. (*Id.* at 11-12). She testified that her daughter, a minor, resides with her. (*Id.* at 14-15). Doe 7's niece testified that she was willing to allow Doe 7 to reside with her. (*Id.* at 16). However, Doe 7's niece's residence is within a zone of exclusion under ASORCNA because it is within 2,000 feet of two childcare facilities. (Bolton Decl. ¶¶ 5-6, 8). In an affidavit submitted by plaintiffs, Doe 7's niece states that she understands Doe 7 cannot reside with her because her residence is in a zone of exclusion, in addition to her residence being excluded due to the presence of a minor. (Doc. 140-3 ¶¶ 6-9).

Dr. Nicholas Scurich has submitted a declaration in support of defendants regarding ASORCNA's restrictions on sex offenders residing with minors, as well as in support of other its other restrictions. (Decl. of Dr. Nicholas Scurich [hereinafter "Scurich Decl."]). Dr. Scurich is a

tenured associate professor at the University of California, Irvine, with a joint appointment in the Department of Criminology, Law and Society, and the Department of Psychology and Social Behavior. (*Id.* ¶ 1). Scurich's research focuses on the risk of violent and sexual recidivism, and he has authored over fifty peer-reviewed journal articles, book chapters, and law review articles. (*Id.* ¶3).

Dr. Scurich states four opinions relevant to ASORCNA's prohibition on sex offenders residing with minors in his declaration:

> **Opinion 1.** "Crossover offending" is the phenomenon of sexual offenders victimizing more than one 'type' of victim over the course of their criminal career (e.g., both child and adult victims, both male and female victims, both extra-familial and intra-familial victims).

> **Opinion 2.** The empirical literature suggests that approximately 1-in-3 sexual offenders will engage in crossover offending of some sort, and approximately 1-in-10 sexual offenders will have both adult and child victims.

> **Opinion 3.** The empirical literature also suggests that crossover offenders cannot be prospectively discerned from non-crossover offenders. In other words, it is not currently possible to assess whether a sexual offender is or is not a crossover offender.

> **Opinion 4.** The minor cohabitation rule is sensible in light of the prevalence, the relative risk, and the inability to prospectively discern crossover offenders.

(Scurich Decl. ¶ 6). Dr. Scurich conducted a meta-analysis of forty-one empirical studies that (1) were based on a sample of direct-contact sexual offenders; (2) reported sexual offense/recidivism information; (3) disaggregated the sample by at least one victim typology (e.g., child vs. adult victims); and (4) included sufficient statistical information to calculate the percentage of crossover offenders. (*Id.* ¶¶ 11-12).

The only three studies that provided the overall percentage of crossover offending across all three categories (i.e. child-adult, male-female, and extra- and intra-familial victims) reported that 25%, 63%, and 41% of their respective samples of sex offenders committed a crossover offense. (Scurich Decl. ¶ 13). These three studies collectively suggest that approximately one in three sexual offenders are crossover sexual offenders. (*Id.*). Scurich's analysis of all forty-one studies of crossover offending yielded a mean rate of victim-gender crossover offending of 16%, a mean rate of victim-age crossover offending of 11%, and a mean rate of victim-relationship crossover offending of 18%. (*Id.* ¶ 15). This metanalysis suggests that anywhere from approximately one in ten to one in five sexual offenders will engage in some specific type of crossover recidivism. (*Id.*).[2]

Dr. Scurich located only two studies published in peer-reviewed journals that attempted to predict whether an offender is a crossover offender. (Scurich Decl. ¶ 17). The first study found that the statistical model employed could not reliably discern crossover offenders from non-crossover offenders. (*Id.*). The second study found that having a major mental illness and a victim less than age six did predict victim-gender crossover, but did not examine victim-age or victim-relationship crossover. (*Id.*).

However, Scurich did find that the empirical literature supports the conclusion that crossover offenders pose a higher risk than non-crossover offenders. (Scurich Decl. ¶ 18). A study that applied the most widely used actuarial instrument for the purpose of assessing sexual

---

[2] Thirteen of the forty-one studies considered by Scurich restricted their samples to include only sexual offenders with multiple victims or convictions. (Scurich Decl. ¶ 16). These studies allow one to ascertain how common crossover offenders are among sexual offenders with multiple victims or convictions, while the other twenty-eight allow one to ascertain how common crossover offenders are among all sexual offenders, i.e., not just among a subset of sexual offenders with multiple victims. (*Id.*). However, when Scurich excluded the thirteen studies involving sexual offenders with multiple offenses, his results yielded nearly identical results with mean rates of 15.51% for gender crossover, 10.70% for age crossover, and 17.76% for relationship crossover. (*Id.*).

recidivism to samples of crossover and non-crossover offenders found that nearly 33% of crossover offenders were classified in the "high risk" category compared to 10% of non-crossover offenders. (*Id.* ¶¶ 18-19). Scurich stated that all studies of crossover offending find that crossover offenders score at least as high and typically higher on scientific risk assessment instruments than non-crossover offenders. (*Id.* ¶ 20). Scurich stated that he has never seen a study that finds that crossover offenders are deemed less risky than non-crossover offenders by an actuarial instrument. (*Id.*).

Dr. Scurich concluded that the empirical research suggests that crossover offenders are not uncommon, with approximately one in ten crossover offenders victimizing both adults and children, and up to one in five repeat offenders victimizing both a relative and a non-relative. (Scurich Decl. ¶ 21). Dr. Scurich opined that these empirical findings undermine the tacit implication in the Supplemental Second Amended Complaint [hereinafter "SSAC"] that because none of the plaintiffs victimized children or their relatives, *ipso facto* their risk of doing so is nil. (*Id.*).

Dr. Scurich opined that the suggestion that convicted sex offenders should be allowed to cohabitate with minors if an "individualized assessment" could prove they posed no risk to children was misguided. (Scurich Decl. ¶ 22). First, there is no risk assessment instrument that can prospectively discern crossover offenders from non-crossover offenders. (*Id.* ¶ 23). Second, the suggestion conflates descriptive and normative judgments by assuming a specific scientific estimate of risk *must* result in the *legal conclusion* that a sex offender "should" be allowed to cohabitate with a minor. (*Id.* ¶ 24).

Scurich elaborates at length on the distinction between descriptive and normative judgments, i.e., the distinction between an empirical prediction of the probability of a given

event occurring and the ethical or value judgment about whether such a probability is "great enough" or "risky enough" to justify a certain legal restraint. (Scurich Decl. ¶¶ 27-30). As a result, mental health professionals confine themselves to predictions of "risk assessment" rather than "predictions of dangerousness." (*Id.* ¶ 28). Dr. Scurich concluded:

> In summary, whether a given risk level is sufficient to justify a liberty deprivation (e.g., the minor cohabitation rule) is a normative (value) judgment that cannot be answered by an individualized risk assessment. This value judgment is the responsibility of a legally-empowered decision maker. With regard to ASORCNA, this decision maker is the Alabama legislature, which has decided to regulate sexual offenders based on their predicate offense and without regard to their risk of victimizing a specific type of victim. In other words, the fact that all sex offenders are subject to the minor cohabitation rule implies that any risk of crossover offending by offenders with adult victims is too great to bear. This decision cannot be invalidated by appealing to the use of individualized risk assessments. Just as the meteorologist cannot dictate what the appropriate weekend plans should be, nor can an individualized risk assessment dictate whether or not an individual should be subject to the minor cohabitation rule of ASORCNA.

(*Id.* ¶ 30).

2.    <u>Facts Relevant to Plaintiffs' Vagueness Claim on ASORCNA's Residence Restrictions</u>

Plaintiffs allege that the safe harbor provision in ASORCNA providing local law enforcement agencies shall grant written preapproval where requested for a sex offender to live at a given address is enforced arbitrarily due to unconstitutional vagueness in ASORCNA's residence restrictions. (Doc. 138 ¶¶ 286-319, 336-41). Plaintiffs' void for vagueness challenge is facial in nature. (*Id.* ¶¶ 336-41). Plaintiffs support this claim with allegations that a non-party sex offender, James Buycks ("Buycks"), was allowed to live within 2,000 feet of an elementary school despite this being a non-compliant address under ASORCNA. (*Id.* ¶¶ 303-09). In order to support their void-for-vagueness claim regarding ASORCNA's residence restrictions, plaintiffs

took the depositions of non-party local law enforcement officers Jeremy Jones and Jeremy Bolton of the City of Montgomery Police Department, Leigh Persky of the Montgomery County Sheriff Department, and Derrick Bone of the Chilton County Sheriff Department. (*See* Deps. of Jeremy Jones [hereinafter "Jones Dep."], Jeremy Bolton ["Bolton Dep."], Leigh Persky ["Persky Dep."], and Derrick Bone ["Bone Dep."]).

At Bolton's deposition, plaintiffs submitted an exhibit reflecting Buycks's current address. (Bolton Dep. at 56-57, Ex. D). Bolton testified he recognized Buycks as a sex offender within his jurisdiction but did not recall details of the registration reflected in the exhibits. (*Id.*). When Bolton was asked whether Buycks should have been allowed to live at the listed address based on plaintiffs' counsel's representation that the residence was within 2,000 feet of an elementary school, Bolton testified that Buycks should not have been allowed to live there based on this representation. (Bolton Dep. at 64). Bolton was asked whether it would have been a mistake for him to allow Buycks to reside within 2,000 feet from a school or daycare in the absence of a court order, and he responded, "Yes, sir." (*Id.* at 65).

Plaintiffs submitted a document in support of their motion for summary judgment that is a "Registered Sex Offender Change of Address Request" form submitted by Doe 3 to the Montgomery Police Department. (Doc. 148-15). The document, signed by Bolton, indicates that the address for which Doe 3 sought preapproval was disapproved because the home was approximately 850 feet from an elementary school. (*Id.*). The elementary school that made the address requested by Doe 3 noncompliant according to this document was also within 2,000 feet of Buycks's current address based on the documents presented at Bolton and Jones's depositions. (*See* Jones Dep. at 67-70).

Bolton was asked about sex offender registration information for two additional registrants based on information from ALEA's website. (Bolton Dep. at 45-52; 67-71, ). Bolton testified that he had no personal knowledge of either individual and that his testimony about whether their listed residences were compliant was based solely on the documents provided from ALEA's website. (*Id.* at 91-92). Bolton testified that, if either of the addresses listed on the documents was within 2,000 feet of a day care or school, they would not be compliant addresses under ASORCNA. (*Id.* at 92).

