## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **JOHN DOES #1 et al.,** | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | **Case No.  2:15-cv-606-WKW** |
| | ) | |
| **STEVEN T. MARSHALL, et al.,** | ) | |
| | ) | |
| *Defendants*. | ) | |

## PLAINTIFFS' CONSOLIDATED RESPONSE AND REPLY TO DEFENDANTS BRIEFING ON SUMMARY JUDGMENT

Plaintiffs respectfully submit this consolidated response and reply to Defendants' briefing on summary judgment, docs. 155, 158.  Based on the following, Plaintiffs request that the Court grant their dispositive motions, docs. 139, 147 and, deny the Defendants' motion, doc. 154.

### Introduction

In their summary judgment briefs, the defendants have engaged in attempts to revive arguments previously foreclosed by this Honorable Court.  They cherry-pick excerpts from the record and, in their usual form, attempt to pass the excerpts off to the Court as impenetrable fact.  The defendants misapply or misapprehend this Court's legal analyses and settled Eleventh Circuit precedent such as the "engagement principle" and continuing violations doctrine as they deflect from the fact that they

simply cannot survive relevant legal scrutiny in light of Plaintiffs' claims. Finally, the defendants make a desperate attempt to convince this Court that the flagrant constitutional violations complained of by Plaintiffs are legally justified because, as their "expert" opines, there exists a high risk of "crossover offending."

Plaintiffs contend that the defendants' distraction tactics should not sway this Court from the relevant matters of law. Moreover, the Court will likely find that the defendants' "expert" not only engages in providing misleading metrics to support his "findings," but that his "conclusions" are intellectually dishonest, given this Court's knowledge of the relevant social science on sex offender recidivism. Based on Plaintiffs' operative complaint, briefs on summary judgment for declaratory relief (doc. 138, 140, 149), this Court's rulings (doc. 51, 125), all which Plaintiffs incorporate by reference herein, together with the following facts and legal argument, Plaintiffs' dispositive motions should be granted.

## I. Declaratory Judgment in Favor of Plaintiffs is Due on all Counts

Declaratory judgment in favor of the Plaintiffs is due on Counts 1, 3, 4 and 5 of doc. 138, Plaintiffs Supplement to the Second Amended Complaint. As to each count, the defendants have failed to carry their burden under relevant legal scrutiny. Each count of the operative complaint is subject to heightened scrutiny (strict or intermediate) which requires the defendants to demonstrate that the provisions under review are narrowly tailored. The defendants have offered nothing credible to demonstrate the ASORCNA provides the requisite tailoring to pass constitutional muster.

A. <u>Defendants failed to meet their burden as to Count 1</u>

In Count 1, Messers John Doe 3 and 7 challenge the "residing with minors" proscriptions of Ala. Code § 15-20A-11(d) as applied to them.  Doe 3 and 7 complain that the statute substantially infringes upon their rights to familial associations.  Doc. 138, ¶¶ 330-335.  This Court has held repeatedly and emphatically that each of the defendants' arguments against Plaintiffs' claim in Count 1 is foreclosed by the Supreme Court's holding in *Moore v. City of East Cleveland,* 431 U.S. 494, 504–05 (1977). Doc. 125 at 17-18.  The defendants are required demonstrate that the proscriptions on living with minors is narrowly tailored to serve a compelling state interest. Doc. 125 at 17 (citing *Reno v. Flores*, 507 U.S. 292, 302 (1993).).

After this Court's rulings at the motion-to-dismiss stage, the defendants finally conceded that all their previous arguments on Count 1 were "unconvincing" and, simply did not "hold water" under relevant scrutiny. Doc. 125 at 17.  To breathe life back into their defense to Plaintiffs' Count 1, the defendants introduced Dr. Nicholas Scurich in their summary judgment briefing, a purported "expert" they located down the hall from Dr. Richard McCleary, their "expert" who testified in the *McGuire v. Strange* matter. *See* doc. 156-8 (Scurich report dated July 5, 2018).

