EXHIBIT 5

*(In press) <u>International Journal of Law and Psychiatry</u>

**The Biasing Effect of the "Sexually Violent Predator" Label on Legal Decisions**

Nicholas Scurich              Jennifer Gongola

Department of Psychology & Social Behavior

Department of Criminology, Law & Society,

University of California- Irvine




Daniel A. Krauss

Department of Psychology

Claremont McKenna College

Correspondence concerning this article may be addressed to Nicholas Scurich, 4213 Social & Behavioral Sciences Gateway, Irvine, CA 92697-7085. Electronic correspondence should be addressed to <u>nscurich@uci.edu.</u> The authors wish to thank Wendi Adams, Daniel Petras, and the other members of the Superior Court of Orange County for assistance in collecting the data reported in this article.

Electronic copy available at: http://ssrn.com/abstract=2754711

# Abstract

Public fear has driven legislation designed to identify and exclude sexual offenders from society, culminating in sexually violent predator (SVP) statutes, in which a sex offender who has served his prison sentence is hospitalized indefinitely if a jury determines he is likely to reoffend as a result of a mental disorder. Jurors rarely vote *not* to commit a previously-convicted sex offender as an SVP. This study tests whether the mere label of "sexually violent predator" affects these legal decisions. Venire jurors (n=161) were asked to decide whether an individual who had been incarcerated for 16 years should be released on parole. The individual was either labeled as a.) a sexually violent predator or b.) a convicted felon, and all other information was identical between the conditions. Jurors were over twice as likely to deny parole to the SVP compared to the felon, even though they did not consider him any more dangerous or any more likely to reoffend. Demographic variables did not moderate this finding. However, jurors' desire to 'get revenge' and to 'make the offender pay', as measured by Gerber and Jackson's (2013) *Just Deserts Scale*, did significantly relate to decisions to deny parole. These findings suggest that jurors' decisions in SVP hearings are driven by legally impermissible considerations, and that the mere label of "sexually violent predator" induces bias into the decision making process.


*Keywords:* sexual offenders; sexually violent predators; risk assessment; juror decision making

Electronic copy available at: http://ssrn.com/abstract=2754711

The Biasing Effect of the "Sexually Violent Predator" Label on Legal Decisions

Despite the fact that government statistics and national crime self-report data indicate that sexual offenses have been significantly declining in the United States, the past 25 years have seen sweeping changes in criminal and civil policy towards sex offenders, a so-called "war on sex offenders" (Ewing, 2011). Spurred by a series of high profile sex offenses committed by repeat offenders, media attention to these and other sexual crimes, and the public perception that a uniquely dangerous groups of sex offenders are recidivating at a high rate, laws targeted specifically at sex offenders have been adopted across US jurisdictions. These laws allow for the post-incarceration civil commitment of sex offenders (i.e., sexually violent person or predator [SVP] laws), mandate that sex offenders follow registration and notification requirements in their communities (i.e., Megan's law), limit the distance sex offenders can live and work in areas inhabited by or frequented by children, and significantly increase sentences for online sex offenses.

Yet, the political rhetoric and public perception underlying many of these laws appears inaccurate (Lave, 2011). While the public and politicians seem to believe that sex offenders are highly likely to recidivate, with public estimates suggesting that over three quarters of offenders will likely re-offend (Levenson, Brannon, Fortney, & Baker, 2007), empirical studies demonstrate that sex offenders' recidivism rates are far lower. Recidivism estimates range from a low of 5% for new arrests in a Department of Justice report completed during the 1990s, tracking the behavior of nearly 10,000 offenders across 15 states for 3 years following release, to just under a 12% re-arrest rate for a study of over 28,000 sex offenders followed for an average of almost 6 years (Hanson & Morton-Bourgon, 2009). While it is impossible to know the actual rate of recidivism of sex offenders because many sexual crimes go unreported or fail to be

investigated and prosecuted, it seems safe to assume that the public misperceives and overestimates the likelihood of this type of recidivism (Scurich & Krauss, 2014).

Furthermore, the public's opinion concerning the likelihood of sex offenders' recidivism risk seems to be bolstered by their belief that sex offenders cannot benefit from treatment or be rehabilitated. A CNN/USA Today poll conducted in 2005 found that roughly two thirds of respondents endorsed the belief that sex offenders cannot be effectively treated. While controversy exists concerning the effectiveness of psychological treatment for sexual offenders, the existing literature does not support the public's dire predictions for intervention for these offenders (LaFond, 2005). These two complementary and inaccurate ideas have led one scholar to characterize these widespread opinions as the myth of "inevitable recidivism" for sex offenders, and to catalogue this rhetoric's common usage by the majority of governors in their public comments on sex offenders (Lave, 2011).