Jones was also asked about Buycks's registration information and, consistent with Bolton's testimony, Jones testified that Buycks should not have been allowed under ASORCNA to move to his current address as reflected in the documents presented at his deposition if the address was within 2,000 feet of an elementary school. (Jones Dep. at 64-70). Jones was similarly asked about non-party registrants based solely on registration documents taken from ALEA's website. (Jones Dep. at 50-56; 70-75). Jones was not personally familiar with the registrants on the ALEA website documents and, consistent with Bolton's testimony, testified that if the addresses on the documents were correct, they were not compliant with ASORCNA if they were within 2,000 feet of a school or childcare center. (*Id.*).

Finally, Persky was asked about Buycks. (Persky Dep. at 16-18). Persky testified that if, as represented by plaintiffs' counsel, Buycks moved from a previous grandfathered address to another address within 2,000 feet of an elementary school, then the Montgomery Police Department should not have allowed Buycks to move to that address. (*Id.* at 18-19).[3]

---

[3] The majority of these depositions involved questions about the officers' practice of conducting home compliance checks to determine whether registered sex offenders were at their registered addresses. Defendants will address the irrelevance of this testimony to the claims and defenses in this case in their opposition brief.

3.      <u>Facts Relevant to Plaintiffs' Vagueness Claim on ASORCNA's Employment Restrictions</u>

The allegations in the SSAC on ASORCNA's allegedly vague employment restrictions concern only John Does 3, 7, and 9. (Doc. 138 ¶ 218-36). Doe 3 testified repeatedly that he had never been employed since his release from prison in 2010. (Doe 3 Dep. at 14, 22-23, 41). Later, in response to questions from his counsel, Doe 3 testified that when he was first released from prison, he performed odd jobs for the owner of a trailer park in exchange for room and board. (*Id.* at 45-47). However, Doe 3 testified that he is currently unemployed, that he has been receiving Social Security disability income for approximately three years, and that this was his sole source of income. (*Id.* at 22-23). He testified that he receives disability income because he is physically unable to work and that he does not foresee his physical condition improving at his age to allow him to work again in the future. (*Id.* at 27-28, 61-63). The only testimony Doe 3 presented as to the impact of ASORCNA on his ability to obtain work was his driver license designating him as a criminal sex offender. (*Id.* at 23, 27, 52-53, 63-64).

Doe 7 testified that he was employed briefly at some point after his 2011 release from prison making car seats. (Doe 7 Dep. at 21-22). However, he testified that he is currently unemployed and that his sole source of income is Social Security disability income. (Doe 7 Dep. at 21-22). Doe 7 testified that he has been receiving disability income for approximately three years. (*Id.*). He testified that he receives this income because he is physically unable to work and that he does not foresee his physical condition improving at any point in the near future. (*Id.* at 23). As with Doe 3, the only testimony Doe 7 gave as to the impact of ASORCNA on his ability to obtain work was his driver license designating him as a criminal sex offender. (*Id.* at 22, 27).

The only other plaintiff who alleges ASORCNA adversely impacted his ability to obtain employment is Doe 9.[4] (Doc. 138 ¶ 218, 230-36). Doe 9 alleges he was convicted for sexual battery of an adult female in another state in 2005. (*Id.* ¶ 94). Doe 9 alleges he was paroled back to his home state of Alabama in 2006 and became subject to the state's sex offender registration laws at that time. (*Id.* ¶¶ 97-98). He alleges that from 2008 to 2012, he worked intermittently remodeling camp grounds. (*Id.* ¶ 205). He alleges that he was "underemployed or unemployed" from 2012 to 2014. (*Id.* ¶ 207).  Doe 9 alleges that he currently lives in a "rural town in the mountains of Alabama which contains vast land, but a compact area for schools, employers and residences." (*Id.* ¶ 232). He alleges that although he "knows several employers in his hometown who will gladly hire him, he remains employable but unemployed because of ASORCNA's employment zones of exclusion." (*Id.* ¶ 235).  Doe 9 also alleges that presenting his Alabama driver license designating him as a criminal sex offender has resulted in him being denied employment. (*Id.* ¶ 100).

4.    Facts Relevant to Plaintiffs' Compelled Speech Claim

Does 3 and 7 presented copies of their Alabama driver licenses at their depositions bearing the criminal sex offender designations. (Doe 3 Dep. at 12, Ex. 3; Doe 7 Dep. at 23, Ex. 3). Each plaintiffs' driver license has the words "CRIMINAL SEX OFFENDER" beneath the date of issuance on the face of their license. (*Id.*). Does 3 and 7 both possess an Alabama birth certificate and a current, valid Alabama driver license. (Doe 3 Dep. at 32-33; Doe 7 Dep. at 24, 27). Does 3 and 7 both testified that they could supply the proof of identification necessary to obtain a United States passport with their birth certificates and driver licenses. (Doe 3 Dep. at 33; Doe 7 Dep. at 28).

---

[4] Doe 1 does not allege any adverse effect by ASORCNA on his ability to obtain employment, and Doe 10 expressly alleges that he is disabled and receives disability income. (Doc. 138 ¶ 118).

Doe 3 testified that he kept his driver license in his pocket and that in general members of the public do not see his license. (Doe 3 Dep. at 40). Doe 7 likewise testified that he kept his driver license in his pocket and that he displayed his license when he had to do so. (Doe 7 Dep. at 26). Doe 3 was asked about allegations he made concerning displaying his driver license with the criminal sex offender designation on it when he went shopping, went to a pharmacy, attempted to purchase alcohol, and attempted to cash a check. (Doe 3 Dep. at 36-39, 42-43). Doe 3 conceded that, in each of these instances, he could have established his identity and date of birth using a passport, if he possessed one. (*Id.*) Doe 3 also conceded that he could use a passport to establish his eligibility to work. (*Id.* at 44).

Doe 7 testified that to his understanding he was "required" to show his driver license with the criminal sex offender designation to rent a house or to get a job (Doe 7 Dep. at 26-27). However, Doe 7 testified that if he had another form of government identification, such as a passport, he could display that form of identification to rent a house or get a job instead of his driver license. (*Id.* at 26-28). Doe 7 testified that if he possessed a passport and that this form of identification did not designate him as a criminal sex offender, he could and would use his passport to rent a home, purchase alcohol, or apply for a job. (*Id.* at 30-31).

Doe 3 testified that he could not afford $65 to obtain an adult passport card, despite the fact that he received $750 a month in disability income. (Doe 3 Dep. at 34-35). However, Doe 3 later testified that he could earn up to $30,000 a year as an auto body painter but for the fact that his driver license designated him as a criminal sex offender. (Doe 3 Dep. at 52-53).[5] Doe 7

---

[5] After this testimony, Doe 3 reaffirmed that he qualified for federal Social Security disability because he was physically unable to work, not because his Alabama driver license prevented him from obtaining employment. (Doe 3 Dep. at 61-63).

testified that he could afford $145 to obtain a passport book or $65 to obtain a passport card. (Doe 7 Dep. at 28-29).[6]

5.    Facts Relevant to Defendants' Statute of Limitations Defense

John Doe 1 alleges that he pleaded guilty to lewd and lascivious behavior in Wisconsin in 1993. (Doc. 138 ¶¶ 39-41). Doe 1 alleges that after he relocated to Alabama, he was convicted of vehicular manslaughter in 2005. (*Id.* ¶¶ 43-44). Doe 1 alleges that after he was released from prison for his manslaughter conviction in 2008, he was required to register as a sex offender under ASORCNA's predecessor, the Alabama Community Notification Act. (*Id.* 45-46). Doe 1 alleges he was subsequently arrested and charged under ASORCNA with failing to report his change of address in June 2012 and for mutilating the "CRIMINAL SEX OFFENDER" designation on his driver license in August 2012. (*Id.* ¶¶ 52-53). Doe 1 alleges he entered conditional guilty pleas on both charges and received a suspended sentence and probation as punishment in October 2012. (*Id.* ¶ 55).

As stated in more detail in Section A.1, *supra*, Doe 3 testified in his deposition that he became subject to the state's sex offender registration laws when he was released from prison in 2010. (Doe 3 Dep. at 14). He testified that he recalled discussing living with his niece in 2010 prior to his release, and that he was aware at that time that the state's sex offender registration laws prevented him from living with her. (*Id.* at 18-19).

As stated in more detail in Section A.1, *supra*, Doe 7 testified in his deposition that he became subject to the state's sex offender registration laws when he was released from prison in July 2011. (Doe 7 Dep. at 13-14); (*see also* Doe 7 Dep., Ex. 4 (noting a release date of July 22,

---

[6] When Doe 7 was later asked by his attorney whether he could afford $100 to pay for a passport, he changed his testimony without explanation and stated that he could not. (Doe 7 Dep. at 43-44).

2011)). Doe 7's sister testified that she first discussed Doe 7 coming to reside with her before he was released from prison in July 2011, and that he informed her at that time that he could not reside with her as a registered sex offender due to the presence of neighboring schools and minors in her home. (Doe 7 Sister's Dep. at 14-15); (*see also* Doc. 140-2 ¶¶ 3-6).

John Doe 9 alleges he was convicted in another state for sexual battery of an adult female in 2005. (Doc. 138 ¶ 94). Doe 9 alleges that he was paroled back to his home state of Alabama in 2006 and was required to register as a sex offender at that time. (*Id.* ¶¶ 97-98). Doe 9 alleges when he moved into a new residence with his mother in 2008, he was informed that the residence was noncompliant due to the presence of a childcare facility within 2,000 feet when he reported the change of residence to local law enforcement. (*Id.* ¶¶ 198-201). Doe 9 alleges a variety of adverse impacts on his ability to obtain a residence and employment from 2008 to 2012. (*Id.* ¶¶ 205-06).

John Doe 10 alleges that he pleaded guilty to sexual abuse in the second degree in 1990. (Doc. 138 ¶¶ 105-07). Doe 10 alleges that after he entered a drug treatment program in Kansas, he returned to Alabama and was convicted in 2009 for failing to report his temporary relocation to Kansas. (*Id.* ¶¶ 114-15). He alleges a variety of problems finding a compliant residence after returning to Alabama in 2009, including a 2015 conviction for violating ASORCNA's in-person reporting requirements. (*Id.* ¶¶ 115-24).