Dr. Scurich employs tactics similar to those employed by Dr. McCleary; he explicitly seeks to insult the Court's intelligence with an unremarkable narrative that fails to approach the boundaries of credible research methods and, that is rote with

misleading "analytics" and "word games," disguised as findings.[1]  Rather than give Dr. Scurich's "contribution" to this matter more credibility than it deserves, Plaintiffs refer the Court to their expert, Dr. Karl Hanson.  Dr. Hanson is considered by the social science community as the preeminent researcher of sex offender recidivism.  He has likely published more important articles and conducted more credible studies on the topic than any sex offender recidivism expert in the world. *See* Exhibit 1, attached (Dr. Hanson's expert report and curriculum vitae).  Importantly, Dr. Hanson developed the world's most commonly used sex offender assessment tools, Static-99 and Static-99R. National Institute of Corrections website, available at https://nicic.gov/static-99static-99r (last visited, August 23, 2018).  Prior to Dr. Scurich submitting his report on "cross-over" offending, Dr. Hanson raised the subject in a supplemental report, finding that such offending was rare while citing relevant research on the topic. *See generally* Exhibit 2, attached.  Dr. Hanson prepared a rebuttal to Dr. Scurich's report which serves to completely invalidate Dr. Scurich's entire report while exposing it for what it is — $37,000.00 worth of useless rhetoric. *See* generally Exhibit 3 (Dr. Hanson's rebuttal

---

[1] For example, Dr. Scurich represents to this Court, "1-in-3 sexual offenders will engage in crossover offending of some sort, and approximately 1-in-10 sexual offenders will have both adult and child victims." Doc. 156-8 at 4.  He further represents that, "[t]he minor cohabitation rule is sensible in light of the prevalence, the relative risk, and the inability to prospectively discern crossover offenders." *Id*. at 4.  He ultimately concludes, "the fact that all sex offenders are subject to the minor cohabitation rule implies that any risk of crossover offending by offenders with adult victims is too great to bear. This decision cannot be invalidated by appealing to the use of individualized risk assessments. Just as the meteorologist cannot dictate what the appropriate weekend plans should be, nor can an individualized risk assessment dictate whether or not an individual should be subject to the minor cohabitation rule of ASORNCA." *Id*. at 15.

report); *Cf.* Exhibit 4 at ¶ 33. (Dr. Scurich Decl., charging Alabamians $37,000.00 for his report).

1. <u>Plaintiffs refer the Court to credible research on sex offender recidivism</u>

As a preliminary matter, it is important to review this history of this Court's engagement in sex offender social science.  In the *McGuire* matter, this Court was provided a detailed review of the compendium of empirical evidence regarding sex offender recidivism. *See e.g.*, *McGuire v. Strange*, 2:11-cv-1027-WKW, doc. 101, at 64-68.  As have courts throughout the United States, this Court has been presented empirical evidence demonstrating that *credible* studies conducted regarding sex offender recidivism have swung the pendulum.

> [E]vidence in the record support[s] a finding that offense-based public registration has, at best, no impact on recidivism.  In fact, one statistical analysis in the record concluded that laws such as SORA actually *increase* the risk of recidivism, probably because they exacerbate risk factors for recidivism by making it hard for registrants to get and keep a job, find housing, and reintegrate into their communities.
> [W]hile it is intuitive to think that at least some sex offenders … should be kept away from schools, the statute makes no provision for individualized assessments of proclivities or dangerousness, even though the danger to children posed by some … who never committed a sexual offense—is doubtless far less than that posed by a serial child molester.

*Doe v. Snyder*, 834 F.3d, 704-705 (6th Cir., 2016) (citing Prescott, Rockoff (2011) study); *see also McGuire*, Tr. Ex. 7.

The most recent studies have caused an overall shift from broad hysteria — hysteria based upon high-profile instances of horrific acts of a dangerous few among

the broadly defined "sex offender" class; to reason — that which acknowledges the heterogeneity of the broadly defined class and the relatively low, not "frighteningly high," recidivism rates of sex offenders, particularly after many years, post-conviction, of living offense-free in the community. *See McGuire*, doc. 249, p. 109 ln 2 : p. 117 ln 12 (Testimony of plaintiff's expert, Dr. Elizabeth Letourneau.).

> 2. Social scientists' sex offender research methods have improved since the enactment of registration laws.

Admittedly, cursory inspection of the science can be confusing, and in the past, the defendants have made every attempt to exploit this.  And litigants have not consistently provided courts with distinguishing characteristics of credible empirical studies versus those that have been performed with less statistical rigor.  While attempting to avoid being hyper-technical, Plaintiffs humbly attempt to so direct this Court's attention:

As a threshold matter, it is important to point out that all *credible* empirical research seeks to demonstrate, through underlying data and ultimate results, two fundamental research principles: (1) "reliability"; and, (2) "validity."  *See*, Ellen A. Drost, *Validity and Reliability in Social Science Research*, Education Research and Perspectives, Vol.38, No.1 (2011), available at http://www.erpjournal .net/wp-content/uploads/2012/07/ERPV38-1.-Drost-E.-2011.-Validity-and-Reliability-in-Social-Science-Research.pdf. (last visited, August 23, 2018.)