Given the disconnect between public perception of sex offenders and existing empirical data, there is the strong possibility that these biases invade the thinking of jurors, who are drawn from the public, when they participate in legal proceedings involving sex offenders. This bias towards sex offenders and sex offenses could lead to prejudicial decision-making when these ideas are made salient during legal commitment proceedings, which are called "Sexually Violent Predator Commitment proceedings" or, in a variant, when the state petitions to commit a respondent as a "Sexually Violent Predator."

The present research will examine how this labeling of a legal proceeding as a sexually violent predator commitment versus a parole hearing release decision, with ostensibly the same legal criteria determining the outcome (i.e., future dangerousness), might affect jurors' decisions

to release an identical offender. Furthermore, if such a juror prejudice exists against individuals in SVP hearings, several different possible reasons for this potential juror bias will be explored. Before detailing the elements of the present study, however, it is first necessary to understand the development of SVP laws and the existing empirical research that has bearing on juror decision-making in these hearings as well as research examining the effects of labeling on juror decisions in similar legal contexts.

**Sexual Violent Predator (SVP) laws**

Since the 1990s, 22 U.S. jurisdictions have adopted civil commitment laws that allow for the post-incarceration *civil* confinement of sex offenders meeting certain criteria (Krauss & Scurich, 2014).[i] Although each state's SVP laws differ from others on a number of legal characteristics (see DeMatteo, Murphy, Galloway, & Krauss, in press, for a complete listing of various differences across jurisdictions), they share the same elements, including a requirement of: 1) a prior sexual conviction or charge for a sexual offense; 2) the diagnosis of a mental abnormality; 3) a likelihood of future sexual recidivism, and 4) the individual having serious difficulty controlling their behavior (e.g., Miller, Amenta, & Conroy 2005; Krauss & Scurich, 2013). Approximately 75% of SVP jurisdictions allow for jury trials in these cases, and they are often employed (Lu, Freeman, & Sandler, 2015). However, sex offenders are often committed once a SVP hearing is initiated with existing data suggesting a near 100% commitment rate in Texas (Boccaccini, Murrie, Turner, & Chevalier, 2013), 82% in New York (Lu, Freeman, & Sandler, 2015), and 78% in California (D'Orazio, Arkowitz, Adams, & Marana, 2009). Several reasons have been posited for these high and varied success rates for SVP civil commitments, including: more reliable and valid screening procedures in some jurisdictions, geographic differences in the intention by jurors to punish sex offenders again for their previous crime, outpatient versus

inpatient commitment programs in some jurisdictions, and/or their beliefs that sex offenders are

highly dangerous (Scurich & Krauss, 2014). Notably, 11 jurisdictions use the terms "sexually

violent predator", 5 states employ "sexual violent persons", and the remaining states use neither

terms in their commitment laws (DeMatteo et al., in press), but no research to date has examined

how these differences might affect juror decisions.

Given the likelihood of jurors harboring pre-conceived notions about the dangerousness of

sex offenders these results are unsurprising, and suggest the strong possibility of prejudice

toward sex offenders in these hearings.  A previous study conducted by Scurich and Krauss

(2014) examined how an online sample of mock jurors' commitment rates changed as more

information bearing on the elements of the SVP civil commitment statute was afforded to them.

Strikingly, over 75% of participants authorized commitment after learning only that an

individual was to have an SVP hearing without any additional information about his mental

abnormality, previous convictions, or his dangerousness, and these same jurors estimated his

likelihood of recidivism at approximately 60%.  Decisions increased to over 90% for

commitment and estimates of an 89% chance of recidivism when information about his prior

convictions was added, but verdicts and estimates of recidivism did not significantly change

when evidence relevant to his mental abnormality or dangerousness was subsequently included.

In short, this research suggests that SVP commitment proceedings are mostly a foregone

conclusion before they even begin. This juror bias has significant legal implications related to the

fairness and impartiality of jurors and their decisions in SVP hearings (see Scurich & Krauss,

2014).

**Labeling and Jury Decision-Making**

A small number of psychological studies have examined the effects of labels in legal decision-making (Lieberman & Krauss, 2009). Primarily, this research has been concerned with the effect of diagnostic labels and the prejudicial impact that they may have on juror decisions. In both capital sentencing and SVP trial simulations, jurors have often but not always decided that individuals labeled as "psychopaths" as compared to "high risk" or "psychotic" should be committed in SVP cases or receive the death penalty in capital sentencing hearings (e.g., Cox, Clark, Edens, Toney Smith, & Maygar, 2013; Edens, Colwell, Desforges, & Fernandez, 2005; Edens, Desforges, Fernandez, & Palac, 2004; Guy & Edens, 2003:2006). In several of these cases, the researchers have found that the label "psychopath" or attributes associated with psychopathy led jurors to associate greater risk of dangerousness or recidivism with the individual even when such attributions may be unrelated to actual risk (Cox et al., 2013).