## B.  Argument

1.  Defendants Are Entitled to a Judgment on the Pleadings, or, in the Alternative, Summary Judgment in Their Favor on All Claims Based on the Statute of Limitations

Defendants are entitled to judgment on the pleadings or, in the alternative, summary judgment in their favor as to all of plaintiffs' claims because all plaintiffs were subject to the challenged provisions of ASORCNA for more than two years prior to the filing of this lawsuit,

and their claims are thus outside the applicable statute of limitations. Plaintiffs bring claims pursuant to 42 U.S.C. § 1983 for violations of their federal constitutional rights. (Doc. 138 ¶10). Does 3 and 7 bring an as-applied challenge in Count I to ASORCNA's prohibition on living with minors based on their Fourteenth Amendment right to familial association. (*Id.* ¶¶ 329-35). Plaintiffs bring a facial void-for-vagueness challenge in Count III to ASORCNA's residence and employment restrictions based on their Fourteenth Amendment right to due process. (*Id.* ¶¶ 336-41). Plaintiffs bring an as-applied challenge in Count IV to ASORCNA's criminal sex offender designation on their driver licenses based on their First Amendment right against compelled speech. (*Id.* ¶¶ 342-51). Plaintiffs bring a facial challenge in Count V to ASORCNA's internet reporting requirements based on their First Amendment free speech rights. (*Id.* ¶¶ 352-55). However, all plaintiffs were subject to these constraints under ASORCNA or its predecessor for more than two years prior to the filing of this lawsuit.

A motion for judgment on the pleadings on statute of limitations grounds is warranted "where the undisputed facts appearing in the pleadings, supplemented by any facts of which the court will take judicial notice, show that no relief can be granted." *J.M. Blythe Mot. Lines Corp. v. Blalock*, 310 F.2d 77, 78-79 (5th Cir. 1962).[7] Alternatively, a statute of limitations defense may be raised by a motion for summary judgment where the alleged failure to comply with the statute of limitations does not appear on the face of the complaint. *AVCO Corp. v. Precision Air Parts, Inc.*, 676 F.2d 494, 495 (11th Cir. 1982). Here, both the face of the SSAC and the depositions of Does 3 and 7 make it clear that plaintiffs were subject to and aware of ASORCNA's challenged provisions outside of the statute of limitations period.

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit that existed on September 30, 1981.

"All constitutional claims brought under § 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought." *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008). In Alabama, the applicable statute of limitations for a § 1983 claim is the two-year limitation set out in § 6-2-8(*l*) of the Alabama Code. *See Jones v. Prueit & Mauldin*, 876 F.2d 1480, 1483 (11th Cir. 1989) (*en banc*). For purposes of a § 1983 claim, "the statute of limitations begins to run from the date 'the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" *Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003) (quoting *Rozar v. Mullis*, 85 F.3d 556, 561-62 (11th Cir. 1996)). "Thus Section 1983 actions do not accrue until the plaintiff knows *or has reason to know* that he has been injured." *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987) (emphasis added).

Case law applying these principals to constitutional challenges to sex offender registration requirements pursuant to § 1983 make clear that a plaintiff's cause of action accrues when the plaintiff becomes subject to the registration requirements. *See Meggison v. Bailey*, 575 F. App'x 865, 867 (11th Cir. 2014); *Moore v. Fed. Bureau of Prisons*, 553 F. App'x 888, 890 (11th Cir. 2014); *Mims v. Bentley*, No. 7:15-cv-119, 2015 WL 5736829, at *2 (N.D. Ala. Oct. 1, 2015). In *Meggison*, the plaintiff pleaded guilty to a sex crime in 1990 and received a letter in 2005 from the Florida Department of Law Enforcement ("FDLE") requiring him to register as a sex offender. *Meggison*, 575 F. App'x at 866. The plaintiff filed suit in 2013, well past the four-year statute of limitations for a § 1983 claim brought in Florida, on the grounds that registering as a sex offender violated his substantive due process rights. *Id.* The court held that the plaintiff's

claim was time-barred because "his cause of action was complete and present at the moment the FDLE required Meggison to register." *Id.* at 867 (internal quotation omitted).

In *Moore*, a corrections officer required the plaintiff to complete a sex offender registration form in 2000 under the mistaken belief that the plaintiff's conviction for simple battery was for sexual battery. *Moore*, 553 F. App'x at 889. The plaintiff thought he would not be subject to Florida's sex offender registration laws because he wrote "void" and "I disagree" in three places on the form. *Id.* However, in 2005 the plaintiff was arrested for failing to register as a sex offender after applying for a contractor's license. *Id.* The court held that his cause of action accrued in 2005 when he became aware he was held subject to Florida's sex offender registration requirements and his 2010 § 1983 suit was thus time-barred. *Id.* at 890. In *Mims*, the court held that Alabama's sex offender registration statute first applied to the plaintiff upon his release from prison in 2000 when the law required him to register. *Mims*, 2015 WL 5736829, at *2.

Both *Moore* and *Meggison* considered and expressly rejected the application of the "continuing violations" doctrine to the statute of limitations defenses. *See Moore*, 553 F. App'x at 890; *Meggison*, 575 F. App'x at 867. As the court in *Meggison* stated:

> We also reject Meggison's argument that his claim is timely under the continuing-violation doctrine. The continuing violation doctrine extends the limitations period for a violation that continues from the past into the present. *Knight v. Columbus, Ga.*, 19 F.3d 579, 580-81 (11th Cir. 1994). We must contrast that scenario from a scenario in which a discrete, one-time violation in the past continues to have effects into the future without itself remaining ongoing. *Id.* Here, the act Meggison contends violated his due process rights *was his classification as a sex offender subject to Florida's registration requirements. This classification will continue to have effects on Meggison in the future, but a new act has not occurred every time Meggison feels one of those continuing effects.*

*Meggison*, 575 F. App'x at 867 (emphasis added). The court in *Moore* held that the continuing violations doctrine applied only "to situations in which a reasonably prudent plaintiff would have been unable to determine that a violation had occurred." *Moore*, 553 F. App'x at 890 (internal quotation and citation omitted). Because the plaintiff was arrested in 2005 under the mistaken belief that he was required to register as a sex offender, he was on notice of the alleged violation at that time and the statute of limitations began to run. *Id.*

Here, all plaintiffs were aware or should have been aware that they were subject to all challenged provisions of ASORCNA outside of the statute of limitations period. The Complaint in this case was filed August 20, 2015. (Doc. 1). Thus, any § 1983 cause of action that accrued prior to August 20, 2013, is barred by the statute of limitations. In 2011, the Alabama Legislature enacted ASORCNA and made its effective date July 1, 2011. *See* Ala. Act 2011-640 § 52. ASORCNA required all sex offenders in the state to comply with the minor prohibition rule, residence and employment restrictions, sex offender driver license designation, and internet registration requirements challenged in this lawsuit. *See* Ala. Act 2011-640 § 11(d) (prohibiting sex offenders residing with minors outside of certain direct familial relationships); *Id.* § 13 (placing employment restrictions on sex offenders); *Id.* § 18(a), (c) (requiring sex offenders to possess a driver license or identification card designating him as a sex offender); *Id.* § 7(9) (requiring registration of identification information used in internet communications). ASORCNA repealed all prior sex offender registration laws. *See* Ala. Act 2011-640 § 49. Prior to ASORCNA, the state's 2001 sex offender registration law included many of the same provisions, including a prohibition on living with minors and residence and employment restrictions. *See* Ala. Act 2001-1127 § 1 (amending former Alabama Code § 15-20-26 to prohibit sex offenders from living with minors and placing other residence and employment restrictions).

All of plaintiffs' claims in this case accrued prior to August 20, 2013, because they were already subject to the challenged provisions of ASORCNA or its predecessor at that time. Doe 1 alleges he was required to register under ASORCNA's 2001 predecessor upon his release from prison in 2008, and he pleaded guilty to violating ASORCNA's residence and identification requirements in 2012. (Doc. 138 ¶¶ 45-46, 52-53, 55). Doe 3 testified he was subject to the prohibition on living with minors and other residence restrictions under ASORCNA's 2001 predecessor when he was released from prison in 2010. (Doe 3 Dep. at 14, 18-19). Doe 7 testified that he was subject to the same restrictions when he was released from prison in July 2011. (Doe 7 Dep. at 13-14). Doe 9 alleges he was required to register under ASORCNA's 2001 predecessor in 2006, and that he suffered a variety of consequences from the residence and employment restrictions from the 2001 statute and ASORCNA from 2008 to 2012. (Doc. 138 ¶¶ 97-98, 198-201, 205-06). Doe 10 alleges he was subject to ASORCNA's 2001 predecessor upon his return to the state in 2009. (*Id.* ¶¶ 114-15). He makes allegations concerning the effects of ASORCNA's residence restrictions on his ability to find housing since 2009 and the sex offender designation on his driver license that demonstrate he is aware of and has been subject to ASORCNA and its predecessor's requirements since 2009. (*Id.* ¶¶ 114-24, 260).

Thus, *all* plaintiffs were subject to ASORCNA's 2001 predecessor and, by operation of law, became subject to ASORCNA's additional restrictions on its effective date of July 1, 2011. Because they were or should have been aware that they were required to comply with all requirements of ASORCNA's 2001 predecessor and of any *new* requirements of ASORCNA beginning July 1, 2011, their claims to any challenged provision of ASORCNA accrued on July 1, 2013, at the latest. But they filed suit on August 20, 2015, after the limitations period had run. They are in the exact same position as the plaintiff in *Mims*:

> In his complaint, Mims states that the now repealed Alabama sex offender registration statute first applied to him upon his release from prison on January 18, 2000. Thus, beginning upon his release, he was required to register with the sheriff in the county in which he lived *and otherwise comply with the statute*. *If the statute violated his constitutional rights, it did so starting on January 18, 2000*. Thus, the period in which to bring a § 1983 action began running on that day and ended two years later. Additionally, the statute was repealed in 2011, so it was not enforced beyond that date. As a result, any unconstitutional application of that law ceased in 2001. Therefore, *even if the statute of limitations period began running in 2011*, Mims's claim would still be time barred. Accordingly, any § 1983 claim for monetary damages based on the enforcement of an unconstitutional law is barred by the statute of limitations.

*Mims*, 2015 WL 5736829, at *2 (emphasis added). All plaintiffs knew or should have known of the alleged injury caused by ASORCNA since they were subject to the identical constraints of its 2001 predecessor and any additional constraints upon the effective date of ASORCNA, July 1, 2011. Thus, all of plaintiffs' claims in this case are time barred because the latest time plaintiffs could file suit for a claim that accrued on July 1, 2011, was July 1, 2013. But any claim that accrued prior to August 20, 2013, two years prior to the filing of their complaint, is outside the statute of limitations period. Defendants are thus entitled to judgment in their favor as to all claims based on the statute of limitations.