Commentary[2] in past litigation, based upon narrowly-focused subject matter, has been misinterpreted by some litigants.  Subsequently, such commentary has appeared in well-known cases. *See e.g. Smith v. Doe*, 538 U.S. 84, 103 (U.S. 2003) ("The risk of recidivism posed by sex offenders is "frightening and high.") (citing *McKune v. Lile*, 536 U.S. 24, 34).   Many citations of the commentary have landed and been presented as fact in sex-offender litigation and court opinions ever since.[3]   Moreover, many litigants (and courts) have taken contextual liberty with scholars' published work, which has likely contributed to a general theme in American case law suggesting as fact that all persons who have committed crimes which contain a sexual component pose high risks for sexual crime recidivism.  *See e.g. id.*   There is no wonder why litigants, courts and the public have been confused — even misled — by some sex offender recidivism research findings of the past.

---

[2] For example, the Court in *McKune v. Lile* stated, "The critical first step in the Kansas Sexual Abuse Treatment Program (SATP), therefore, is acceptance of responsibility for past offenses. This gives inmates a basis to understand why they are being punished and to identify the traits that cause such a frightening and high risk of recidivism." *McKune v. Lile*, 536 U.S. 24, 33-34 (U.S. 2002).  Since the Court's commentary, litigants and courts have failed to acknowledge the derivation of this comment in full context – that the Court's commentary originated from a 1988 training guide designed to offer treatment for imprisoned, male sex offenders. *McKune v. Lile*, 536 U.S. 24, 33 (*citing* U.S. Dept. of Justice, Nat. Institute of Corrections, *A Practitioner's Guide to Treating the Incarcerated Male Sex Offender xiii* (1988)).

[3] *See e.g. United States v. Mercado*, 2015 U.S. App. LEXIS 3974, 10 (1st Cir. R.I. Feb. 6, 2015); *Hobbs v. County of Westchester*, 397 F.3d 133, 145 (2d Cir. N.Y. 2005); *Cunningham v. Lemmon*, 2007 U.S. Dist. LEXIS 97020, 25 (S.D. W. Va. Feb. 14, 2007); *Doe v. Snyder*, 932 F. Supp. 2d 803, 813 ( E.D. Mich. 2013); *Doe v. Raemisch*, 895 F. Supp. 2d 97, 908 (E.D. Wis. 2012); *Doe v. Nebraska*, 734 F. Supp. 2d 882, 920 (D. Neb. 2010); *United States v. Garner*, 490 F.3d 739, 743 (9th Cir. Cal. 2007); *Seals v. Alabama*, 2011 U.S. Dist. LEXIS 66094, 54 (M.D. Ala. May 26, 2011).

3.  Dr. Hanson, Plaintiffs' expert, provides the Court with credible empirical analyses on sex offender recidivism

The most recent, credible empirical research on sex offender recidivism provides the collective conclusion that sex offender recidivism, generally, is low relative to other crimes.  True, when a recidivist pedophile claims an additional victim, it is a horrific occurrence — the pain and anguish to victims, their families and the community, palpable.  But current research indicates that sexual crimes and recidivism are best managed by a targeted approach towards those who pose credible threats of recidivist activity.  Based on decades of observation of sexual offenders, the compendium of research now indicates that Alabama's "one-size-fits-all" approach to employing its onerous sex offender scheme is inapposite prevailing findings and common sense.

One recent meta-analysis (over 540,000 individuals across 11 different studies) of sex offenders provides solid support for Plaintiff's contentions. *See*, Rachel E. Kahn, Gina Ambroziak, Karl Hanson & David Thornton, *Release from the Sex Offender Label*, Archives of Sexual Behavior (Feb., 2017), available at https://www.researchgate. net/publication/314487441_Release_from_the_Sex_ Offender_Label.  Employing the soundest statistical measurements available today, the results found by Kahn *et al*., provide further proof of what Plaintiffs contend — the lack of proper tailoring of the § 15-20A-11(d) and the other provisions challenged here is fatal under this Court's heightened scrutiny.

The Kahn *et al.* analysis of the study's results suggests that Alabama sex offenders, like Plaintiffs and ASORCNA registrants who are similarly situated, have predicted rates of sexual recidivism between 1 and 2 percent. *Id.*, at 2; *see also*, *McGuire*, doc. 250, p. 86 ln 22 : p. 90 ln 4 (Plaintiff's expert, Dr. Prentky, discussing his "offender" profile.). The study finds that, at such low rates, sexual offenders' risk of recidivism cannot be differentiated from that of "out of the blue" sexual crimes committed by persons convicted for non-sexual crimes. *Id.*, at 2.