Moreover, in one of the few field studies of sex offenders and legal decisions, researchers found that psychiatrists' use of the term "sexual deviancy" at the screening phase of the process was the single most important factor in eventual decisions, and that no other factor significantly affected decisions once that label had been ascribed (Konechi, Mulcahy, & Ebbesen, 1980). Although this research occurred before the advent of the most recent sexual offender laws, it again points to the possibility that a mere label or the saliency of being a sex offender or sexual deviant may be sufficient to affect juror decisions.

The present research builds on existing studies by employing individuals called for jury duty rather than an online participant sample (e.g., Scurich & Krauss, 2014) to further test whether the label of a "sexually violent predator" hearing itself affects juror verdicts and estimates of recidivism when compared to an identical case involving a convicted felon. It also explores the basis for any juror bias, such as whether jurors' preexisting opinions concerning inevitable

recidivism of sex offenders or whether jurors' proclivity to punish sex offenders again for their past bad acts underlie this prejudice. It is hypothesized that the mere label of SVP will increase the number of decisions to deny parole, even though the risk information and legal criteria are identical between the two cases. The effect is hypothesized to occur for several reasons, including a.) that jurors will be more fearful of a "sexually violent predator" versus a convicted felon, b.) they will believe a sexually violent predator is more likely to reoffend, and c.) jurors will harbor a greater desire to punish a sexually violent predator than a convicted felon.

**Method**

**Participants**

Participants were drawn from a pool of venire jurors who had reported for jury duty in Orange County, California during June, 2015. Just prior to releasing the jurors who had not been called for jury duty, a court employee announced that a study was being conducted that was approximately 20 minutes in length and that those who volunteered to participate would be compensated $10. Data were collected on three different days, resulting in responses from 161 jury-eligible participants (median age = 33, Interquartile range [IQR] = 28). The demographic breakdown of participants appears in the table below.

*Characteristics of Participants*
*(n = 161)*

| Characteristic | n | % |
|---|---|---|
| Sex | | |
|     Male | 74 | 46 |
|     Female | 83 | 51.6 |
| Race | | |
|     White | 81 | 50.3 |
|     Hispanic | 40 | 24.8 |
|     Asian | 31 | 19.3 |
|     Other | 1 | 0.6 |

Education
  High school graduate          10        6.2
  Trade school                   2        1.2
  Some college                  51       31.7
  College graduate              55       34.2
  Post college education        39       24.2
Marital status
  Married                       71       44.2
  Divorced                      11        6.8
  Never married                 74       46
Parental status
  No children                   83       51.6
  1 child                       11        6.8
  2 children                    32       19.9
  3 children                    26       16.1
  4 children                     4        2.5
  5+ children                    2        1.2
Political affiliation
  Democrat                      63       39.1
  Republican                    45       28
  Independent                   26       16.1
  Libertarian                    9        5.6
  Green party                    1        0.6
  Other                         11        6.8
Political affiliation strength
  Not very strong               30       18.6
  Moderate                      71       44.1
  Very strong                   53       32.9
Household income
  0-$24,999                     25       15.5
  $25,000-$49,999               31       19.3
  $50,000-$74,999               25       15.5
  $75,000-$99,999               25       15.5
  $100,000-$124,999             15        9.3
  $125,000+                     32       19.9

**Materials and Procedure**

Participants were provided with a risk assessment report that was ostensibly prepared by a forensic psychologist employed by the State of California. Participants were instructed that their task was to determine whether the individual described in the report should be released

from custody and placed on parole. The instructions stated that the decision to release the

individual should depend on the individual's likelihood to reoffend in the near future if released

into the community. If participants judged that likelihood to be sufficiently low, then they should

recommend release. The instructions advised participants that, legally speaking, their decision

should not be motivated by a desire to inflict additional punishment for past crimes, and that

studies have shown that parole is an effective approach to help reduce California's large budget

deficit.

There was one experimental manipulation which pertained to the type of incarceration the

individual—John Roberts Jr.—was currently under. Half of the participants were informed that

John Roberts Jr. had been incarcerated as a Sexually Violent Predator for 16 years (hereinafter

referred to as "SVP condition"). The other half of participants was informed that John Roberts Jr.

had served the mandatory minimum of 16 years of an indeterminate sentence (herein "Prison

condition"). Participants were randomly assigned to one of the two experimental conditions. In

both conditions, John Roberts Jr. was convicted of the use of a weapon and assault with attempt

to commit rape.