2.    Defendants Are Entitled to Summary Judgment in Their Favor on Does 3 and 7's As-Applied Challenge to ASORCNA's Prohibition on Living with Minors

      a.    Does 3 and 7's Intimate Association Claims Are Time-Barred

For the reasons stated above, *all* plaintiffs' claims in this case are time-barred. However, in the case of Does 3 and 7, their depositions and the depositions and affidavits of their family members show that they had *actual* knowledge of ASORCNA's minor prohibition rule, or that of its 2001 predecessor, and its application to them well outside of the statute of limitations time period. Doe 3 testified in his deposition that he became subject to the state's sex offender

23

registration laws when he was released from prison in 2010. (Doe 3 Dep. at 14). He testified that he recalled discussing living with his niece when he was released from prison in 2010 and he recalled that he was unable to reside with his niece at that time because she lived within 2,000 feet of a restricted property and because minors lived with her. (*Id.* at 18-19). Doe 3's niece stated in an affidavit submitted by plaintiffs that she discussed Doe 3 living with her shortly after his release in 2010 and discovered that he could not do so "because I [Doe 3's niece] lived too close to a school and because I have children in my home." (Doc. 140-1 ¶¶ 10-11).

Doe 7 testified in his deposition that he became subject to the state's sex offender registration laws when he was released from prison in July 2011. (Doe 7 Dep. at 13-14). ASORCNA was thus in effect when Doe 7 was released on July 22, 2011. (Doe 7 Dep., Ex. 4); Ala. Act 2011-640 § 52 (stating ASORCNA became effective July 1, 2011). Doe 7's sister testified in her deposition that she first discussed Doe 7 coming to reside with her before he was released from custody in 2011. (Doe 7 Sister Dep. at 14; Doe 7 Dep. at 13-14). Doe 7's sister testified that at that time Doe 7 informed her that he could not reside with her as a sex offender due to the proximity of her residence to neighboring schools and the presence of minors in her home. (*Id.* at 14-15). She confirmed in an affidavit submitted by plaintiffs that she communicated with Doe 7 about the residence restrictions that prevented Doe 7 from residing with her prior to his release from prison in 2011. (Doc. 140-2 ¶¶ 3-6).

ASORCNA's 2001 predecessor was in effect when Doe 3 was released from prison and required to register in 2010 and when Doe 7 first discussed coming to live with his sister prior to his release in July 2011. That statute prohibited sex offenders from residing with minors, subject to certain exceptions not applicable to Does 3 or 7. *See* Ala. Act 2001-1127 § 1 (amending former Alabama Code § 15-20-6(c)). The same prohibition on residing with minors applied to

24

their situations when ASORCNA became effective on July 1, 2011. *See* Ala. Act 2011-640 §

11(d). Does 3 and 7 both had *actual* knowledge that the state's sex offender laws prohibited them

from living with family members due to the presence of minors in their homes in 2010 and July

2011, respectively. Thus, the facts regarding the prohibition on residing with minors were

"apparent . . . to a person with a reasonably prudent regard for his rights" at those times. *Brown*,

335 F.3d at 1261 (internal quotation omitted). Since Does 3 and 7's intimate association claims

accrued on July 1, 2011 at the latest, and likely even earlier, they are outside the statutory period

in this case of August 20, 2013, two years before the filing of the complaint in this case. (Doc.

1).[8] Because Does 3 and 7's intimate association claims are time-barred, the Court need not

reach the constitutionality of these claims and should enter judgment in defendants' favor.

> b.      Defendants Are Entitled to Summary Judgment on Count I Because Does 3 and 7
>         Wish to Live in Family Members' Residences Located in Zones of Exclusion and
>         Thus ASORCNA Does not Directly Burden Their Right to Intimate Association

Even if Does 3 and 7's intimate association claims were not barred by the statute of

limitations, their claims fail because each family member with whom they wish to reside lives in

a zone of exclusion under ASORCNA due to the residence being within 2,000 feet of a school or

childcare facility. Since Does 3 and 7 are prohibited from living at these residences due to

ASORCNA's zones of exclusion, ASORCNA does not *directly* regulate their right to carry on

familial associations by living with sisters or nieces. As a result, ASORCNA's incidental burden

on their right to intimate association is subject only to rational basis review. Because ASORCNA

easily satisfies this burden, summary judgment is due to be granted in favor of defendants on

Count I. Alternatively, Does 3 and 7 lack standing to assert an as-applied challenge to the minor

---

[8] Though Does 3 and 7 may continue to feel the effects of the prohibition on residing with minors, these are ongoing effects of a past, one-time violation rather than a "continuing violation" as *Meggison* and *Moore* make clear. *See Meggison*, 575 F. App'x at 867; *Moore*, 553 F. App'x at 890.

prohibition rule in Alabama Code § 15-20A-11(d) as the 2,000-foot rule prevents them living at the residences in question notwithstanding the prohibition on residing with minors.

The United States Supreme Court has stated that the "Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). "The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* The Supreme Court has recognized a due process right to "the formation and preservation of certain kinds of highly personal relationships" that must be afforded "a substantial measure of sanctuary from unjustified interference by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). In *Moore v. City of E. Cleveland*, 431 U.S. 494 (1977) (plurality opinion), a plurality of the Supreme Court recognized that "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment," and stated that "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." *City of E. Cleveland*, 431 U.S. at 499. But the ordinance in that case "slic[ed] deeply into the family itself" by defining "family" in such a way as to prohibit a grandmother and her two grandsons from living together in an area designated for "single family" dwellings. *City of E. Cleveland*, 431 U.S. at 495-98.

Any statute or regulation that directly burdens a fundamental right must satisfy strict scrutiny, i.e., the state bears the burden of showing that its regulation is narrowly tailored to serve a compelling state interest. *See Roe v. Wade*, 410 U.S. 113, 155 (1973). However, "[s]ubstantive due process challenges that do not implicate fundamental rights are reviewed

26

under the 'rational basis' standard." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1280 (11th Cir. 2014); *see also Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) (stating that "the test of due process" for a legislative act is "a legitimate legislative purpose furthered by rational means."). A classification subject to rational-basis review will not violate substantive due process if "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* at 320. A legislature need not "actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992). Rather, classification subject to rational-basis review "must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Comms. Comm'n, Inc.*, 508 U.S. 307, 313 (1993).

In *Doe v. Miller*, 405 F.3d 700 (8th Cir. 2005), the Eighth Circuit held that a residency restriction preventing sex offenders convicted of sex offenses involving minors from living within 2,000 feet of a school or child care facility did not "operate directly on the family relationship" as did the ordinance in *City of East Cleveland* in such a manner as to trigger strict scrutiny. *Miller*, 405 F.3d at 710. Because the statute directly governed *where* a sex offender may live, its effect had a merely incidental effect on the ability of sex offenders to reside with family members and did not require heightened scrutiny of the state's interests. *Id.* at 710-11.

This Court has previously applied *Miller*'s holding to find that where ASORCNA prevents a sex offender from living with a family member because the family member resides in a zone of exclusion, ASORCNA does not directly regulate the right to intimate association in a way that triggers strict scrutiny. *See McGuire v. City of Montgomery*, No. 2:11-cv-1027-WKW, 2013 WL 1336882, at *11 (M.D. Ala. Mar. 29, 2013). In *McGuire*, the Court stated that to the extent ASORCNA prevented the plaintiff from living with his wife, "it does so only because the

address at which Plaintiff desires to live with his wife and his mother is not a compliant address." *Id.* The Court accordingly found that the applicable residence restriction was subject to rational basis review, and that ASORCNA's legislative findings that the residence restrictions serve "the primary governmental interest of protecting vulnerable populations, particularly children" satisfied rational basis review. *Id.* (quoting ALA. CODE § 15-20A-2(5)).

Here, Does 3 and 7 cannot live with their sister or nieces because these family members' residences are in zones of exclusion. Doe 3 testified that he would like the option of living with his niece "as a backup" if he needed another place to live. (Doe 3 Dep. at 19-20). However, his niece's residence is located in an ASORCNA zone of exclusion because it is within 2,000 feet of a childcare facility and a school. (Bolton Decl. ¶ 7; Doc. 140-1 ¶¶ 11, 16). Doe 3's niece testified that she intends to remain at this noncompliant address for the foreseeable future. (Doe 3 Niece Dep. at 10). Doe 7's sister testified that her residence is in a zone of exclusion because it is near two schools. (Doe 7 Sister Dep. at 14-15). She again stated her residence is in a zone of exclusion in an affidavit submitted by plaintiffs. (Doc. 140-2 ¶6). Doe 7's sister testified that she intends to reside at her residence for the foreseeable future. (Doe 7 Sister Dep. at 7). Doe 7's niece's residence is within a zone of exclusion under ASORCNA because it is within 2,000 feet of two childcare facilities. (Bolton Decl. ¶¶ 5-6, 8). Doe 7's niece stated her residence is in a zone of exclusion in an affidavit submitted by plaintiffs. (Doc. 140-3 ¶ 6). In his deposition, Doe 7 disclosed another sister with whom he stated he wished to live, but the parties have jointly stipulated that due to the late disclosure of this sister "Doe 7 shall not base any alleged infringement of his right to intimate association in Count I on any purported burden to his right to reside with [sister #2] upon documents submitted during the dispositive motion stage of the proceedings." (Joint Stipulation).

As applied to Does 3 and 7, ASORCNA does not "slic[e] deeply into the family itself" by "select[ing] certain categories of relatives who may live together and declaring that others may not." *City of E. Cleveland*, 431 U.S. at 498-99. Rather, the family members' residences at issue are in zones of exclusion due to ASORCNA's 2,000-foot rule, and thus Does 3 and 7 could not reside at these locations even if ASORCNA did not prohibit them from residing with minors. Alternatively, Does 3 and 7 lack standing to challenge ASORCNA's minor prohibition rule because they cannot demonstrate that they are injured by that provision rather than the 2,000-foot rule. Whether viewed as a lack of standing or a failure to state a claim, the outcome is the same.