The Kahn *et al.* publication intuitively suggests that, if registrants pose no more risk than that of an "out of the blue" sexual offense, ASORCNA's lifetime registration requirement, let alone its unmatched debilitating restrictions and requirements, simply make no sense absent individualized assessments. *Id.*, at 2. The study buttresses previous findings that predicted sexual recidivism rates decrease dramatically over time for offenders who remain offense-free. *Id.* Yet there are likely thousands of ASORCNA registrants who, like the Plaintiffs here, have been offense-free in the community after committing a single sexual crime against adult victims, 20, 30, or more than 40 years ago. *McGuire*, doc. 251, p. 91 ln 22 : p. 92 ln 17 (Alabama Intelligence Analyst, Lesia Baldwin, testifying to as many as 17,000 ASORCNA registrants in the state database as of April 2, 2014.).

Along with at least one colleague familiar to this Court, Dr. Hanson recently published a report which confirmed his Kahn et al. study. Hanson, R. K., Harris, A. J. R., Letourneau, E., Helmus, L. M., & Thornton, D. (2017, October 19), Reductions in

Risk Based on Time Offense Free in the Community: Once a Sexual Offender, Not Always a Sexual Offender, *Psychology, Public Policy, and Law* (attached hereto as Exhibit 5)(finding that, "[T]he likelihood of new sexual offenses declined the longer individuals with a history of sexual offending remain sexual offense free in the community. After 10 to 15 years, most individuals with a history of sexual offenses were no more likely to commit a new sexual offense than individuals with a criminal history that did not include sexual offenses.").

This Court was previously provided unrebutted expert testimony which strongly indicates that infringing on the right to familial associations and other constitutional rights of Plaintiffs and many registrants the way ASORCNA does, *increases* risk of recidivism. *See e.g.*, *McGuire*, doc. 249, p. 137 ln 1 : p. 142 ln 11. The findings by Dr. Prescott *et al.*, are also intuitive. Making it difficult for persons to find jobs and housing, and to seek shelter with family members — to reintegrate into our communities after atoning for their crimes — leads to desperation and despair, for lack of basic sustenance and family and community support. *See id.*, p. 137 ln 1 : 144 ln 18. Increased crime among the homeless, jobless and desperate is a result that is quite familiar to this Court.

4.  The defendants offer no credible empirical evidence

The compelling empirical evidence presented in *McGuire* and in this matter demonstrates that under scrutiny requiring narrow tailoring of ASORCNA provisions, the statute is unconstitutional, particularly considering the absence the individualized assessments in the scheme. In comparison and contrast, the defendants present virtually

nothing.  They have in the past strained to sift through the body of sex offender research, which overwhelmingly supports Plaintiff's contentions, and have conveniently (and duplicitously) used Dr. Scurich to further their practice of waiving "shiny objects," such as "cross-over"[4] offending. This Court should not be detained by defendants' attempts to engage this Court in fallacious anecdotes.

Ultimately, Dr. Scurich has as additional, fatal flaw as an "expert"; one that disqualifies him from serious consideration by this Court and  should cause the Court to reject his findings and opinions in full.  The findings and opinions offered by Dr. Scurich's here appear to completely contradict his recently published findings and opinions.  In 2016, Dr. Scurich published an article advancing, in part, the following findings and opinions:

> Despite the fact that government statistics and national crime self-report data indicate that sexual offenses have been significantly declining in the United States, the past 25 years have seen sweeping changes in criminal and civil policy towards sex offenders, a so-called "war on sex offenders." Spurred by a series of high profile sex offenses committed by repeat offenders, media attention to these and other sexual crimes, and the public perception that a uniquely dangerous groups of sex offenders are recidivating at a high rate, laws targeted specifically at sex offenders have been adopted across US jurisdictions. These laws allow for the post-incarceration civil commitment of sex offenders, mandate that sex offenders follow registration and notification requirements in their communities (i.e., Megan's law), limit the distance sex offenders can live

---

[4] *McGuire*, doc. 166-3, -4.  Yet Defendants ignore that fact that *all* manner of sexual recidivism is subsumed in comprehensive, well-conducted recidivism studies, especially meta-analyses with longer follow-up periods on the topic.  In other words, so-called "*cross-over" offenses are necessarily recidivist acts* thus, the occurrences are controlled for and represented in overall recidivism rates in relevant studies.

and work in areas inhabited by or frequented by children, and significantly increase sentences for online sex offenses.