All participants read an identical risk assessment report, which was presented in a format

similar to that used in actual cases in California. The report began by identifying basic

information about John Roberts Jr., including his age, and details on his index offenses. The next

section listed his criminal history, which included several arrests beginning with false

imprisonment at age 20, followed by robbery and assault, grand theft, stolen credit cards and

battery. At age 42 Mr. Roberts committed his current crime in which he assaulted a female

victim, a 37-year-old acquaintance, with a knife and attempted to commit rape. The subsequent

section on his personal history revealed a troubled childhood, various psychiatric symptoms

resulting from different personality disorders, as well as issues with drug addiction and retaining

stable employment. Analysis of clinical factors stated that Mr. Roberts had made progress in

addressing these issues during his incarceration and that his compliance with the treatment was

moderate. Further analysis of risk management factors concluded that his post-release plans to

continue treatment and live with his brother and near other family were acceptable. Other risk

considerations recognized that his older age and deteriorating health lowered his risk.

Additionally, an actuarial risk assessment instrument (the Static-99R) placed him in the "low

risk" category relative to other offenders. In the concluding case formulation portion of the

report, the forensic psychologist opined that Mr. Roberts presented a slightly less than average

risk relative to other parolees.

      Participants were asked to make a decision about whether or not to release John Roberts,

Jr. on supervised release ("parole") and for their confidence in that decision. They then estimated

his likelihood for re-offense within the next year under both supervised and unsupervised release

on a scale from 1 to 100. Additionally, participants were also asked to estimate a base rate of

likelihood for reoffending for offenders like Mr. Roberts and for low risk offenders in general.

To assess the quality of the risk assessment report, participants answered 5 related items on an

11-point scale (e.g., "To what extent do you think the risk assessment report accurately

characterized John Robert Jr.'s risk of reoffending?"; "How satisfied are you with the risk

assessment that was conducted?").

      Participants completed the 12-item retribution as revenge and retribution as just deserts

scale in which they indicated their level of agreement or disagreement with each statement on a 1

– 7 scale (Gerber & Jackson, 2013). Half of the items measured retribution as revenge, defined

by two subscales: a.) the motivation to get even (e.g., "Society should punish to get back at

criminal offenders."), and b.) to inflict suffering (e.g., "Punishment without an element of suffering is no punishment."). The other half measured retribution as just deserts, also comprised of two subscales: the desire to restore social balance through a.) compensation by the offender (e.g., "By undergoing punishment, a criminal pays off his debt to society.") that is b.) proportional to the imbalance caused by the transgression (e.g., "The severity of the punishment should fit the severity of the crime."). Participants concluded the survey by providing basic demographic information. Note that political affiliation strength was measured on a 1-9 point likert scale (from not very strong to very strong).

## Results

Nearly 36% ($n$ = 28) of participants in the prison condition would release John Roberts Jr. from custody and place him on parole compared to 17% ($n$ = 14) in the SVP condition, a difference that is statistically significant ($\chi^2$ = 7.08, $df$ = 1, $p$ = .008). A binary logistic regression revealed that John Roberts was 2.63 times more likely (95%CI [1.28, 5.61], $Wald$ = 6.84, $df$ = 1, $p$ = .009) to be released in the prison condition compared to the SVP condition.[ii] Overall, participants felt quite strongly about their decision; a decision X confidence variable was created by coding a 'do not release decision' as -1 and a 'release decision' as 1 and multiplying that by the confidence in the decision (as rated on a 1-7 point scale). Hence, positive values correspond to the confidence associated with decisions to release John Roberts Jr., and negative values correspond to the confidence associated with the decision to not release John Roberts. Figure 1 (below) depicts the results.



As is apparent, virtually no participants were *unconfident* in their decision (i.e., not a single participant selected 1, and only a single participant selected 2). However, participants who voted not to release John Roberts expressed higher confidence (*M* = -5.65, *SD* = 0.950) than participants who voted to released him (*M* = 4.74, *SD* = 1.13), a difference that is statistically significant (*t*(157) = 5.07, *p* < .001).[iii]

A second binary logistic regression was conducted to determine whether any demographic variables could reliably predict whether participants would vote to release John Roberts or not. These variables included participants' age, gender, race, marital status, political beliefs, and whether they had children. The model was not significant ($\chi^2$ = 9.76, *df* = 10, *p* = .462), indicating that participants' demographics do not significantly explain variance in the decision to release John Roberts Jr. from custody or not.