Does 3 and 7's intimate association claim fails because they cannot show that ASORCNA, as applied to them, directly burdens their right to intimate association. As this Court has already held, ASORCNA's 2,000-foot rules are rationally related to a legitimate government interest. *See McGuire*, 2013 WL 1336882, at * 11. Because Does 3 and 7's intimate association claim can be resolved by applying a portion of ASORCNA of clear constitutional validity, the canon of "constitutional avoidance" requires the Court to avoid reaching the constitutionality of ASORCNA's minor prohibition rule as applied to Does 3 and 7. *See I.N.S. v. St. Cyr*, 533 U.S. 289, 299-300 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, we are obligated to construe the statute to avoid such problems.") (internal quotations and citations omitted).

    c.    Defendants Are Entitled to Judgment as a Matter of Law on ASORCNA's Minor Prohibition Rule Because It Does Not Burden a Fundamental Right and Satisfies Rational Basis Review

Even if Does 3 and 7 could otherwise challenge the prohibition on residing with minors, the prohibition contained in Alabama Code § 15-20A-11(d) does not implicate a fundamental

right under the Due Process Clause, and this prohibition is thus subject to rational basis review. The minor prohibition rule in ASORCNA applies only to convicted sex offenders and, furthermore, creates certain exceptions. *See* ALA. CODE § 15-20A-11. Section 15-20A-11(d) expressly permits sex offenders to reside with their own children, grandchildren, or siblings, whether by blood or marriage. The provision prevents sex offenders from having an "overnight visit" with their minor nephews or nieces (or more distant minor relatives). ALA. CODE § 15-20A-11(d). But this limited prohibition on residing with minors, applicable only to convicted sex offenders, does not implicate any fundamental right that would trigger heightened scrutiny.

The Supreme Court has provided a cautious approach to recognizing and describing a fundamental right under the Due Process Clause:

> But we ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court.

*Glucksberg v. Washington*, 521 U.S. 702, 720 1997) (internal quotations and citations omitted). In order to prevent this judicial usurpation of the democratic process, the Supreme Court has created a two-step analysis that constrains what rights a court may recognize as fundamental. "First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 720-21 (internal quotation and citations omitted). "Second, we have required in substantive-due-process cases a 'careful description' of the

asserted fundamental liberty interest.'" *Glucksberg*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).

The Eleventh Circuit applied the *Glucksberg* analysis in a due process challenge to Florida's sex offender registration law in *Doe v. Moore*, 410 F.3d 1337 (11th Cir. 2005). The registrants argued that the law infringed their "rights to family association, to be free of threats to their persons and members of their immediate families, to be free of interference with their religious practices, to find and/or keep any housing, and to a fundamental right to find and/or keep any employment." *Id.* at 1343. In applying the "careful description" prong of the *Glucksberg* analysis, the court found that the gravamen of the plaintiffs' complaint was a challenge to the registration requirement as such. *See id.* at 1344 ("[T]he right at issue here is the right of a person, convicted of "sexual offenses," to refuse subsequent registration of his or her personal information with Florida law enforcement and prevent publication of this information on Florida's Sexual Offender/Predator website.") The court went on to conclude this right was not deeply rooted in this Nation's history and tradition, and accordingly Florida's registration statute was subject only to rational basis review. *Id.* at 1344-45. The analysis of the alleged fundamental right in *Doe v. Moore* took into account that the putative right was asserted by those "convicted of 'sexual offenses.'" *Id.* at 1344.

In a subsequent unpublished opinion, the Eleventh Circuit reiterated that it framed the description of the putative fundamental right in *Doe v. Moore* in the context of sex offenders. *See Windwalker v. Governor of Ala.*, 579 F. App'x 769, 773-74 (11th Cir. 2014). The plaintiff in *Windwalker* asserted that ASORCNA violated his fundamental rights "to privacy, his right to find and retain housing, his right to find and keep employment, his right to free travel and movement, his right to be free from interference in his religious practices, and his right to be free

of threats and harassment." *Id.* at 773. However, the court found that none of these rights were fundamental *given the plaintiff's status as a sex offender*:

> Indeed, when "carefully described" *in the context of a regulation designed to protect the public from sex offender recidivism*, none of Windwalker's asserted rights are so "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. This reasoning applies notwithstanding the differences between the sex-offender statute at issue in *Doe* and the one here.

*Windwalker*, 579 F. App'x at 773-74 (quoting *Doe v. Moore*, 410 F.3d at 1344) (citation omitted) (emphasis added).

Thus, following the analysis in *Doe v. Moore* and *Windwalker*, a careful description of the right regulated by Alabama Code § 15-20A-11(d) is the right of a sex offender to reside with or stay overnight with his or her minor extended relatives. Just as the courts in *Doe v. Moore* and *Windwalker* found the restraints on sex offenders were not deeply rooted in the nation's history or tradition or implicit in the concept of ordered liberty, the Court should find that there is no fundamental right to the carefully described right in question here. Unlike the regulation in *City of East Cleveland* that "slic[ed] deeply into the family itself" by directly defining "family" *as such* in a way that prevented a grandmother from living with her grandsons, ASORCNA's minor prohibition applies only to sex offenders, a population the state has a compelling interest in preventing from committing future offenses or offenses against minors. Thus, ASORCNA's minor prohibition rule is subject to rational basis review, and "ASORCNA's expressly incorporated legislative findings articulat[e] several reasonable bases for enacting the law." *Windwalker*, 579 F. App'x at 774 (citing ALA. CODE § 15-20A-2(1)–(5)). Even if Does 3 and 7 could challenge the merits of ASORCNA's minor prohibition, defendants are entitled to judgment as a matter of law.

d.     Even if ASORCNA's Minor Prohibition Rule Burdened the Fundamental Right to Intimate Association, It Satisfies Strict Scrutiny

Even if the Court were to conclude ASORCNA's minor prohibition rule burdened a fundamental right of a sex offender to reside with an extended minor relative, the regulation would survive strict scrutiny. A regulation that burdens a fundamental right "is subjected to strict scrutiny and is therefore deemed to infringe those rights unless shown to be narrowly tailored to serve a compelling government interest." *McCabe v. Sharrett*, 12 F.3d 1558, 1566 (11th Cir. 1994). ASORCNA's express legislative findings state, among other things, that the statute's residence restrictions are intended to prevent sex offender recidivism and "to protect the public and, most importantly, promote child safety." ALA. CODE § 15-20A-2(5). The Supreme Court has recognized that states have a compelling interest in promoting child safety. *See New York v. Ferber*, 458 U.S. 747, 756-57 (1982) ("It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling.") (internal quotation and citation omitted); *see also McKune v. Lile*, 536 U.S. 24, 32 (2002) (plurality opinion) (stating that "[s]ex offenders are a serious threat" and "the victims of sexual assault are most often juveniles."); *Globe Newpaper Co. v. Superior Court, County of Norfolk*, 457 U.S. 596, 607 (1982) ("[T]he . . . interest [of] safeguarding the physical and psychological well-being of a minor is a compelling one.").

The only question for purposes of strict scrutiny is whether ASORCNA's minor prohibition is narrowly tailored to achieve the compelling government interest in promoting the safety of minors. The SSAC suggests a more narrowly drawn minor prohibition rule limited to sex offenders whose victim was a child. (*See* Doc. 138 ¶¶ 148, 328). However, Dr. Scurich's declaration explains why the minor prohibition rule cannot be drawn more narrowly to achieve the state's compelling interest in promoting child safety. (*See* Scurich Decl. ¶ 6)

Dr. Scurich submitted a declaration on the phenomenon of "crossover offending," i.e., the phenomenon of sexual offenders victimizing more than one "type" of victim over the course of their criminal career, e.g., both child and adult victims, both male and female victims, and both extra and intra-familial victims. (*Id.*). Dr. Scurich stated in his declaration that, based on his analysis, anywhere from approximately one in ten to one in five sexual offenders will engage in some specific type of sexual recidivism. (*Id.* ¶ 15). Dr. Scurich found that no reliable test existed that allowed one to predict a particular sex offender's risk of engaging in crossover offending. (*Id.* ¶ 17). However, empirical studies did find that crossover offenders had a significantly higher risk of recidivism than non-crossover offenders. (*Id.* ¶ 18-20). Thus, given the significant rates of crossover offending among sex offenders, the greater risk posed by crossover offenders, and the inability to prospectively discern who would engage in crossover offending, Dr. Scurich concluded that ASORCNA's minor prohibition was reasonable. (*Id.* ¶21-24). Based on Dr. Scurich's declaration, ASORCNA's minor prohibition cannot be more narrowly tailored given the significant risk posed by sex offenders of crossover offending, the greater danger posed by crossover offenders, and the inability to predict whether a given sex offender will be a crossover offender. As a result, ASORCNA's minor prohibition satisfies strict scrutiny.

3.   Defendants Are Entitled to a Judgment on the Pleadings, or, in the Alternative, Entry of Summary Judgment in their Favor on Plaintiffs' Void-for-Vagueness Challenge to ASORCNA's Residence and Employment Restrictions

Plaintiffs assert a facial void-for-vagueness claim in Count III of the SSAC. (Doc. 138 ¶¶ 336-41). Plaintiffs allege ASORCNA's residence and employment restrictions are unconstitutionally vague in violation of their Fourteenth Amendment due process rights. (*Id.*)[9] In

---

[9] The SSAC continues to assert that ASORCNA's reporting requirements are unconstitutionally vague. However, the Court dismissed plaintiffs' vagueness challenge to ASORCNA's reporting requirements. (Doc. 125, at 29-33). In its Memorandum Opinion and Order on plaintiffs' motion for leave to file a second supplemental complaint, the Court did not grant plaintiffs leave to re-

its Memorandum Opinion and Order on defendants' motion to dismiss the first amended complaint, the Court held that ASORCNA's residency restrictions were void for vagueness because registrants could not reasonably expect to determine whether certain property was compliant and because of the potential for disparate enforcement based on different readings of the statute. (Doc. 51, at 21-28.) However, the Alabama legislature subsequently amended the residency restrictions of ASORCNA in 2017 to provide a process for a registrant to receive preapproval in writing from local law enforcement that a given residence was compliant prior to establishing a residence at that location. *See* ALA. CODE § 15-20A-11(g). The Court later ruled that this preapproval process nullified plaintiffs' vagueness challenge to the residence restrictions by providing a process for clarifying any potential vagueness. (Doc. 125, at 25-28.) However, the Court allowed plaintiffs to replead the vagueness challenge to ASORCNA's residence restrictions based on specific allegations of inconsistent application of the preapproval process. (Doc. 137, at 12.). The Court has also held that plaintiffs stated a vagueness claim based on ASORCNA's employment restrictions. (Doc. 125, at 28-29.)

      a.      **Plaintiffs Lack Standing to Challenge ASORCNA's Preapproval Process for Residence Locations and Employment Restrictions on Vagueness Grounds**

The Court held that plaintiffs only stated plausible vagueness claims as to ASORCNA's residential preapproval process and employment restrictions. However, even a facial vagueness challenge does not provide justification for a court to strike down a statute on vagueness grounds based on any hypothetical application of which the court can conceive. In other words, even a facial vagueness challenge does not relieve plaintiffs of the ordinary requirements of standing. They must present an actual case or controversy to the Court by presenting allegations or evidence of an actual or imminently threatened application of some particular provision of

plead their vagueness challenge to ASORCNA's reporting requirements. (Doc. 137, at 8-10, 12.) Plaintiffs' inclusion of this claim in the SSAC was therefore inadvertent.