Yet, the political rhetoric and public perception underlying many of these laws appears inaccurate. While the public and politicians seem to believe that sex offenders are highly likely to recidivate, with public estimates suggesting that over three quarters of offenders will likely re-offend, empirical studies demonstrate that sex offenders' recidivism rates are far lower. Recidivism estimates range from a low of 5% for new arrests in a Department of Justice report completed during the 1990s, tracking the behavior of nearly 10,000 offenders across 15 states for 3 years following release, to just under a 12% re-arrest rate for a study of over 28,000 sex offenders followed for an average of almost 6 years. While it is impossible to know the actual rate of recidivism of sex offenders because many sexual crimes go unreported or fail to be investigated and prosecuted, it seems safe to assume that the public misperceives and overestimates the likelihood of this type of recidivism.

Scurich, Nicholas and Gongola, Jennifer and Krauss, Daniel A., *The Biasing Effect of the 'Sexually Violent Predator' Label on Legal Decisions* (March 25, 2016)(citing Plaintiffs' expert, Dr. Karl Hanson, among other scholars.)(copy attached hereto as Exhibit 5). Interestingly, in his 2016 article, Dr. Scurich vehemently defends the constitutional rights of "sexually violent predators." *Id*. at 18-19 ("**The findings … also raise implications for the due process rights afforded under the Constitution. Due process essentially refers to the rights one is due before liberty may be deprived.** *The label sexually violent predator is not a legitimate basis on which to deprive an individual of liberty*, (i.e., it serves no diagnostic or legal purpose)." (emphasis added).

Because the defendants present Dr. Scurich's opinion[5] as their sole support for Ala. Code 15-20A-11(d)'s requisite tailoring to serve a compelling state interest, they have failed to meet their burden under strict scrutiny and, declaratory judgment in favor of Plaintiffs is due as to Count 1.

### B. Under vagueness analysis, defendants failed to meet their burden as to Count 3

Plaintiffs motion for declaratory relief should be granted, as to Count 3 of their operative complaint.   Plaintiffs contend that ASORCNA's residential zones of exclusion, Ala. Code § 15-20A-11(a)-(i) are void due to arbitrary enforcement of the provisions. *See* doc. 138, ¶¶ 292-294, 296-307.   Moreover, Plaintiffs contend that ASORCNA's employment zones of exclusion are unconstitutionally vague because persons of ordinary intelligence cannot possibly understand when and how they violate the provisions and, that the employment zones of exclusion are arbitrarily enforced. Doc 138, ¶¶ 337-341.

1. ASORCNA's residential zones of exclusion are unconstitutional due of arbitrary enforcement.

In their brief in support of summary judgment for declaratory relief, Plaintiffs presented disturbing, irrefutable evidence of Alabama law officers' tactics employed to enforce ASORCNA's residential zones of exclusion. *See generally* doc. 149 at 6-18 (providing evidence that Alabama law enforcement, based on their understanding of

---

[5] Indeed, Dr. Scurich's opinion is the defendants' sole remaining proffer of requisite tailoring for all provisions challenged by Plaintiffs here.  Thus declaratory relief is due as to each of Plaintiffs' claims.

ASORCNA, conducts random, warrantless, uninvited and unannounced "home compliance checks," requiring registrants to be present when they arrive and, requiring registrant to produce items (*e.g.* mail or clothing inside the home) to prove their residency at the address.). *Id.* While the defendants have played "fast and loose"[6] with the factual record in their attempt to defend against Plaintiffs claims of vagueness due to arbitrary enforcement of § 15-20A-11, they do not and cannot deny that these "home compliance checks" occur, nor that these random searches of registrants' homes are ongoing. The defendants make a tremendous effort to try to sanitize the actions and words of, for example, Investigator Bone of the Chilton County Sheriff's Office. *See* doc. 158 at 4, 7-9. But then there is that transcript of Bone's sworn testimony from Doe 7's July 17, 2018 preliminary hearing regarding the charges recently brought against him by Bone and Chilton County prosecutors. *See* Ex. 6 (submitted under seal). Two things become clear from Bone's July 17 testimony: (1) Bone and the prosecutor interprets ASORCNA in a retrospective manner to justify their actions (*see id.* at 3-8, 33-34) and, (2) the judge's actions may provide an indication as to why officers and prosecutors fail to appreciate one's constitutional rights. *See id.* at 19-21, 37-38. But through Bone's testimony at Doe 7's preliminary hearing, the Court can clearly find

---

[6] For example, the defendants represent to the Court that home compliance checks are performed annually along with the U.S. Marshall's Service. Doc. 158 at 3-4, 17. But Bolton, Jones and Bone have clearly conducted home compliance checks on more frequently and, without federal presence. *See e.g.* doc. 148-6 (Jones video).

that his enforcement tactics, as ASORCNA's residency restrictions, is nothing short of lawless. *See id*. at 8-19, 22-33.