Responses to the just deserts scale were factor analyzed to determine dimensionality. A principal component analysis with varimax rotation revealed a three factor solution (eigenvalues

= 5.03, 1.83, 1.56, all others less than 1) that explained 70.16% of cumulative variance. Factor 1

will be referred to as "revenge", factor 2 as "proportionality" and factor 3 as "compensation."

Logistic regressions were conducted to determine whether each factor related to participants'

decisions to release John Roberts. A binary logistic regression with the non-decomposed just

deserts scale as the independent variable revealed that general views about just deserts were

significantly and negatively related release decisions ($Exp(B)$ = 0.552, 95% CI [0.331, 0.718],

$Wald$ = 13.24, $df$ = 1, $p$ < .001). The relation between individual factors and release decision was

examined next. Factor 1 and factor 3 were significantly related to decisions ($\chi^2$ = 7.59, $df$ = 1, $p$ <

.01, $\chi^2$ = 18.17, $df$ = 1, $p$ < .001, respectively) while factor 2 was not (model $\chi^2$ = 1.206, $df$ = 1, $p$

= .272). For each unit increase in beliefs about revenge and compensation, participants were

nearly twice as likely to not release John Roberts ($Exp(B)$ = 0.635, 95%CI [0.458, 0.881], $Wald$

= 7.40, $df$ = 1, $p$ < .01; $Exp(B)$ = 0.552, 95%CI [0.410, 0.744], $Wald$ = 15.21, $df$ = 1, $p$ < .001,

respectively).

　　　　The five questions probing the quality of the risk assessment were combined into a

composite variable, herein referred to as "risk assessment quality," yielding a Cronbach's α =

.834. Table 2 (below) contains the means and standard deviations of all other dependent

variables as well as inferential tests to see whether the variables differed between experimental

groups.

Table 2
*Means (standard deviations) and p-values of dependent variables decomposed by
experimental condition.*

| DV | SVP | | Parole | | p-value |
|---|---|---|---|---|---|
| | N | Mean (SD) | N | Mean (SD) | |
| How strongly do you feel about that decision? (1-7) | 81 | 5.53 (1.01) | 79 | 5.28 (1.12) | 0.137 |
| If Mr. Roberts were paroled, what is the likelihood he would commit a criminal offense within the next year? (0-100) | 81 | 55.06 (25.89) | 78 | 49.42 (23.05) | 0.149 |
| If Mr. Roberts were released into the community unsupervised, what is the likelihood he would commit a criminal offense within the next year? (0-100) | 81 | 71.98 (22.5) | 78 | 71.28 (20.47) | 0.839 |
| If you took a sample of 100 individuals like Mr. Roberts, how many would commit a violent offense within one year if released into the community without supervision? (0-100) | 80 | 66.38 (21.77) | 80 | 61.75 (20.11) | 0.165 |
| Dr. Booker suggested that Mr. Roberts was low risk, what likelihood of reoffending do you believe is associated with that term? (0-100) | 81 | 37.52 (20.6) | 79 | 36.67 (19.08) | 0.366 |
| Risk Assessment Quality (1-11) | 79 | 7.47 (1.45) | 76 | 7.18 (1.42) | 0.211 |

As is apparent, the experimental manipulation had no effect on the dependent variables. In other words, when deciding to release John Roberts from either prison or SVP commitment participants did not feel more strongly about their choice, they did not believe he was more likely to reoffend, whether placed on parole or left in the community unsupervised, they did not believe the base rate of re-offense was higher, they did not operationalize "low risk" differently, and they did not think that one risk assessment was of higher quality than the other.

## Discussion

The findings support the hypothesis that the mere label of "sexually violent predator" affects legal decisions. In this study, the legal criteria and the relevant case information were identical, yet jurors were over twice as likely to release the "convicted felon" than to release the "sexually violent predator." This difference cannot be accounted for by the possibility that jurors viewed the SVP as more dangerous than the convicted felon. Indeed, jurors did not rate the SVP as more dangerous than the felon, nor did they believe the SVP was more likely to reoffend whether supervised or not if released into the community. Furthermore, it does not appear that jurors operationalized "low risk" differently for the SVP compared to the felon. In other words, it is not the case that jurors were less tolerant of risk for the SVP compared to the felon; in both cases, they considered low risk to mean the same thing. Finally, demographic variables of the jurors cannot explain the effect.