ASORCNA's residence preapproval process or employment restrictions *and* that the actual or imminently threatened application of the statute involves unconstitutional vagueness.

"Article III of the Constitution limits the jurisdiction of federal courts to the consideration of 'Cases' and 'Controversies.'" *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.,* 524 F.3d 1229, 1232 (11th Cir. 2008) (quoting U.S. Const. Art. III § 2). Those bringing suit in federal court "may not invoke federal-court jurisdiction unless [they] can show 'a personal stake in the outcome of the controversy'" by establishing Article III standing. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). A plaintiff must show such a personal stake by meeting the "familiar three-part test for Article III standing: that he '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Gill*, 138 S. Ct. at 1929 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

The burden of establishing these elements rests with the party invoking federal jurisdiction. *Lujan v. Defenders of Wildlife, Inc.*, 504 U.S. 555, 561 (1992). "Foremost among [the standing] requirements is injury in fact." *Gill*, 138 S. Ct. at 1929. One must show proof of "the 'invasion of a legally protected interest' that is 'concrete and particularized,' *i.e.*, which 'affect[s] the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560). Unless the plaintiffs establish that a proper case or controversy exists, "'the courts have no business deciding it, or expounding the law in the course of doing so.'" *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).

"Litigants may not comb the statute books for poorly drafted laws and sue to enjoin their enforcement." *Dana's R.R. Supply v. Atty. Gen. of Fla.*, 807 F.3d 1235, 1241 (11th Cir. 2015)

(quoting *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1348–50 (11th Cir. 2011). Generally, litigants may "raise void-for-vagueness challenges only as a defense during an actual prosecution" or if they "are being 'chilled from engaging in constitutional activity.'" *Id.* (quoting *Bankshot Billiards*, 634 F.3d at 1349–50). Those litigants that demonstrate a chilling effect "suffer a discrete harm independent of enforcement, and that harm creates the basis for [a federal court's] jurisdiction." *Id.*

Only after a litigant establishes that his or her individual situation implicates one of these discrete "constitutional harms" will a court analyze the statute at issue for vagueness. *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1301 (11th Cir. 2013). If the litigant cannot do so, then the case must be dismissed for lack of standing. *Bankshot Billiards*, 634 F.3d at 1350–51 (affirming the district court's finding that Bankshot Billiards lacked standing to bring a claim for damages against the city based on the ordinance's vagueness where Bankshot failed to show either category applied). Courts must "consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian Project*, 561 U.S. 1, 18–19 (2010) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)) (addition in original).

i.    Plaintiffs Lack Standing to Challenge ASORCNA's Residence Restrictions Based on the Preapproval Process on Vagueness Grounds

Plaintiffs allege that the provision in ASORCNA allowing local law enforcement agencies to grant written preapproval for a sex offender to live at a given address is enforced arbitrarily due to unconstitutional vagueness. (Doc. 138 ¶¶ 286-319, 336-41). Plaintiffs support this claim with allegations that a non-party sex offender, Buycks, was allowed to live within 2,000 feet of an elementary school despite this being a non-compliant address. (*Id.* ¶¶ 303-09).

However, the only *plaintiff* who has submitted proof of applying for preapproval is Doe 3. (Doc. 148-15).

Plaintiffs submitted a document in support of their motion for summary judgment that is a "Registered Sex Offender Change of Address Request" form submitted by Doe 3 to the Montgomery Police Department. (Doc. 148-15). The document, signed by Bolton, indicates that the address for which Doe 3 sought preapproval was disapproved because the home was approximately 850 feet from an elementary school. (*Id.*). The elementary school that made the address requested by Doe 3 noncompliant according to this document was also within 2,000 feet of Buycks's current address based on the documents presented at Bolton and Jones's depositions. (*See* Jones Dep. at 67-70). When Bolton was asked whether Buycks should have been allowed to live at the listed address based on plaintiffs' counsel's representation that the residence was within 2,000 feet of an elementary school, Bolton testified that Buycks should not have been allowed to live there based on this representation. (Bolton Dep. at 64). Bolton was asked whether it would have been a mistake for him to allow Buycks to reside within 2,000 feet from a school or daycare in the absence of a court order, and he responded, "Yes, sir." (*Id.* at 65). Jones was also asked about Buycks's registration information and, consistent with Bolton's testimony, Jones testified that Buycks should not have been allowed under ASORCNA to move to his current address as reflected in the documents presented at his deposition if the address was within 2,000 feet of an elementary school. (Jones Dep. at 64-70). Finally, Persky was asked about Buycks. (Persky Dep. at 16-18). Persky testified that if, as represented by plaintiffs' counsel, Buycks moved from a previous grandfathered address to another address within 2,000 feet of an elementary school, then the Montgomery Police Department should not have allowed Buycks to move to that address. (*Id.* at 18-19).

Doe 3's preapproval form and the undisputed testimony in this case establish that he was denied approval to relocate to a requested address because it was well within 2,000 feet of an elementary school. The undisputed testimony of Bolton, Jones, and Persky was that if Buycks had been allowed to live at an address within 2,000 feet of the same school, that would not have been a compliant address. Because Doe 3 sought, and was denied, permission to live at a residence that is *clearly* and *unambiguously* noncompliant under ASORCNA, he has no standing to raise merely speculative vague applications of the preapproval process. Doe 3, because he is "[a] plaintiff who engages in some conduct that is *clearly proscribed*, cannot complain of the vagueness of the law as applied to the conduct of others." *Village of Hoffman Estates*, 455 U.S. at 495 (emphasis added). *See also id.* at 495 n.7 ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.") (quoting *Parker v. Levy*, 417 U.S. 733, 756 (1974)).

Here, the portions of the statute applied to Doe 3 are the residence restrictions preventing an "adult sex offender" from "establish[ing] a residence or maintain[ing] a residence after release or conviction within 2,000 feet of the property on which any *school* . . . is located." ALA. CODE § 15-20A-11(a) (emphasis added). The statute provides that "the 2,000-foot measurement shall be taken in a straight line from nearest property line to nearest property line." ALA. CODE § 15-20A-11(h). The statute expressly provides a definition of "school" to include a "licensed or accredited public, private, or church school that offers instruction in grades pre-K–12 if it is sufficiently conspicuous that a reasonable person should know or recognize its location or its address has been provided to local law enforcement." ALA. CODE § 15-20A-4(24). The school that served as the basis for the denial of Doe 3's request for preapproval, (Doc. 148-15), is clearly a "school" within the ASORCNA definition. As plaintiffs' counsel represented to Jones in his deposition,

the school in question has been operating as an elementary school since at least 1970. (Jones Dep. at 69). Again, as the form notes, the residence clearly and unambiguously comes within the 2,000-foot rule as defined by the statute because Bolton's handwritten note states the home is approximately "*850 feet*" from the school. (Doc. 148-15) (emphasis added). Thus, because the residence for which Doe 3 sought preapproval is "clearly proscribed," Doe 3 and the other plaintiffs "cannot complain of the vagueness of the law as applied to the conduct of others," i.e., **Buycks**. *Village of Hoffman Estates*, 455 U.S. at 495.

> ii.     Plaintiffs Lack Standing to Challenge ASORCNA's Employment Restrictions on Vagueness Grounds

Plaintiffs fail to establish standing to mount a facial vagueness challenge of ASORCNA's employment restrictions because they fail to make sufficient allegations or present any evidence of a chilling effect on their employment. Plaintiffs cannot "invoke federal-court jurisdiction" as to this claim of the suit, without demonstrating a "personal stake" in its outcome. *Gill*, 138 S. Ct. at 1929 (quoting *Baker*, 369 U.S. at 204). An injury in fact must be shown to demonstrate this personal stake, and plaintiffs fail to meet their burden to make sufficient allegations or point to any facts in the record that show they suffered an injury due to the employment restrictions. The allegations in the SSAC on ASORCNA's allegedly vague employment restrictions concern only Does 3, 7, and 9. (Doc. 138 ¶¶ 218-36). Does 3 and 7 testified in their depositions that they are physically unable to work, and Doe 9 alleges in the SSAC that ASORCNA "clearly proscribes" obtaining employment at the desired locations because he "knows several employers in his hometown who will gladly hire him, [but] he remains employable but unemployed *because of ASORCNA's employment zones of exclusion*." (Doc. 138 ¶ 235) (emphasis added). Thus, these plaintiffs cannot allege or show any actual or imminent application of any allegedly *vague*

portion of ASORCNA's employment restrictions to them and consequently lack standing for a vagueness challenge.

Even under the more abstract requirements of a facial vagueness challenge, plaintiffs still fail to allege or establish facts that warrant standing. To establish an injury sufficient to maintain a facial void for vagueness challenge, plaintiffs must demonstrate they raise the challenge "as a defense during an actual prosecution" or that they "are being 'chilled from engaging in constitutional activity.'" *Dana's R.R. Supply*, 807 F.3d at 1241 (quoting *Bankshot Billiards, Inc.*, 634 F.3d at 1349–50). As plaintiffs raise this claim as part of a civil suit against state defendants in their official capacities, they clearly do not bring their claim of facial vagueness "as a defense during an actual prosecution." *Id.* They similarly fail to establish that the alleged vagueness of the statute chills their engagement in constitutional activity.

Doe 3 testified that he is currently unemployed, that he has been receiving Social Security disability income for approximately three years, and that this was his sole source of income. (*Id.* at 22-23). He testified that he receives disability income because he is physically unable to work and that he does not foresee his physical condition improving at his age to allow him to work again in the future. (*Id.* at 27-28, 61-63). The only testimony Doe 3 presented as to the impact of ASORCNA on his ability to obtain work was his driver license designating him as a criminal sex offender. (*Id.* at 23, 27, 52-53, 63-64). Doe 7 also testified that he is currently unemployed and that his sole source of income is Social Security disability income. (Doe 7 Dep. at 21-22). Doe 7 testified that he has been receiving disability income for approximately three years. (*Id.*). He testified that he receives this income because he is physically unable to work and that he does not foresee his physical condition improving at any point in the near future. (*Id.* at

23). As with Doe 3, the only testimony Doe 7 gave as to the impact of ASORCNA on his ability to obtain work was his driver license designating him as a criminal sex offender. (*Id.* at 22, 27).