The undisputed facts are that registrants like Mr. Doe 7 are being arrested and prosecuted for violating § 15-20A-11 at the whims of officers, prosecutors and judges. See e.g. doc. 148-3 at 51-54. And this is the type of arbitrary activity contemplated by the Court when invalidating statutory provisions which represent "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 357-358 (internal citations omitted.); See also *United States v. Matchett*, 837 F.3d 1118, 1122 (11th Cir. 2016) ("Arbitrary enforcement means that a law leaves government actors "free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case."). Registrants of ASORCNA should not be required to have two lawyers present to avoid arrest and potential imprisonment because of arbitrary arrests and prosecution under presumed officer and prosecutor statutory authority. *See e.g.* doc. 148-6 (Jones Video).

Plaintiffs presented additional evidence that although law enforcement is required since August 1, 2017 to provide a preapproval process for ASORCNA registrants seeking housing in Alabama, approval to live in some cities is completely arbitrary. For example, since August 1, 2017, the police officers who manage sex offenders in the city of Montgomery Alabama, where about 425 registrants report to local law enforcement, have allowed registrants with sexual convictions against minors to live within ASORCNA's zones of exclusion. Doc. 148-1 at 3. The defendants

advance the argument that this Montgomery law enforcement practice is not arbitrary enforcement because, as the defendants contend, such allowances are done by "mistake." Doc. 155 at 38; doc. 158 at 5.  But Investigator Bolton readily admitted that he grants "leniency" from the residency restrictions when he feels it is appropriate. Doc. 148-1 at 21-22.

Because the residential zones of exclusion are arbitrarily enforced, and the defendants cannot demonstrate that the provisions are narrowly tailored, declaratory relief in favor of Plaintiffs as to the part of Count 3 challenging Ala. Code § 15-20A-11(a)-(i) is due.

> 2. ASORCNA's employment zones of exclusion are unconstitutionally vague.

This Court has ruled "ASORCNA still fails to put ordinary people on notice of the extent or effect of the employment exclusion zones. Without a safe-harbor provision or a publicly available land-use database, registrants can only guess at whether their place of employment falls within a zone of exclusion." Doc. 125 at 28.  The result is, registrants like Doe 3, 7 and 9, each of whom have sought work, would like to work more than they do and, have specific skill sets they would like to use for work are prohibited from doing so in, for example, of eighty-five percent of jobs available in Montgomery. *See* doc. 138 ¶¶ 213-236; *see also McGuire v. Strange*, 83 F. Supp. 3d 1231, 1241 ("Approximately 85 percent of jobs in the city are barred to offenders (creating an employment 'zone of exclusion').").

Because the defendants cannot demonstrate that ASORCNA's employment zones of exclusion are narrowly tailored, declaratory relief in favor of Plaintiffs on this aspect of Count 3 is due.

### C. Defendants failed to meet their burden as to Count 4

Count 4 is Plaintiff's challenge to ASORCNA's branded identification requirement as unconstitutionally compelled speech. This First Amendment Claim is subject to heightened scrutiny and, the defendants have failed to meet the required burden by demonstrating that the challenged provisions in Count 4 are narrowly tailored.

In their brief in support of summary judgment, the defendants re-raise the contention that the branded identification provisions challenged here pass constitutional muster because Doe 3 and 7 indicated that they are not prevented using a passport. Doc. 155 at 14-16, 50. Upon further questioning however, it becomes clear that whether Doe 3 and 7 may purchase or afford to purchase a passport are two very distinct questions. *Id*. (Doe 3 testifying that he cannot afford to purchase a passport.). Besides, this Court has held that passports are poor substitutes for state-issued identification. Doc. 125 at 38 n. 16. Moreover, the branded state-issued identification ASORCNA registrants are required to carry are clearly and "readily associated" with the bearer, unlike passports. Doc. 51 at 46 n. 11. The defendants failed to address this truth.

Finally, as to the branded identification requirements under review here, the defendants cannot demonstrate that the provisions are narrowly tailored. In fact, the

opposite is true; state officials responsible for promulgating the branded identification designation have admitted (doc. 140-5 at 10; doc. 140-6 at 10-11) that they could have chosen single-letter designation in order to accomplish the stated purpose for the brand: to allow law enforcement officers to "identify the licensee as a sex offender." Ala. Code § 15-20A-18(b), (d).  Thus, the State admits that the branded identification provisions are more broadly tailored than necessary to achieve the stated purpose.