One thing that does appear to explain these legal decisions is a desire for retribution and compensation. In other words, participant's judgments to deny parole were based in part on the desire to further punish the individual for past crimes. Retribution can be defined as the belief that criminal offenders need to be punished as retaliation for their wrongful actions that violated society's laws (Gerber & Jackson, 2013). Researchers have further distinguished two related yet

conceptually distinct 'types' of retribution (Finckenauer, 1988), which Gerber and Jackson's (2013) scale measures: *Retribution as revenge* is concerned with retaliation and getting even through suffering. The revenge dimension has been related to increased support of harsh punishment and the proclivity to deny fair procedure. *Retribution as just deserts* is associated with a more constructive motive to restore justice through proportional compensation from the offender. The use of a fair process is employed to determine comparable restitutions to repay for the transgression and restore societal balance. In this way, the just deserts dimension is thought to somewhat buffer against the negative effects of retribution as revenge. However, this study found that proportionality was the only factor that was not significant in juror's judgments, suggesting that they were not concerned with applying a fair punishment proportional to the severity of the crime for Mr. Roberts.

Finding that the proportionality of the punishment is a lesser concern compared to compensation, getting even and inflicting suffering is consistent with an experimental study conducted by Carlsmith et al. (2007) that examined the role that retribution plays in legal decisions involving SVPs. That study manipulated the likelihood of recidivism as well as the severity of the previous punishment (i.e., the offender served 3 years in a minimum security prison or 25 years in a harsh maximum security prison), which legally should play no role in the decision to commit an individual as an SVP. However, the study revealed that the degree of previous punishment did affect legal decisions, such that an individual was much more likely to be committed as an SVP when he had served only three years as opposed to 25 years. Furthermore, even an individual described as posing virtually no risk was still committed as an SVP by a significant amount of participants.  In short, the findings of Carlsmith el at. (2007) suggest that retribution seems to be driving juror decisions in SVP cases. Our results are

consistent with this notion, and further suggest that this desire applies more generally to individuals who commit a sexual offense.

The finding that the SVP label affects jurors' decisions and increases the desire for retribution has important legal policy implications. The United States Supreme Court has repeatedly upheld SVP statutes because they are "civil" not "criminal" in nature and intent, and thus do not constitute additional punishment for previous bad acts, which would be incontrovertibly unconstitutional as it would constitute double punishment (Kansas v. Hendricks, 1997; Kansas v. Crane, 2002). As Justice Kennedy noted in his decisive concurrent opinion upholding the constitutionality of Kansas' SVP statue in *Hendricks* "If, however, civil confinement were to become a mechanism for retribution or general deterrence… our precedents would not suffice to validate it" (1997, p. 2087) However, our data suggest that retribution and a desire to inflict additional punishment do undergird the SVP decisions rendered by jurors. The findings – if replicated by others – call into question the distinction the Court made in order to uphold SVP statutes. Recently, two different federal courts have grappled with these issues and invalidated Minnesota and Missouri's SVP laws on constitutional grounds. In the Minnesota decision, the judge found that the fact that Minnesota had not since the law's enactment released any of the 714 committed SVPs indicated that the law was unconstitutionally being used for punitive reasons (DeMatteo et al., in press). In the Missouri case, the federal judge held that while the SVP law was constitutional on its face, the fact that none of the 200 committed individuals had progressed through the treatment component and been released made the law unconstitutional in practice (*Van Orden v. Schafer*, 2015).

The findings reported in this manuscript also raise implications for the due process rights afforded under the Constitution. Due process essentially refers to the rights one is due before

liberty may be deprived (Slobogin, 2006).  The label sexually violent predator is not a legitimate

basis on which to deprive an individual of liberty, (i.e., it serves no diagnostic or legal purpose).

Yet the findings reported here indicate that the label affects jurors, specifically they are more

likely to deprive an individual of liberty when the label is present. This seems obviously

inappropriate. Future research might examine the effect of 'relabeling' the proceeding, perhaps

simply calling it a "civil commitment proceeding" and eschewing the term "sexually violent

predator."  In light of the data reported here, we see no compelling reason to retain the SVP

label.  Alternatively, further research might examine whether judges are similarly influenced by

the SVP label; if they are not, then it might be desirable for judges to occupy the fact finding role

in SVP commitment proceedings.

      Aside from the impact of the SVP label on juror decisions, it is worth reflecting more

generally on how jurors responded to the risk assessment in the present case. Consistent with

previous research (e.g., Boccaccini & Brodsky, 2002; Boccaccini et al., 2013; Scurich & Krauss,

2014), venire jurors apparently gave little weight to the expert's assessment of "low risk."

What's more, they assumed that "low risk" is associated with a recidivism rate of 36-38% within

a year, which is over twice the rate of recidivism described in the scientific literature based on

much longer time frames (e.g., Hanson & Morton-Bourgon, 2009).  This misapprehension

suggests that experts might consider communicating risk assessment results in probabilistic as

opposed to categorical terms so to minimize variability stemming from different

operationalizations of "low risk" (Scurich & John, 2012; Hilton, Scurich, & Helmus, 2015).