The only other plaintiff who alleges ASORCNA adversely impacted his ability to obtain employment is Doe 9.[10] (Doc. 138 ¶ 218, 230-36). Doe 9 alleges he was convicted for sexual battery of an adult female in another state in 2005. (*Id.* ¶ 94). Doe 9 alleges he has been subject to the state's sex offender registration laws since 2006, and that from 2008 to 2012, he worked intermittently remodeling camp grounds. (*Id.* ¶ 97-98, 205). He alleges that he was "underemployed or unemployed" from 2012 to 2014. (*Id.* ¶ 207). Doe 9 alleges that he currently lives in a "rural town in the mountains of Alabama which contains vast land, but a compact area for schools, employers and residences." (*Id.* ¶ 232). He alleges that although he "knows several employers in his hometown who will gladly hire him, he remains employable but unemployed because of ASORCNA's employment zones of exclusion." (*Id.* ¶ 235). Doe 9 also alleges that presenting his Alabama driver license designating him as a criminal sex offender has resulted in him being denied employment. (*Id.* ¶ 100).

Thus, the void for vagueness claim must be dismissed for lack of standing. Does 3 and 7 lack standing to claim they are "chilled from engaging in constitutionally protected activity," *Bankshot Billiards*, 634 F.3d at 1350, because they have qualified for federal social security disability income on the basis of being physically unable to work and do not foresee themselves being able to work again in the future. Doe 9 alleges he is chilled from engaging in constitutionally protected activity, viz. obtaining employment, but *not because of any vagueness* in ASORCNA's employment restrictions. Rather, he alleges that because he lives in a "rural town in the mountains of Alabama" that "contains vast land, but a compact area for schools,

---

[10] Doe 1 does not allege any adverse effect by ASORCNA on his ability to obtain employment, and Doe 10 expressly alleges that he is disabled and receives disability income. (Doc. 138 ¶ 118).

employers and residences," he is prevented from obtaining employment "because of ASORCNA's employment zones of exclusion." (Doc. 138 ¶¶ 232, 235). Because Doe 9 is "clearly proscribed" by the 2,000-foot rule due to the "compact area for schools, employers and residences," and not because of any vague application of ASORCNA's employment restrictions, Doe 9 lacks standing to challenge ASORCNA on vagueness grounds as it might apply to others. *See Village of Hoffman Estates*, 455 U.S. at 495. Without facts sufficient to support standing, the vagueness claim must be dismissed.

        b.    <u>Plaintiffs' Void-for-Vagueness Challenge Fails on the Merits</u>

Plaintiffs' facial void-for-vagueness claim in Count III fails on the merits and defendants are thus entitled to judgment as a matter of law on this claim. Because plaintiffs fail to present any allegations or evidence of *which* allegedly vague residence or employment restriction is being applied or potentially applied to them, it is difficult for defendants to address plaintiffs' vagueness challenge in the abstract. This highlights the importance of establishing standing, even in a facial vagueness challenge. *See Bankshot Billiards*, 634 F.3d at 1348-50 ("Litigants may not comb the statute books for poorly drafted laws and sue to enjoin their enforcement."). However, defendants move for judgment as a matter of law because ASORCNA's residence and employment restrictions are sufficiently clear, contain definitions of key terms, and include a scienter requirement that a registrant be in "knowing" violation of their restrictions.

The Supreme Court has stated:

> As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of vagueness doctrine is not actual notice, but the other principal element of the

> doctrine—the requirement that a legislature establish minimal
> guidelines to govern law enforcement. Where the legislature fails
> to provide such minimal guidelines, a criminal statute may permit
> a standardless sweep [that] allows policemen, prosecutors, and
> juries to pursue their personal predilections.

*Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) (internal quotations, citations, and footnote omitted). But such guidelines, "[e]ven to the extent that a heightened vagueness standard applies," still do not require "'perfect clarity and precise guidance.'" *Holder*, 561 U.S. at 19–20 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). Indeed, "we can never expect mathematical certainty from our language." *Pine v. City of West Palm Beach*, 762 F.3d 1262, 1275 (11th Cir. 2014) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). In *Pine*, the Eleventh Circuit affirmed a municipal sound ordinance prohibiting "loud, raucous, or unreasonably disturbing amplified noise near health care facilities or institutions for the sick" was not unconstitutionally vague because it "squarely [gave] fair notice to those who may be affected." *Id.* at 1275–76. The court went on to reject the notion that just "because property lines are invisible" that the regulation using them as a benchmark must be vague. *Id.* at 1276. Rather, the presence of signs indicating the "zone and its rough boundaries" where particular conduct was forbidden was found sufficient to "give a person of ordinary intelligence fair notice." *Id.*

ASORCNA provides definitions for the terms "residence," "reside," "school," "childcare facility," "minor," and "overnight visit," to clarify the reach of its residence restrictions. *See* ALA. CODE §§ 15-20A-4(20), (21), (24), (3), (13), (14). It provides with specificity that the 2,000-foot rule applies "in a straight line from nearest property line to nearest property line." ALA. CODE § 15-20A-11(h). A registrant can be held criminally liable for a violation of these restrictions only if he "knowingly violates" these restrictions. ALA. CODE § 15-20A-11(i). The employment restrictions incorporate the same definitions of prohibited locations and the 2,000-

foot rule, and also has a scienter requirement. *See* ALA. CODE § 15-20A-13(f), (g). ASORCNA also has a statutory definition of "employment." *See* ALA. CODE § 15-20A-4(5).

It is difficult to imagine prohibitions couched in more mathematical terms. Though the restriction certainly does not provide "perfect clarity," it does provide more "precise guidance" than the sound ordinance affirmed by the Eleventh Circuit in *Pine*. *Holder*, 561 U.S. at 19–20 (quoting *Ward*, 491 U.S. at 794); 762 F.3d at 1275-76. The individuals subject to ASORCNA are more "squarely [given] fair notice" that they are affected by the statute than those playing loud music near healthcare facilities. Registration itself provides sufficient notice to sex offenders that their conduct post-conviction is affected by ASORCNA. Like the healthcare facilities at issue in *Pine*, the schools and daycares that create exclusion zones typically have signs or other indicators that provide fair warning to all that they are, in fact, schools and daycares. Though the exact property lines of these facilities may be difficult to discern, this does not make exclusion zones vague. Any person of "ordinary intelligence" can recognize and has "fair notice" of the "rough boundaries" of an exclusion zone created by a school or daycare facility.

ASORCNA requires application of these terms and definitions to real-world facts and contrasts significantly with the standardless statutory term held to be unconstitutionally vague in *Johnson v. United States*, 135 S. Ct. 2551, 2557-59 (2015). In that case, the Supreme Court held the term "violent felony," defined in relevant part under the Armed Career Criminal Act as a crime that "involves conduct that presents a serious potential risk of physical injury to another," was unconstitutionally vague. *Johnson*, 135 S. Ct. at 2555. However, the central feature of the Court's vagueness analysis was that the Court's precedent required a judge to apply this definition "not to real-world facts or statutory elements," but rather "to a judicially imagined 'ordinary case' of a crime." *Id.* at 2557. The inability of a judge to consider the concrete facts of

the underlying crime created a completely indeterminate standard. *Id.* at 2558. *See also Sessions v. Dimaya*, 138 S. Ct. 1204, 1232 (2018) (stating with respect to a statutory definition of "crime of violence" identical to that in *Johnson* that "[t]he statute doesn't even ask for application of common experience. Choice, pure and raw, is required. Will, not judgment, dictates the result.") (Gorsuch, J., concurring in part and concurring in the judgment).

But the Court in *Johnson* contrasted this abstract statutory definition with statutory terms that are applied to concrete situations as follows:

> As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as "substantial risk" to real-world conduct; "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree," *Nash v. United States,* 229 U.S. 373, 377, 33 S.Ct. 780, 57 L.Ed. 1232 (1913). The residual clause, however, requires application of the "serious potential risk" standard to an idealized ordinary case of the crime. Because "the elements necessary to determine the imaginary ideal are uncertain both in nature and degree of effect," this abstract inquiry offers significantly less predictability than one "[t]hat deals with the actual, not with an imaginary condition other than the facts." *International Harvester Co. of America v. Kentucky*, 234 U.S. 216, 223, 34 S. Ct. 853, 58 L.Ed. 1284 (1914).

*Johnson*, 135 S. Ct. at 2561. ASORCNA's residence and employment restrictions are an example of the "general matter" in which qualitative standards, or even expressly defined terms, are applied to "real-world conduct." Thus, ASORCNA's residence and employment restrictions contrast with the completely indeterminate standard held to be unconstitutionally vague in *Johnson*. As a result, defendants are entitled to judgment as a matter of law on the merits of Count III.

4.      Defendants Are Entitled to Judgment on the Pleadings, or, in the Alternative, Summary
Judgment in Their Favor on Plaintiffs' Compelled Speech Claim

Plaintiffs allege in Count IV that ASORCNA's requirement that they possess an Alabama

driver license or identification card with a "CRIMINAL SEX OFFENDER" designation on it

violates their First Amendment right to be free from compelled speech. (Doc. 138 ¶¶ 342-51).

Plaintiffs allege that by requiring plaintiffs to carry a government identification that designates

them as a criminal sex offender, the state is forcing them to convey a message with which they

do not agree against their will. Defendants acknowledge that the Court has already ruled against

them on this claim. (Doc. 125, at 33-37). Defendants respectfully request that the Court

reconsider its earlier ruling as to the applicability of *Wooley v. Maynard*, 430 U.S. 705 (1977), in

light of Doe 3 and 7's deposition testimony, the Seventh Circuit's recent compelled speech

analysis in *Mayle v. United States*, 891 F.3d 680, 686 (7th Cir. 2018), and in light of the limited

situations under Alabama law in which a citizen is *required* to specifically display an *Alabama

driver license* or identification card.

In *Wooley*, the plaintiff challenged the requirement of the State of New Hampshire that

his license tag display the state's motto, "Live Free or Die." *Wooley*, 430 U.S. at 713. The

manner in which the Court framed the constitutional issue is significant:

> We are thus faced with the question of whether the State may
> constitutionally require an individual to participate in the
> dissemination of an ideological message *by displaying it on his
> private property in a manner and for the express purpose that it be
> observed and read by the public*. We hold that the State may not do
> so.

*Id.* (emphasis added). The Court found that the New Hampshire statute "in effect requires that

appellees use their private property as a 'mobile billboard' for the State's ideological message or

suffer a penalty." *Id.* at 1435. The Court found the state could achieve its purpose of identifying

vehicles without the use of the motto and that the motto conveyed a distinct ideological message. *Id.* at 716.