### D. Defendants failed to meet their burden as to Count 5

This Court has held that the internet reporting provisions complained of in Count 5 of Plaintiffs' operative complaint are subject strict or intermediate scrutiny.  For the reasons stated, supra, particularly regarding the State resting on Dr. Scurich to satisfy the narrow tailoring prong of heightened scrutiny, the defendants have not and cannot meet their burden.  This should end the matter as to Count 5.  Declaratory judgment is due in favor of Plaintiffs as to Count 5.

### II. The Defendants' are Wrong as to Statute of Limitations

The Defendants contend that they are entitled to judgment as a matter law based on the statute of limitations.  The defendants acknowledge the Eleventh Circuit's continuing violations doctrine (doc. 155 at 20-21, 25 n. 8), but ignore or fail to appreciate that each of the provisions challenged by Plaintiffs in this matter represent the paradigmatic example for which our continuing violations doctrine applies.

> Under the Eleventh Circuit's continuing violation doctrine, if a series of discrete acts of discrimination continues into the statutory filing period, then the cause of action is considered timely filed. To revive the otherwise

time-barred claim under the doctrine, however, it must be a part of a pattern or continuing practice out of which the timely-filed incident arose. When a [plaintiff] files a timely charge for a discriminatory act, he may recover for previous acts of discrimination which would otherwise be time-barred to the extent that he can meet his burden of proving the existence of a substantial nexus between the acts.

*Lewis v. Board of Trustees of Ala. State Univ.*, 874 F. Supp. 1299, 1303 (11th Cir. 1995)

(citing *Roberts v. Gadsden Memorial Hosp.,* 835 F.2d 793, 799-800 (11th Cir. 1988).).

The Court should find the defendants "statute of limitations" contentions unavailing.

Importantly, the defendants fail to acknowledge that effective August 1, 2017, the Alabama legislature enacted major revisions to each of the ASORCNA provisions under review here. Ala. Act 2017-414 (2017)(making significant changes to definitions of "overnight," "childcare facility," "reside," "residence" and, significantly revising provisions of Ala. Code §§ 15-20A-10, 11, 13, 18. This Court determined that these changes were indeed, significant. Doc. 125 at 4 (finding that Ala. Act 2017-414 was "a far-reaching rewrite of the challenged ASORCNA provisions."). As to the provisions under review here, any applicable statute of limitations clock re-started on August 1, 2017.

### III.    The Defendants' are Wrong as to Standing

The defendants contend that Plaintiffs lack standing with regard to Count 3, Plaintiffs vagueness challenge to ASORCNA's residency and employment zones of exclusion. The defendants base their contention upon what this Court has described as, the engagement principle and upon *Younger* abstention doctrine. With regard to the

employment zones of exclusion, the defendants underpin their assertion on their belief that Plaintiffs have not claimed a personal stake in the outcome regarding the employment restrictions.

> A. Doe 3 and 7 have standing to challenge ASORCNA's residential zones of exclusion based on arbitrary enforcement of the preapproval process.

The defendants contend that Plaintiffs lack standing based on what this Court has referred to as, the "engagement principle" meaning, a challenger launching a facial attack on a statute may not complain that the statute is impermissibly vague in all of its applications when it is clear that some of the activity in which he engages is clearly prohibited under the language of the statute. Doc. 51 at 24 (citing *Village of Hoffman*, 455 U.S. at 495). The Court addressed this earlier in the proceedings and, as is the case here, found that the defendants invocation of the engagement principle was "imprecise." *Id*. Applying the relevant language to this Court's ruling, the analysis includes:

> Even if it were clear what the statute proscribed, Plaintiffs have not alleged that they are already [residing within ASORCNA's zones of exclusion]. They only contend that they … are unsure of what … the statute actually allows. The engagement principle does not foreclose Plaintiffs' facial vagueness challenge… in the way Defendants suggest.
> Plaintiffs contend that law enforcement agencies across the state do not apply the residency provision uniformly. Some agencies, they allege, have allowed individuals convicted of sexual crimes to live for extended periods of time within 2,000 feet of a restricted property. They further allege that officers interpret "overnight" and "residence" to mean different things. These allegations indicate the sort of arbitrary and disparate enforcement that the due process clause will not tolerate…

Doc. 51 at 26 (citing *Village of Hoffman*, 455 U.S. at 495).