Future research is necessary to examine the impact of different forms of risk communication on

jurors' decisions across different contexts.

The study reported here is not without limitations. Participants read a synopsis of a case and a risk assessment report, and were asked to render a legal decision about a hypothetical individual without deliberation. It is unclear how verisimilitude would affect the results, but it seems safe to assume that the principal effect would either increase or decrease but likely not change directions (Bornstein & McCabe, 2005). Hence, the findings should not be dismissed outright because of concerns about ecological validity. Importantly, the participants used in this study – venire jurors – are more externally valid than samples typically used in juror research (e.g., online samples or college students), and the stimulus materials were quite realistic as they were adapted from actual forensic reports that are used in California parole decision-making. Finally, the experimental manipulation  contained a confound in that the SVP was described as having been incarcerated for 16 years while the felon was described as having served the mandatory minimum of 16 years of an indeterminate sentence. It is possible that the terms "mandatory minimum" and/or "indeterminate sentence" impacted the results, though it is unclear why they would only impact release decisions but not any of the other dependent variables.

What is clear from this research is that a label associated with an important legal decision appears to unfairly bias juror decisions.  While this research cannot specifically identify the mechanism by which this bias results, it does highlight that several commonly held reasons for this prejudice (inevitable recidivism; sex offenders are highly dangerous) do not appear in this case to be responsible for juror's decisions. Future research and replication will have to examine in greater depth the precise causes of the label bias. Ameliorating this and other extra-legal influences on juror's decisions is essential to a fair adjudicatory legal process.

**References**

Boccaccini, M. T., & Brodsky, S. L. (2002). Believability of expert and lay witnesses:

Implications for trial consultation. *Professional Psychology: Research and*

*Practice*, *33*(4), 384-388.

Boccaccini, M.T., Turner, D. B., Murrie, D.C., Henderson, C.E., & Chevalier, C., (2013). Do

scores from risk measures matter to jurors? *Psychology, Public Policy, and Law, 19*, 259-

269. doi: 10.1037/a0031354

Bornstein, B.H., & McCabe, G.G. (2005). Jurors of the absurd: The role of consequentiality in

jury simulation research. *Florida State Law Review, 32*, 443-467.

Cox, J., Clark, J. C., Edens, J. F, Toney Smith, S., Magyar, M.S. (2013) Jury panel member

perceptions of interpersonal-affective traits of psychopathy predict support for execution

in a capital murder trial simulation. *Behavioral Sciences and the Law, 31*, 411-428. DOI:

101.1002/bsl.2073

Carlsmith, K. M., Monahan, J., & Evans, A. (2007). The function of punishment in the "civil"

commitment of sexually violent predators. *Behavioral Sciences & the Law*, *25*, 437-448.

D'Orazio, D., Arkowitz, S., Adams, J., & Maram, W. (2009). The California sexually violent

predator statute: History, description, and areas for improvement. Retrieved on-line June

24th, 2015 from http://ccoso.org/papers/CCOSO%20SVP%20Paper.pdf.

DeMatteo, D., Murphy, M., Galloway, M., & Krauss, D. (in press). A national survey of state

sexually violent person (SVP) legislation: Procedures, policy and practice. *International*

*Journal of  Law and Mental Health*.

Edens, J. F., Colwell, L. H., Desforges, D. M., & Fernandez, K. (2005). The impact of mental

health evidence on support for capital punishment: Are defendants labeled psychopathic

considered more deserving of death? *Behavioral Sciences & the Law, 23,* 603–625.

doi:10.1002/bsl.660

Edens, J.F, Desforges, D.M., Fernandez, K., & Palac, C.A. (2004). Effects of psychopathy and

violence risk testimony on mock-juror perceptions of dangerousness in a capital murder

trial. *Psychology, Crime, & Law, 10*, 393-412.

Ewing, C. P. (2011). *Justice perverted: Sex offense law, psychology, and public policy*. Oxford:

Oxford University Press.

Finckenauer, J. O. (1988). Public support for the death penalty: Retribution as just deserts or

retribution as revenge? Justice Quarterly, 5(1), 81–100.

Gerber, M. M., & Jackson, J. (2013). Retribution as revenge and retribution as just

deserts. *Social Justice Research*, *26*(1), 61-80.

Guy, L.S., & Edens, J.F. (2003). Juror decision-making in a mock sexually violent predator trial:

Gender differences in the impact of divergent types of expert testimony. *Behavioral*

*Sciences & the Law, 21*, 215-237.

Guy, L.S., & Edens, J.F. (2006). Gender differences in attitudes toward psychopathic sexual

offenders. *Behavioral Sciences & the Law, 24*, 65-85.