In contrast to the requirement in *Wooley* that citizens use private property to broadcast the state's ideological message to the public generally, the Seventh Circuit recently rejected a compelled speech claim brought by a Satanist who challenged the printing of "In God We Trust" on United States currency. *Mayle*, 891 F.3d at 683. The court dispensed with this claim as follows:

> Inscribing the motto on currency, Mayle argues next, violates the Free Speech Clause because the national motto conveys a religious message, which he is being forced to convey: that he "trusts" in a deity. But Mayle is not in any meaningful way affirming the motto by using currency. See *Wooley v. Maynard*, 430 U.S. 705, 717 n.15, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). *He is not wearing a sign or driving a car displaying a slogan.* See *id.* at 717, 97 S.Ct. 1428. As the district court noted, *most people do not brandish currency in public—they keep it in a wallet or otherwise out of sight until the moment of exchange.* And the recipient of cash in a commercial transaction could not reasonably think that the payer is proselytizing. If the recipient thought about it at all, *she would understand that the government designed the currency and is responsible for all of its content, including the motto. She would not regard the motto as Mayle's own speech.*

*Mayle*, 891 F.3d at 686 (emphasis added). *Mayle*'s analysis regarding carrying currency is more analogous to carrying a state identification document under ASORCNA than displaying the state's motto on a private vehicle as in *Wooley*, as the testimony of Does 3 and 7 and the state's statutory purposes regarding the use of driver licenses make clear.

First, neither ASORCNA, nor Alabama law in general, require registrants to display their Alabama driver license or identification card to the general public. Doe 3 testified that he kept his driver license in his pocket and that in general members of the public do not see his license. (Doe 3 Dep. at 40). Doe 7 likewise testified that he kept his driver license in his pocket and that

48

he displayed his license when he had to. (Doe 7 Dep. at 26). *See Mayle*, 891 F.3d at 686 (stating "most people do not brandish currency in public—they keep it in a wallet or otherwise out of sight until the moment of exchange.").

Second, Alabama law requires registrants to display their Alabama driver license or identification card bearing the criminal sex offender designation only under limited circumstances. The Alabama Code governs the contents of a driver license and when it, *rather than another form of government identification*, must be possessed or displayed. An Alabama driver license must contain "a distinguishing number assigned to the licensee and a color photograph of the licensee, the name, birthdate, address, and a description of the licensee." ALA. CODE § 32-6-6. Alabama law further provides that "[e]very licensee shall have his or her license in his or her immediate possession at all times when driving a motor vehicle and shall display the same, upon demand of a *judge of any court, a peace officer, or a state trooper*." ALA. CODE § 32-6-9 (emphasis added). In *Sly v. State*, 387 So. 2d 913 (Ala. Crim. App. 1980), the Alabama Court of Criminal Appeals upheld a defendant's conviction for refusing a state trooper's request to see a driver's license because the trooper had a statutory right to request the license and the driver had a duty to display it. *Sly*, 387 So. 2d at 915-16. Thus, the state requires every citizen to possess a form of state identification that proves the citizen is authorized to operate a motor vehicle and that accurately identifies the citizen to judicial officials and law enforcement officers.

ASORCNA adds that "[e]very adult sex offender who is a resident of this state shall . . . always have in his or her possession, a valid driver license or identification card," and that this card shall "bear[] a designation that enables law enforcement officers to identify the licensee as a sex offender." ALA. CODE § 15-20A-18(a), (b). Consistent with the purposes of a driver licenses

for non-sex offenders, ASORCNA allows law enforcement officers to accurately identify sex offenders. ASORCNA's additional license requirement is consistent with its legislative purpose of "providing law enforcement with priceless tools to aid them in their investigations including obtaining information for identifying, monitoring, and tracking sex offenders." ALA. CODE § 15-20A-2(1). This is in turn related to the statute's stated purpose of preventing sex offender recidivism. *Id.* Thus, as with other regulations regarding Alabama driver licenses, ASORCNA's sex offender designation requirement is to allow law enforcement officers to accurately identify sex offenders.

There is *no* requirement in Alabama law that a sex offender use an Alabama driver license, rather than, for instance, a United States passport or passport card, when applying for a job, purchasing alcohol, or otherwise providing proof of identity, age, or eligibility to work. A passport would not bear a sex offender designation and can be used to establish identity and proof of age for a wide variety of transactions. Alabama Alcoholic Beverage Control Board regulations provide that proof of age to legally purchase alcohol can be established not only with a driver's license of any state, but a military identification, passport, or government agency identification bearing a photograph and date of birth. *See* Ala. Admin. Code § 20-x-6-.09(1)(d). Doe 3 testified in his deposition that in each of the instances in which he stated he was "required" to display is driver license, he could have established his identity and date of birth using a passport, if he possessed one. (Doe 3 Dep. at 36-39, 42-43). Doe 7 testified that if he possessed a passport and that this form of identification did not designate him as a criminal sex offender, he could and would use his passport to rent a home, purchase alcohol, or apply for a job. (Doe 7 Dep. at 30-31).

Thus, because Alabama law limits the circumstances under which an individual must display a driver license and limits the people to whom an individual must display a driver license to judicial officials and law enforcement officers, ASORCNA does not require sex offenders to "use their private property as a 'mobile billboard' for the State's ideological message." *Wooley*, 430 U.S. at 715. As with the display of currency in *Mayle*, registrants need not publicly display their license, and when they do so, a person viewing the license "would understand that the government designed the [license] and is responsible for all of its content, including the [criminal sex offender designation]." *Mayle*, 891 F.3d at 686. The state thus does not compel speech through the information contained on its driver licenses. Rather, an Alabama driver license or identification card and the information displayed on it is "government speech" not constrained by the First Amendment. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015); *Pleasant Grove v. City of Summum*, 555 U.S. 460 (2009). As a result, defendants are entitled to judgment as a matter of law as to plaintiffs' compelled speech claim in Count IV.

5. Defendants Are Entitled to a Judgment as a Matter of Law on Plaintiffs' First Amendment Overbreadth Claim in Count V

Defendants also move for summary judgment on Count V, plaintiffs' First Amendment "overbreadth" claim. This claim challenges the law's requirement that registered sex offenders report "[a]ny email addresses or instant message address or identifiers used, including any designations or monikers used for self-identification in Internet communications or postings other than those used exclusively in connection with a lawful commercial transaction." ALA. CODE § 15-20A-7(a)(9). In addition, sex offenders must provide "[a] list of any and all Internet service providers used by the sex offender." ALA. CODE § 15-20A-7(a)(18).

Defendants recognize this Court's analysis of that claim in its order (doc. 125) on an earlier motion to dismiss. Defendants respectfully disagree with the Court's conclusions, and

instead of repeating their earlier arguments, defendants rely on their briefing in their Motion to Dismiss (doc. 87), and make two additional points: First, defendants respectfully submit that this Court should read the sub-sections more narrowly, and that the sub-sections should be read to contain separate obligations so that even if one is unconstitutional, the other can stand. Second, defendants bring a related case to the Court's attention.

Sub-section (9) does not require sex offenders to report every time they use a computer, or even every time they post or transmit messages on a computer. Rather, it requires them to provide their email addresses and online "monikers," or user names. Take the popular social media platforms Facebook and Twitter. A user registers once on those platforms, and others like it. Offenders need report those user names only once, not every time they are used. There are only so many platforms in existence, and only so many email addresses that people use for lawful purposes. It seems unlikely that any person, sex offender or not, would register on new platforms so regularly that the statute would impose such a reporting burden that it would chill speech. And if a sexual predator is changing online identities and email addresses so often that it becomes a burden, one must wonder why he is going through such efforts to change his online identity.

Sub-section (18) was the subject of this Court's concern about reporting requirements when a sex offender uses another's smart phone or computer. It is true that the statute imposes this requirement, but not every instance that another device is used. If a sex offender uses the internet at a public library, that internet service provider must be provided, but only once, not each time it is used. And as with sub-section (9), if a sexual predator is so regularly going online using new internet service providers that reporting is a burden, one must wonder if he is actively attempting to disguise his online identity.

Should this Court conclude that sub-section (18) is overbroad, that does not necessarily mean that sub-section (9) is overbroad, or vice versa. The obligations are separate, and while defendants believe that both are constitutional, one can stand without the other.

Finally, defendants bring to the Court's attention a Supreme Court decision concerning a North Carolina law, *Packingham v. North Carolina*, 137 S.Ct. 1730 (2017). There, a registered sex offender challenged a statute that made it a felony for sex offenders to access certain social media websites like Facebook and Twitter, and the Supreme Court found that the statute violated the First Amendment. Of course, North Carolina's outright ban is very different from Alabama's reporting requirement.

Justice Alito's concurring opinion in *Packingham* discusses how the internet can be misused by predators (and why it is reasonable to require offenders to report online identities):

> Several factors make the internet a powerful tool for the would-be child abuser. First, children often use the internet in a way that gives offenders easy access to their personal information – by, for example, communicating with strangers and allowing sites to disclose their location. Second, the internet provides previously unavailable ways of communicating with, stalking, and ultimately abusing children. An abuser can create a false profile that misrepresents the abuser's age and gender. The abuser can lure the minor into engaging in sexual conversations, sending explicit photos, or even meeting in person. And an abuser can use a child's location posts on the internet to determine the pattern of the child's day-to-day activities—and even the child's location at a given moment. Such uses of the internet are already well documented, both in research and in reported decisions.

137 S.Ct. at 1739-1740 (Alito, J., concurring) (footnotes omitted).

It is thus important that law enforcement be aware of a sex offender's online aliases. Normal internet usage would not require so many different online identities that reporting would be such a burden that it chills anyone's speech. If a person is changing identities so often that it becomes a burden, it implicates the dangers noted by Justice Alito.

For all these reasons, defendants are entitled to judgment on plaintiffs' First Amendment overbreadth claim.

## C.  Conclusion

For the reasons stated above, defendants are entitled to judgment on the pleadings, or, in the alternative, summary judgment in their favor as to all of plaintiffs' claims in this case.

Respectfully submitted,

Steve Marshall
  *Attorney General*

/s Brad A. Chynoweth
James R. Houts (ASB-1321-T77J)
  *Deputy Attorney General*
Brad A. Chynoweth
(ASB-0030-S63K)
Winfield J. Sinclair
(ASB-1750-S81W)
  *Assistant Attorneys General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
(334) 242-7300
(334) 353-8440 (fax)
jhouts@ago.state.al.us
bchynoweth@ago.state.al.us
wsinclair@ago.state.al.us

**Counsel for Defendants**

**CERTIFICATE OF SERVICE**

I certify that on July 30, 2018, I filed the foregoing electronically using the Court's CM/ECF system, which will serve all counsel of record.

/s Brad A. Chynoweth
Counsel for Defendants