Here, Plaintiffs challenge the fact that only law enforcement, through the preapproval process can ensure compliance with the law by using their geographic mapping tools to determine whether a prospective address is valid. It is disingenuous for the defendants to claim that after amending the statute to provide for the preapproval process, that instances in which offenders who have harmed minors are allowed to reside within zones of exclusion, while the same approval process forecloses registrant housing choices for those who have never harmed minors and pose no discernable threat to children. A finding of arbitrary enforcement based on the evidence presented by Plaintiffs is to be decided by this Honorable Court. But there is no doubt that Plaintiffs have standing to challenge zones of exclusion under the vagueness analysis due to the arbitrary enforcement of the exclusion zones.

### B. Doe 7 has standing to challenge the arbitrary enforcement of ASORCNA's residential zones of exclusion and, Younger abstention is inappropriate.

Mr. Doe 7 was arrested recently by Investigator Bone for violating ASORCNA's residency restrictions. Doc. 149 at 13. His arrest is nearly identical to the circumstances he complained about in the operative complaint. Doc. 138, ¶¶ 174-180. And Plaintiffs complained of the vagueness of ASORCNA's zones of exclusion. *Id.* at 292-294, 297-302. Under this facial challenge, Plaintiffs, including Doe 7 have standing.

The defendants further contend that the Court should abstain from reviewing Plaintiff's arbitrary enforcement, vagueness challenge to ASORCNA's zones of exclusion based on abstention doctrine established in *Younger v. Harris*, 401 U.S. 37

(1971), because of Doe 7's recent arrest and pending criminal charges. The defendants are wrong.

First, as the Supreme Court has held, "*Younger* abstention is required, however, only when state court proceedings are initiated 'before any proceedings of substance on the merits have taken place in the federal court.' In other cases, federal courts must normally fulfill their duty to adjudicate federal questions properly brought before them." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 238 (1984) (citing *Hicks v. Miranda*, 422 U.S. 332, 349 (1975)). Doe 7 did not come to federal court as a defendant in a state court case. His arrest occurred well after this litigation was filed. And it is clear that notwithstanding amendments to the residency restrictions of ASORCNA, the arbitrary enforcement of the provisions is identical to that which led to Doe 7's arrest in 2014 and complained about in 2015. Since the 2017 amendments, substantial litigation has occurred including discovery and motions practice. As such, prosecution of Doe 7 should not be a State tool to foreclose this Court's opinion on vagueness.

Second, it is clear here, that the arrest and pending charges against Doe 7 is evidence of arbitrary enforcement and the likelihood of future arbitrary enforcement. The harm complained of by Plaintiffs from the outset of this matter is that the law is so vague that it will lead to repeated, arbitrary enforcement. Abstention is not in order simply because a pending state-court proceeding involves the same subject matter. *New Orleans Public Service, Inc. v. Council of City of New Orleans,* 491 U.S. 350, 373, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (*NOPSI* )

Third, "there is no doctrine that ... pendency of state judicial proceedings excludes the federal courts.". *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72, (2013). In *Sprint v. Jacobs*, the Court acknowledged "exceptional" circumstances, such as pending state criminal proceedings, as one which *Younger* abstention is appropriate, but under such exceptional circumstances, the state case again, must predate substantial litigation in the federal matter. *Id*. at 73.

Finally, this matter is distinguishable from *Younger*: Doe 7 is not asking this Court to enjoin the state court criminal proceedings against him. *Cf. Younger v. Harris*, 401 U.S. 37, 39 (Harris asking the federal court to enjoin Younger, from prosecuting him.). Assuming that the court finds the residency restrictions unconstitutionally vague, it would necessarily impact the State's prosecution of Doe 7... and every other registrant who is being prosecuted for not being at home during the few moments when Bone, Bolton, Jones and other law enforcement officials conduct "home compliance checks." *Younger* abstention is inappropriate in this case.

## IV.    Conclusion

Based on the foregoing, Plaintiffs are entitled to summary judgment for declaratory relief on Counts 1, 3, 4 and 5 of their operative complaint because, after close of discovery, Plaintiffs have presented facts and evidence demonstrating that declaratory relief is due.

Respectfully submitted this 23rd day of August, 2016.

*/s/ Joseph Mitchell McGuire*

Joseph Mitchell McGuire (MCG044)
*McGuire & Associates, LLC*
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000 (voice)
334-517-1327 (fax)
jmcguire@mandabusinesslaw.com

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of August, 2018, I electronically filed the foregoing documents with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to counsel for all parties:

*/s/ Joseph Mitchell McGuire*
Joseph Mitchell McGuire

*Attorney for Plaintiffs*