Hanson, R., & Morton-Bourgon, K. (2009). The accuracy of recidivism risk assessments for sex

offenders:  A meta-analysis of 118 predictive studies. *Psychological Assessment, 21*, 1-

21.

Hilton, N.Z., Scurich, N., & Helmus, L.M. (2015). Communicating the risk of violent and

offending behavior: Review and introduction to this special issue. *Behavioral Sciences &*

*the Law, 33*(1), 1-18.

*Kansas v. Crane* 534 U.S. 407 (U.S. Supreme Ct. 2002).

*Kansas v. Hendricks* 521 U.S. 346 (U.S. Supreme Ct. 1997).

Konečni, V. J., Mulcahy, E. M., & Ebbesen, E. B.  Prison or mental hospital:  Factors affecting the processing of persons suspected of being "mentally disordered sex offenders".  In P. D. Lipsitt and B. D. Sales (Eds.), *New directions in psycholegal research*.  New York:  Van Nostrand Reinhold, 1980, 87-124.

Krauss, D. & Scurich, N. (2014). The Impact of case factors on jurors' decisions in a sexual violent predator hearing. *Psychology, Public Policy, and Law, 20*, 135-145.

Krauss, D. & Scurich, N. (2013). Risk assessment in the law: Legal admissibility, scientific validity, and some disparities between research and practice. *Behavioral Sciences and the Law, 31*, 215-229. DOI: 10.1002/bsl.2065

Lu, Y., Freeman, N. J., & Sandler, J. C. (2015, June 15). Predictors of the Sex Offender Civil Commitment Trial Outcomes in New York State. *Law and Human Behavior*. Advance online publication. http://dx.doi.org/10.1037/lhb0000143

LaFond, J. Q. (2005). *Preventing sexual violence: How society should cope with sex offenders*. Washington DC: APA press.

Lave, T.R., (2011). Inevitable recidivism-the origin and centrality of an urban legend. *International Journal of Law and Psychiatry, 34*, 186-194.

Lieberman, J. & Krauss, D. (2009). The effects of labeling, expert testimony and information processing mode on juror decisions in a SVP civil commitment trial. *Journal of Investigative Psychology and Offender Profiling*, 6, 25-41.

Miller, H. A., Amenta, A. E., & Conroy, M. A. (2005). Sexually violent predators evaluations: Empirical evidence, strategies for professionals, and research directions. *Law and Human Behavior*, *29*, 29-54.

Scurich, N., & John, R.S. (2012). Prescriptive approaches to communicating the risk of violence

in actuarial risk assessment. *Psychology, Public Policy, and Law, 18*(1), 50-78.

Scurich, N. & Krauss, D.A. (2013). The effect of adjusted actuarial risk assessment on mock-

jurors' decisions in a sexual predator commitment proceeding. *Jurimetrics Journal, 53,*

395-413.

Scurich, N. & Krauss, D.A. (2014). The presumption of dangerousness in sexually violent

predator commitment proceedings. *Law, Probability, and Risk, 13*, 91-104. doi:

10.1093/lpr/mgt015

Slobogin, C. (2006). *Proving the unprovable: The role of law, science, and speculation in

adjudicating culpability and dangerousness.* Oxford University Press.

*Van Orden v. Schafer*, Case No. 4:09CV00971 AGF.  (US Dis. Ct. 2015)

---

[i] The states that currently have SVP laws are: Arizona, California, District of Columbia, federal government Florida, Illinois, Iowa, Kansas, Massachusetts, Minnesota, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Dakota, Pennsylvania (juveniles only), S. Carolina, Texas, Virginia, Washington, and Wisconsin there are three consistent elements in existing SVP laws (Scurich & Krauss, 2013). However, most recently both Minnesota and Missouri have had federal judges declare their SVP laws unconstitutional (DeMatteo, et al., in press; *Van Orden v. Schafer*, 2015).

[ii] An attention check question was included at the end of the stimulus materials. Including such a question is customary in online research but relatively unorthodox in in-person, paper and pencil research. When participants who failed the attention check question (n=29) are removed, this effect is attenuated but in the same direction (i.e., 33.3% vs 21.9% voting to release in the parole and SVP condition, respectively). The attenuated difference is no longer statistically significant (p=.14). The lack of statistical significance is likely the result of a reduction in statistical power because of the decreased sample size. It should be noted that actual jurors are of course not given an attention check question. Hence, the analyses reported in the manuscript contain all the participants for ecological validity reasons.

[iii] Note that this inferential test was not conducted on the verdict*confidence variable depicted in Figure 1. Rather, the analysis was conducted on the confidence variable, testing whether there is a difference in decision confidence between those who would release and those who would not release John Roberts Jr.