## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

JOHN DOE 1; JOHN DOE 3;  )
JOHN DOE 7; JOHN DOE 9; and  )
JOHN DOE 10,  )
           )
      Plaintiffs,  )
           )
      v.  )      CASE NO. 2:15-CV-606-WKW
           )           [WO]
STEVEN T. MARSHALL,  )
Attorney General of the State of  )
Alabama, in his official capacity;  )
CHARLES WARD, Director of the  )
Alabama Department of Public  )
Safety, in his official capacity; and  )
HAL TAYLOR, Secretary of the  )
Alabama Law Enforcement Agency,  )
in his official capacity,  )
           )
      Defendants.  )

## MEMORANDUM OPINION AND ORDER

The Alabama Sex Offender Registration and Community Notification Act (ASORCNA) is the most comprehensive and debilitating sex-offender scheme in the nation. No other state's system comes close. ASORCNA applies to adult offenders no matter when or where they were convicted. It bans them from living or working within 2,000 feet of a school or daycare, even if the offender never harmed a child. Between 10:30 p.m. and 6:00 a.m., no offender can be in the same house as a minor niece or nephew — not even for a minute. An offender's driver's license is branded

with "CRIMINAL SEX OFFENDER" in bold, red letters. Offenders must report lawful internet activity — such as connecting to the Wi-Fi at a new McDonald's, or anonymously commenting on a news article — to the police. Even a minor violation of any of these provisions may result in years behind bars. And unless a narrow exception somehow applies, offenders must comply with ASORCNA for life. *See generally* Ala. Code § 15-20A-1 *et seq.*

The State of Alabama says that these restrictions protect the public, especially children, from recidivist sex offenders. That is a compelling state interest. But sex offenders are not second-class citizens. The Constitution protects their liberty and dignity just as it protects everyone else's.

This case is about whether certain ASORCNA provisions violate the First and Fourteenth Amendments. Plaintiffs are five registered sex offenders covered by ASORCNA. Their claims are before the court on cross-motions for summary judgment. (Docs. # 139, 147, 154.) For the reasons below, Plaintiffs are entitled to summary judgment on their First Amendment claims. The branded-identification requirement unnecessarily compels speech. The internet-use reporting requirements also go too far, chilling free speech. But the State of Alabama is entitled to summary judgment on Plaintiffs' Fourteenth Amendment claims. Though Plaintiffs have made several good legal arguments, one Fourteenth Amendment claim fails on the merits, and Plaintiffs lack standing to pursue the rest.

# I.  JURISDICTION AND VENUE

The court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2201.  The parties do not contest personal jurisdiction or venue.

# II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn from it, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

A party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the parts of the record that show there is no genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c)(1).  "A verified complaint may be used in the summary judgment context, but verification must be on personal knowledge alone, not knowledge, information and belief."  *Horne v. Russell Cty. Comm'n*, 379 F. Supp. 2d 1305, 1323 (M.D. Ala. 2005) (citing *Fowler v. S. Bell Tel. & Tel. Co.*, 343 F.2d 150, 154 (5th Cir. 1965)).  A movant who does not bear a trial burden of production may also assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B).  If the moving party meets its

burden, the burden shifts to the nonmoving party to present evidence of a genuine dispute of material fact. *See Celotex*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact-finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

"Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *Bricklayers, Masons & Plasterers Int'l Union v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975). Still, cross-motions "may be probative of the nonexistence of a factual dispute." *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983). If both parties proceed on the same legal theories and rely on the same material facts, "the court is signaled that the case is ripe for summary judgment." *Id.*; *see Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015).

### III. BACKGROUND

ASORCNA is a comprehensive statute that severely limits how sex offenders live their lives. It brings together most of the restrictive features used by other states, adds new restrictions, and punishes minor violations with years in prison. Plaintiffs John Doe 1, John Doe 3, John Doe 7, John Doe 9, and John Doe 10 are registered sex offenders who must comply with ASORCNA. Their hopscotch numbering

reflects that other plaintiffs have been dropped from this case during the three years of litigation.  Defendants are state officials charged with implementing and enforcing ASORCNA.  Because Defendants are sued in their official capacities, however, the court refers to them collectively as "the State of Alabama" or "the State."

A.    **The Challenged Statutory Provisions**

The State of Alabama enacted its first sex-offender statute over five decades ago.  *See* Ala. Act No. 1967-507.  That law merely required offenders to submit their name to their county sheriff, *id.* § 1, and only law enforcement could access that roster, *id.* § 2.  But over the years, Alabama has repeatedly amended its sex-offender laws to make them broader and more restrictive.  *See McGuire v. Strange*, 83 F. Supp. 3d 1231, 1236–40 (M.D. Ala. 2015); *Doe v. Pryor*, 61 F. Supp. 2d 1224, 1226–29 (M.D. Ala. 1999).  The current statute, ASORCNA, is comprised mostly of legislation from 2011, 2015, and 2017.  *See* Ala. Act No. 2011-640; Ala. Act No. 2015-463; Ala. Act. No. 2017-414.

ASORCNA applies to adults convicted of any of thirty-three "sex offenses." Ala. Code § 15-20A-5.  It also applies to anyone convicted in another jurisdiction of a crime that, "if it had been committed in [Alabama] under the current provisions of law, would constitute" a sex offense.  *Id.* § 15-20A-5(35).  It applies retroactively, sweeping offenders under its control no matter when they were convicted or their duty to register arose.  *Id.* § 15-20A-3(a).  Unless relieved from its requirements

because of medical need or through one of the Act's other narrow exceptions,[1] offenders are subject to the Act's requirements for life. *Id.* § 15-20A-3(b).

### 1. *Reporting Requirements*

Offenders must register with law enforcement. *Id*. § 15-20A-10. When registering, they must provide law enforcement with their home address, the name and address of their employer, their vehicle information, their phone numbers, and more. *Id.* § 15-20A-7(a)(4)–(8). Offenders must also report information about their internet use: email addresses, instant-message usernames, "designations or monikers used for self-identification in Internet communications or postings," and "any and all Internet service providers used by the sex offender." *Id.* § 15-20A-7(a)(9), (18). The Act does carve out a small exception: Offenders need not report an internet identifier if it is "used exclusively in connection with a lawful commercial transaction." *Id.* § 15-20A-7(a)(9). But the Act does not define "lawful commercial transaction" or explain how it differs from other internet use.

Offenders must "immediately" update their registration information whenever it changes. *Id.* § 15-20A-10. "Immediately" means within three business days. *Id.* § 15-20A-4(9). Most changes must be reported in-person. *Id.* § 15-20A-10(e)(1). Changes to phone numbers, online identifiers, and internet service providers may be

---

[1] For example, ASORCNA offers limited relief for juvenile offenders, Ala. Code § 15-20A-28, and for those offenders whose crimes resulted from their victim's age, if the offender was less than five years older than his victim, *id.* § 15-20A-24.

reported in-person, online, or over the phone, "as required by the local law enforcement agency." *Id.*

### 2. *Residency Restrictions*

ASORCNA sharply limits where sex offenders may live. Offenders may not "establish" or "maintain" a residence within 2,000 feet of a school, childcare facility, or resident camp. *Id.* § 15-20A-11(a). Nor may they establish or maintain a residence within 2,000 feet of where their victim, or an immediate family member of their victim, resides. *Id.* § 15-20A-11(b). The exclusion zone is measured "in a straight line from nearest property line to nearest property line." *Id.* § 15-20A-11(h).

ASORCNA also includes a "minor-cohabitation rule." Under that rule, no offender may "reside or conduct an overnight visit with a minor." *Id.* § 15-20A-11(d). "Any presence between the hours of 10:30 p.m. and 6:00 a.m." counts as an "overnight visit." *Id.* § 15-20A-4(14). The minor-cohabitation rule generally does not apply if the offender is the parent, grandparent, sibling, stepparent, or stepsibling of the minor. *Id.* § 15-20A-11(d). In some cases where the offender's victim was a minor, however, the familial exceptions do not apply. *Id.* § 15-20A-11(d)(1)–(5).

Deciphering the statutory meaning of "residence" is no small feat — it takes several cross-references to pin down the term's definition. "Residence" is defined as "[a] fixed residence . . . or other place where the person resides, regardless of whether the person declares or characterizes such place as a residence." *Id.* § 15-

20A-4(21).  To "reside" is to be "habitually or systematically present at a place," as "determined by the totality of the circumstances."  *Id.* § 15-20A-4(20).  In addition to this catch-all definition, the Act gives three illustrations of when a person "resides" at a place: first, if the person spends four hours there on three consecutive days; second, if the person spends four hours there ten days a month; and third, if the person spends any length of time there and indicates an intent to remain for the named periods of time.  *Id.*  If an offender fails to notify law enforcement or obtain a travel permit before spending three or more consecutive days away from his residence, he is considered to have changed residences and must report the change to the authorities.  *Id.* §§ 15-20A-10(e)(2), 15-20A-11(e)(2).

ASORCNA does have limited exceptions from the residency restrictions. First, it offers a "safe harbor" from the 2,000-foot exclusion zone in the form of preapproval:  If law enforcement preapproves an address as ASORCNA-compliant before an offender moves in, his residence there will not violate the 2,000-foot rule. *Id.* § 15-20A-11(g).  Second, offenders may petition a state court for relief based on terminal illness, permanent immobility, or other debilitating medical condition.  *Id.* § 15-20A-23(a).  To grant this relief, the state court must find the petitioner poses no substantial risk of engaging in future sexual misconduct.  *Id.* § 15-20A-23(g).

### 3. *Employment Restrictions*

ASORCNA also limits where offenders may work.  Offenders may not

"accept or maintain employment or a volunteer position" within 2,000 feet of a school or childcare facility. *Id.* § 15-20A-13(b). Nor may they work within 500 feet of a playground, park, or other place that "has a principal purpose of caring for, educating, or entertaining minors." *Id.* § 15-20A-13(c). Finally, they may not work anywhere that provides services "primarily to children." *Id.* § 15-20A-13(a).

These employment restrictions apply to everyone, even if their offense did not involve a minor. The exclusion zones are measured "from nearest property line to nearest property line." *Id.* § 15-20A-13(f). "Employment" includes volunteer work and part-time work, but not "time spent traveling as a necessary incident to performing the work." *Id.* § 15-20A-4(5). There is no preapproval "safe harbor" for the 2,000-foot employment exclusion zone. Offenders may, however, be relieved from that restriction if a state court finds they pose no substantial risk of any future sexual misconduct. *Id.* § 15-20A-25(f).

### 4. *Branded Identification*

ASORCNA requires offenders to "obtain . . . and always have in [their] possession, a valid driver license or identification card issued by the Alabama State Law Enforcement Agency." *Id.* § 15-20A-18(a). These identification cards must "bear a designation that, at a minimum, enables law enforcement officers to identify the licensee as a sex offender." *Id.* § 15-20A-18(b)–(c). Offenders must relinquish any non-branded ID issued "by a state motor vehicle agency." *Id.* § 15-20A-18(d).

The Act bestows on the Secretary of the Alabama Law Enforcement Agency the exclusive power "to promulgate any rules as are necessary to implement and enforce" the Act. *Id.* § 15-20A-44(c). The Secretary, in turn, requires the face of the ID cards to bear the inscription "CRIMINAL SEX OFFENDER" in bold, red letters. The brand is printed in about the same font size used for the "endorsements" label, and it is printed directly beneath the issuance date. (*See* Doc. # 156-4, at 28.)

**5.     *Penalties for ASORCNA Violations***

ASORCNA's provisions are enforced by threat of criminal prosecution. Even a minor violation may constitute a Class C felony. *See, e.g.*, Ala. Code § 15-20A-10(j). Offenders are liable only if they "knowingly" violate the law, however. *Id.*

The baseline term of imprisonment for a Class C felony is "not more than 10 years or less than 1 year and 1 day." *Id.* § 13A-5-6(a)(3). But if the defendant was convicted before of a Class A, B, or C felony, he must be sentenced to "not more than 20 years or less than 2 years." *Id.* §§ 13A-5-6(a)(2), 13A-5-9(a). And if he was convicted before of two Class A, B, or C felonies, he must be sentenced to "life or not more than 99 years or less than 10 years." *Id.* §§ 13A-5-6(a)(1), 13A-5-9(b).

**B.     The Plaintiffs**

In 1992 and 1993, John Doe 1 pleaded guilty to two Wisconsin misdemeanor charges after he exposed his genitals in public. Doe 1 served a six-month suspended sentence for each charge. He did not have to register as a sex offender in Wisconsin.

Nor did he have to register when he moved to Alabama in 1994. It was only in 2008 that Alabama forced Doe 1 to register. Since then, he has twice been convicted of violating ASORCNA: once for failing to report a change of address, and once for redacting his branded identification. (Doc. # 138, at 8–9, 22, 32–33.)

John Doe 3 was convicted of murder in 1968. He was thirteen. In 1985, while in prison, he pleaded guilty to first-degree sodomy of another adult inmate. Doe 3 registered as a sex offender upon his release from prison in 2010. He has committed no crimes since his release. (Doc. # 138, at 10; Doc. # 156-1, at 4–5, 25.) Doe 3 has a close relationship with his adult niece. That niece invited Doe 3 to live with her, but he cannot do so for two reasons. First, his niece lives within 2,000 feet of both a school and a childcare facility. Second, his niece's thirteen-year-old son and one-year-old grandson live with her. (Docs. # 140-1, 156-2, 156-3.)

John Doe 7 pleaded guilty to second-degree sodomy of an adult jail inmate in 1987. He registered as a sex offender upon his release from prison in 2011. In 2015, he was convicted of violating ASORCNA's residency restrictions. In 2018, he was charged with two more residency violations. (Doc. # 138, at 11–12, 24–25; Doc. # 150-7; Doc. # 156-4, at 4–5, 29.) When he was released from prison in 2011, Doe 7 had planned to live with his sister, but she lives within 2,000 feet of a school. His sister's granddaughter (age five) and great-granddaughter (age eight) also live with her several nights a week. (Docs. # 140-2, 156-6.) Doe 7 has a close relationship

with his niece, and she is willing to let Doe 7 live with her. But her home is within 2,000 feet of two childcare facilities, and her four-year-old daughter lives with her. (Docs. # 140-3, 140-4, 156-3, 156-7.)

John Doe 9 was convicted of sexual battery of an adult female in 2005. He registered as a sex offender in Alabama in 2006. (Doc. # 138, at 12–13.)

John Doe 10 pleaded guilty to second-degree sexual abuse, a misdemeanor, in 1990. He registered as a sex offender at that time. In 2009, he went to Kansas for a year-long drug-treatment program. When he returned home to Alabama, he was convicted of failing to report that he moved to Kansas. (Doc. # 138, at 14.)

## C.    **Procedural History**

Plaintiffs filed their initial complaint in August 2015. (Doc. # 1.) They filed amended complaints in November 2015 and August 2016. (Docs. # 39, 81.) The State moved to dismiss both the first amended complaint and the second amended complaint. (Docs. # 43, 87.) Those motions were granted in part and denied in part. (Docs. # 51, 125.) In April 2018, Plaintiffs moved for leave to supplement their second amended complaint. (Doc. # 132.) That motion was largely denied, though Plaintiffs were allowed to make a small addition to one claim. (Doc. # 137.) As things stand now, Plaintiffs have four operative claims. (*See* Doc. # 138.)

Count One argues that the minor-cohabitation rule violates the Due Process Clause of the Fourteenth Amendment. This is an as-applied challenge brought by

Doe 3 and Doe 7, who claim the rule deprives them of their fundamental right to associate with their family. (Doc. # 81, at 45; Doc. # 138, at 46.) They previously challenged the 2,000-foot exclusion zone under the same family association theory, but that part of Count One was dismissed in 2016. (Doc. # 51, at 31–33.)

Count Three claims the residency and employment restrictions are facially void for vagueness under the Due Process Clause. All five Plaintiffs bring this claim. (Doc. # 81, at 48; Doc. # 138, at 46.) The supplemental second amended complaint lists a vagueness challenge to reporting requirements (Doc. # 138, at 47), but that claim was dismissed (Doc. # 125, at 29), and leave to amend was not granted (Doc. # 137, at 8–10).

Counts Four and Five raise First Amendment claims. Count Four is an as-applied challenge to ASORCNA's branded-identification requirement as applied by the State. According to Plaintiffs, that requirement compels speech in violation of the First Amendment. (Doc. # 81, at 49; Doc. # 138, at 47.)

Count Five is a First Amendment overbreadth challenge to the internet-use reporting requirements. Plaintiffs claim those reporting requirements unduly chill free speech. (Doc. # 81, at 50; Doc. # 138, at 49.)

Now before the court are cross-motions for summary judgment on all counts. (Docs. # 139, 147, 154.) Each side has filed three briefs and several exhibits. (Docs. # 140, 149, 155, 158, 159, 161.) The issues are ripe for summary judgment.

# IV. DISCUSSION

Plaintiffs are entitled to summary judgment on their claims that the branded-identification and internet-use reporting requirements violate the First Amendment. The court has already held that Plaintiffs have a cause of action on which relief may be granted. (Doc. # 51, at 43–48; Doc. # 125, at 33–49.) Undisputed material facts now show that Plaintiffs are entitled to judgment as a matter of law on those claims.

But the State is entitled to summary judgment on the Fourteenth Amendment claims. Though the court found before that Plaintiffs alleged valid claims under the Fourteenth Amendment (Doc. # 51, at 21–28, 33–40; Doc. # 125, at 17–20, 24–32), the facts in discovery do not bear out those claims. Doe 3 and Doe 7 lack standing to challenge the minor-cohabitation rule because the relatives they want to live with also live within 2,000 feet of schools and childcare facilities. As for the employment exclusion zones, Plaintiffs have not been affected by any vagueness in that part of the statute. Some Plaintiffs are disabled, and others concede that desired jobs are within an exclusion zone. Finally, Plaintiffs fail to trace arbitrary enforcement of the residency restrictions to any vagueness in the text of the law.

## A.      **Plaintiffs are entitled to summary judgment on their First Amendment claims.**

The First Amendment prohibits governments from "abridging the freedom of speech." U.S. Const. amend. I. ASORCNA's branded-identification and internet-

use reporting requirements violate that fundamental liberty.[2]

1. ***The branded-identification requirement is compelled speech and does not survive strict scrutiny.***

In *Wooley v. Maynard*, the Supreme Court affirmed that the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." 430 U.S. 705, 714 (1977). The issue in *Wooley* was that New Hampshire printed its motto, "Live Free or Die," on most license plates. *Id.* at 707 & n.1. George Maynard disagreed with that ideological message. The Court held that it was unconstitutional to force Maynard and others to use their cars to propagate the state's message. More specifically, New Hampshire's license plate law compelled speech, and the state had no compelling interest in doing so. *Id.* at 715–17.

Plaintiffs rely on *Wooley* and its progeny to argue that printing "CRIMINAL SEX OFFENDER" on state-issued identification cards is unconstitutional. Plaintiffs are correct. The branded-ID requirement compels speech, and it is not the least

---

[2] In *McGuire v. Strange*, the court found that the branded-identification requirement is not "punishment" and thus is not an *ex post facto* law. 83 F. Supp. 3d at 1254; *see* U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . *ex post facto* Law"); *United States v. W.B.H.*, 664 F.3d 848, 852 (11th Cir. 2011) (explaining that the Ex Post Facto Clause applies only to punitive laws). The branded-ID requirement is not punitive because it is not similar enough to traditional "public shaming." *McGuire*, 83 F. Supp. 3d at 1354. Though the requirement is humiliating, defendants in colonial times were "without any power to contain or control the extent or timing of the humiliation." *Id.* (citing *W.B.H.*, 664 F.3d at 855). ASORCNA registrants, by contrast, "have some degree of control over when and where to present identification." *Id.* The court thus rejected an *ex post facto* challenge to the branded-ID requirement. At the same time, however, the court recognized that "there may be other constitutional concerns with requiring registrants to carry a branded license." *Id.* This case is about one of those other constitutional concerns.

restrictive means of advancing a compelling state interest.

### a. The branded-identification requirement compels speech.

The first step in a *Wooley*-style analysis is to determine whether the state has, in fact, compelled speech. This is a four-part test. There must be (1) speech; (2) to which the plaintiff object; (3) that is compelled; and (4) that is readily associated with the plaintiff. *Cressman v. Thompson*, 798 F.3d 938, 949–51 (10th Cir. 2015). All four elements are satisfied here.

First, just as the Court in *Wooley* "had no trouble" finding that "Live Free or Die" was speech, neither does this court have trouble finding that "CRIMINAL SEX OFFENDER" is speech. *Cressman*, 798 F.3d at 951.

The State tries to distinguish *Wooley* as a case about ideological speech. Yet the words here call to mind philosophical and moral messages about crime, victims, retribution, deterrence, and rehabilitation. And even if they did not — even if the words here were purely factual with no ideological implications — the compelled speech doctrine would still apply. As the Supreme Court explained in *Riley v. National Federation of the Blind*, "cases cannot be distinguished because they involve compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech." 487 U.S. 781, 797–98 (1988); *see Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 62 (2006). "The constitutional harm — and what the First Amendment prohibits

— is being forced to speak rather than to remain silent," and that harm does not turn on whether speech is ideological, factual, or something else. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004). *Riley* thus held that professional fundraisers could not be forced to preemptively disclose to potential donors the percentage of donations that the fundraisers actually turned over to charity. 487 U.S. at 798; *see also Frudden v. Pilling*, 742 F.3d 1199, 1208 (9th Cir. 2014) (holding a school motto, "Tomorrow's Leaders," on school uniforms was unconstitutional compelled speech).

Just as *Wooley* applies to compelled statements of fact, it also applies to government speech. The message here is indeed government speech. After all, the State issues the ID cards and controls what is printed on them. *See Mech v. Sch. Bd. of Palm Beach Cty.*, 806 F.3d 1070, 1075 (11th Cir. 2015) (defining government speech). But the fact that a license is government speech does not mean it is immune from the compelled speech analysis. License plates are government speech. *See Walker v. Texas Div., Sons of Confederate Vets., Inc.*, 135 S. Ct. 2239, 2246 (2015). As a result, no one can force a state to print a particular message on a license plate. *Id.* But under *Wooley*, neither can a state force someone to display a particular message on his or her license plate. 430 U.S. at 717; *Walker*, 135 S. Ct. at 2252–53.

Second, Plaintiffs do not agree that they are "criminal sex offenders." Though even a minor disagreement with a message is enough for constitutional purposes, *see*

*United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001), Plaintiffs strongly

object to the message here. Doe 1, for example, "vehemently denies" that he is a

criminal sex offender. (Doc. # 138, at 8.) Doe 10 describes the humiliation he feels

whenever he shows his identification during everyday activities:

> I have never felt so embarrassed and ashamed in all of my life. I would
> not wish showing this [branded identification] on my worst enemy. It
> makes me not want to go places where I have to show it, and I try not
> to go places where I know I will have to [show the branded license].
> But every week, there is some places that ask me to show it, and every
> time, I get them evil looks from people — like I'm a murderer or
> something. I done paid for what I did over 25 years ago. Nobody
> should have to carry this [branded license]. It ain't right, but I don't
> have a way out.

(Doc. # 138, at 34.) Doe 3, Doe 7, and Doe 9 describe similar experiences with, and

thus their disagreement with, the State's message. (Doc. # 138, at 13, 33; Doc.

# 156-1, at 10–11; Doc. # 156-4, at 13.)

Third, Plaintiffs are compelled to display the offensive message. Plaintiffs

are legally required to keep their ID "in [their] possession" at all times. Ala. Code

§ 15-20A-18(a). They cannot have any non-branded ID issued "by a state motor

vehicle agency." *Id.* § 15-20A-18(d). State-issued photo ID is a virtual necessity

these days. One must show ID to enter some businesses, to cash checks, to get a job,

to buy certain items, and more. That is like the situation in *Wooley*. Although New

Hampshire did not force George Maynard to drive a car, driving was (and is) "a

virtual necessity for most Americans," so the license plate message was compelled

speech. 430 U.S. at 715. Here, the State has similarly conditioned a virtual necessity of everyday life on displaying a message to others.

The State of Alabama contends that Plaintiffs are not *compelled* to show their branded IDs to anyone. Instead, the State says, Plaintiffs could use a passport. But a passport is a poor substitute for a state-issued ID. Passports are cumbersome and highly sought-after on the black market.[3] They also cost money. A passport book is $145, and a passport card is $65. (Doc. # 156-1, at 35.) Doe 3 cannot afford either. (Doc. # 156-1, at 10, 14.) More importantly, the State cannot force someone to choose between carrying a government message and paying extra money. *See Cressman v. Thompson*, 719 F.3d 1139, 1148 (10th Cir. 2013) (holding speech is compelled when one "must choose between (1) prosecution and criminal penalties . . . and (2) paying additional fees"). Even in *Wooley*, George Maynard could have avoided displaying the state motto if he had spent extra money: License plates for antique automobiles did not include the motto. 430 U.S. at 707 n.1. But the Court still found that the state had compelled speech. *Id*. at 715.

Fourth, the message on the branded IDs is "readily associated" with Plaintiffs. *Id.* at 717 n.15; *see Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 565 (2005).

---

[3] *See Stolen Passports: A Terrorist's First Class Ticket: Hearing Before the H. Comm. on Int'l Relations*, 108th Cong. 1 (2004) (statement of Rep. Henry J. Hyde, Chair, H. Comm. on Int'l Relations) ("A stolen passport may be worth more than its weight in gold."); Rey Koslowski, *Smart Borders, Virtual Borders, or No Borders: Homeland Security Choices for the United States and Canada*, 11 L. & Bus. Rev. Am. 527, 536 (2005) (recognizing the demand for stolen passports).

The words "CRIMINAL SEX OFFENDER" are *about* Plaintiffs. The ID cards are chock-full of Plaintiffs' personal information: their full name, photograph, date of birth, home address, sex, height, weight, hair color, eye color, and signature. Just as George Maynard was associated with his stationwagon, Plaintiffs are associated with their licenses. When people see the brand on Plaintiffs' IDs, they associate it with Plaintiffs. The dirty looks that Plaintiffs get are not directed at the State.

The State likens the words on Plaintiffs' IDs to the national motto, "In God We Trust," on U.S. currency. Several courts recently held that engraving that motto on currency is not compelled speech, reasoning that the motto is attributed only to the government and that no one must display currency. *New Doe Child #1 v. United States*, 901 F.3d 1015, 1024 (8th Cir. 2018); *Mayle v. United States*, 891 F.3d 680, 686 (7th Cir. 2018); *New Doe Child #1 v. Cong. of the U.S.*, 891 F.3d 578, 593–94 (6th Cir. 2018). But currency is not personalized; it says not a word about the person who holds it. Nor is currency displayed; it is exchanged. Hundreds of people may spend the same dollar bill. Identification cards, by contrast, are personalized. They are meant to convey substantive personal information about their holders. They are meant to be displayed, never to be given away.

### b. The branded-identification requirement fails strict scrutiny.

Because it compels speech, ASORCNA's branded-identification requirement "is a content-based regulation of speech." *NIFLA v. Becerra*, 138 S. Ct. 2361, 2371

(2018); *see Riley*, 487 U.S. at 795 ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech."). As a result, it must pass strict scrutiny. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). That means the State must have a compelling interest, and it must have adopted the least restrictive means of achieving that interest. *Id.*

The State has a compelling interest in enabling law enforcement to identify a person as a sex offender. *See* Ala. Code § 15-20A-18(b)–(d). But Alabama has not adopted the least restrictive means of achieving that interest. By using "CRIMINAL SEX OFFENDER" instead of a single letter, the State goes beyond what is necessary to achieve its asserted interest. Both the Secretary of the Alabama Law Enforcement Agency and the Director of the Alabama Department of Public Safety agree that the State could use a single letter to designate sex offenders. (Doc. # 140-5, at 10; Doc. # 140-6, at 10–11.) The Director of Public Safety also agrees that law enforcement officers would know what that single letter meant. (Doc. # 140-6, at 11.) Yet the general public most likely would not know what that single letter meant. Thus, using one letter would keep officers informed while reducing the unnecessary disclosure of information to others.[4]

---

[4] Other states use more discrete labels. Delaware, for example, uses the letter "Y" to denote sex-offender status. Del. Code tit. 21, § 2718(e) (2018). Florida divides offenders into categories: most have a code ("943.0435, F.S.") on their ID, while a "sexual predator" label is used for the most serious offenders. Fla. Stat. § 322.141(3) (2018). (Florida Statute § 943.0435 requires sex offenders to register with the state.) This is relevant evidence in determining whether Alabama has adopted the least restrictive means of furthering its interest. *See United States v. Secretary,*

Because Alabama has not used the least restrictive means of advancing its interest, Alabama Code § 15-20A-18, as applied by the State, is unconstitutional.

## 2. *The internet-use reporting requirements are facially overbroad.*

"The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). Though a state may burden speech if it has a strong enough interest, it cannot overburden speech. ASORCNA's internet-use reporting requirements unduly chill protected speech, so they are unconstitutional.

### a. The internet-use reporting requirements burden free speech.

ASORCNA implicates the First Amendment because it requires "a narrow class of individuals to notify the government" within three business days of engaging certain online activity. *Doe v. Harris*, 772 F.3d 563, 572 (9th Cir. 2014). The Act requires offenders to report every "email addresses or instant message address or identifiers used, including any designations or monikers used for self-identification in Internet communications or postings other than those used exclusively in connection with a lawful commercial transaction." Ala. Code § 15-20A-7(a)(9). Offenders must also provide a list of "any and all Internet service providers used by the sex offender." *Id.* § 15-20A-7(a)(18); *see id.* § 15-20A-10(e)(1).

These requirements burden an offender's "ability and willingness to speak on

---

*Fla. Dep't of Corrections*, 828 F.3d 1341, 1349 (11th Cir. 2016).

the Internet." *Harris*, 772 F.3d at 572. Indeed, the Act specifically refers to "self-identification in Internet *communications or postings*." Ala. Code § 15-20A-7(a)(9) (emphasis added). It creates an "affirmative obligation" to report activity, *Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965), thus requiring offenders to weigh the benefits of speech against the burden of reporting it. It is no defense that the burden falls mainly on online speech. *Reno v. ACLU*, 521 U.S. 844, 870 (1997). Nor is a defense that the Act burdens rather than bans speech; "the distinction between laws burdening and laws banning speech is but a matter of degree." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565–66 (2011) (quoting *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 812 (2000)) (cleaned up).

The Act is also far-reaching. An offender must report to the police every time he connects to a Wi-Fi spot at a new McDonald's, every time he uses a new computer terminal at a public library, every time he borrows a smartphone to read the news online, and every time he anonymously comments on a news article. Every time he walks into a new coffee shop, he must determine whether opening his laptop is worth the hassle of reporting. The Act is not limited to unlawful internet activity. To the contrary, "just as the Act burdens sending child pornography and soliciting sex with minors, it also burdens blogging about political topics and posting comments to online news articles." *Harris*, 772 F.3d at 573.[5]

---

[5] To be sure, ASORCNA puts only a minimal restriction on the right to anonymous speech.

The State argues that "if a sexual predator is changing online identities and email addresses so often that it becomes a burden, one must wonder why he is going through such efforts to change his online identity." (Doc. # 155, at 52.) "Normal internet usage," it says, "would not require so many different online identities that reporting would be such a burden that it chills anyone's speech." (Doc. # 155, at 53.) But that argument has several flaws. One is that it incorrectly assumes the Act applies only to "sexual predators." Not every offender is a "predator," and the State poisons the well by implying otherwise. Another flaw is that it assumes one must report several times before reporting is a burden. In reality, offenders experience a burden each time they must report their online activity. And finally, the State plainly understates ASORCNA's true impact. ASORCNA burdens speech.

### b. Strict scrutiny applies because the law is not content neutral.

Once a court finds that a law burdens speech, the next step is to determine what level of scrutiny applies. The level of scrutiny hinges on content neutrality. "Content-based laws — those that target speech based on its communicative content — are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135

---

Standing alone, knowledge that speech may be monitored does not unconstitutionally burden speech. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972). ASORCNA also prohibits disclosing internet activity to the public. Ala. Code § 15-20A-8(b)(5)–(6). Instead, an offender's internet activity "may only be disclosed pursuant to federal law or to law enforcement for the purpose of administering, implementing, or enforcing [ASORCNA] or to prevent or investigate a crime by the sex offender based on an articulable basis for suspicion." *Id.* § 15-20A-42(h).

S. Ct. at 2226.  Under strict scrutiny, a law is invalid unless it uses the least restrictive means of furthering the compelling interest.  *Playboy*, 529 U.S. at 813.  On the other hand, if a law regulates speech without reference to content, it receives "intermediate" scrutiny.  *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994).  Under that test, a law cannot "burden substantially more speech than is necessary to further the government's legitimate interests."  *Id.* at 662 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

ASORCNA is a content-based law because it singles out commercial speech for special treatment.  *See Playboy*, 529 U.S. at 811.  If an offender uses an identifier "exclusively in connection with a lawful commercial transaction," he need not report it.  Ala. Code § 15-20A-7(a)(9).  Online identifiers used for other topics, though, are not exempt.  The only way to tell whether an identifier is exempt is to examine the content of the offender's speech.  ASORCNA is therefore "subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech."  *Reed*, 135 S. Ct. at 2228 (cleaned up).  But because the Act burdens substantially more speech than necessary, it fails even intermediate scrutiny.

### c.     The internet-use reporting requirements do not survive even intermediate scrutiny.

The State has a compelling interest in protecting its citizens from predators.  *See* Ala. Code § 15-20A-2(4) ("The Legislature declares that its intent . . . is to assist

law enforcement in carrying out their duties and, most importantly, to protect the public, especially children."); *Doe v. Shurtleff*, 628 F.3d 1217, 1223 (10th Cir. 2010) ("We have no doubt that the State . . . has a compelling interest in investigating kidnapping and sex-related crimes."). To the State's credit, that interest is "unrelated to the suppression of free expression." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). But the State has not shown that ASORCNA is narrowly tailored. Because the Act requires an affirmative act as a condition of First Amendment activity, applies broadly, gives wide discretion to law enforcement, threatens serious criminal penalties, and applies forever without regard to risk, it is not narrowly tailored.

First, under ASORCNA, "anytime registrants want to communicate with a new identifier, they must assess whether the message they intend to communicate is worth the hassle of" immediately reporting the change to law enforcement. *Harris*, 772 F.3d at 582. This chills speech and deters expressive activity. *See Lamont*, 381 U.S. at 307. And inevitably, some offenders will have to report in person if "required by [their] local law enforcement agency." Ala. Code § 15-20A-10(e)(1). That makes reporting "not only psychologically chilling, but physically inconvenient." *Harris*, 772 F.3d at 582.

Second, the Act applies to broad swaths of lawful speech. A state "may not suppress lawful speech as the means to suppress unlawful speech." *Ashcroft*, 535 U.S. at 255. But Alabama makes little effort to single out types of speech that raise

safety concerns.  The Act does have an exception for identifiers "used exclusively in connection with a lawful commercial transaction."  Ala. Code § 15-20A-7(a)(9).  That is a sensible exception.  But why just commerce-related speech?  As the Ninth Circuit observed when it struck down an internet-use reporting requirement, if "a sex offender establishes a username on a news outlet's website for purposes of posting comments to news articles, it is hard to imagine how speedily reporting that identifier will serve the government's interests."  *Harris*, 772 F.3d at 582; *see also White v. Baker*, 696 F. Supp. 2d 1289, 1309 (N.D. Ga. 2010) ("A regulatory scheme designed to further the state's legitimate interest in protecting children from communication enticing them into illegal sexual activity should consider how and where on the internet such communication occurs.").  Perhaps the State could enact a "specific, narrowly tailored" law addressing "conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor."  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  But the State did not do so here.

Third, ASORCNA grants local law enforcement significant discretion.  There is no objective limiting principle to prevent arbitrary or discriminatory enforcement.  The sheriff of one county could require offenders to report in-person each time they create a new online identifier, while the sheriff of a neighboring county could let offenders report such changes over the phone.  Indeed, nothing keeps police officers

from requiring one offender to report in-person while allowing others to report over the phone. The effect of this discretion is that offenders may fear retribution if they criticize the police online. That conflicts with the need for "stringent protection of First Amendment rights." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983); *see also Bell v. City of Winter Park*, 745 F.3d 1318, 1324 (11th Cir. 2014) ("A grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional.") (quoting *Atl. J. & Const. v. City of Atl. Dep't of Aviation*, 322 F.3d 1298, 1310 (11th Cir. 2003) (en banc)).

Fourth, violating ASORCNA can lead to a felony conviction and years behind bars. This "may well cause speakers to remain silent rather than communicate." *Reno*, 521 U.S. at 872; *see Harris*, 772 F.3d at 578 ("The concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions.") (citing *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)).

Finally, the reporting requirements apply for life without regard to risk. Doe 1, for example, was convicted twenty-six years ago of what was basically indecent exposure. Doe 3 and Doe 7's convictions, while for more serious crimes, are over three decades old. No Plaintiff used the internet in any capacity to facilitate their crimes. No Plaintiffs' crimes involved minors. Yet every offender must report when they connect to a new Wi-Fi spot.

The failure to account for risk is a problem throughout ASORCNA. Not all

sex crimes are the same. Nor are all offenders the same. Instead, as Dr. Karl Hanson explains (Docs. # 159-1, 159-2, 159-3), one can classify sex offenders based on their risk of committing another sex offense ("sexual recidivism").[6] Some offenders have a low risk of sexual recidivism; others have a medium or a high risk. Also, the older someone gets, and the longer they go without committing a new crime, the less likely they are to reoffend. At a certain point, "most individuals convicted of a sexual offense will be no more likely to commit another sexual offense than the rate of spontaneous 'out-of-the-blue' sexual offenses in the general population." (Doc. # 159-1, at 5.) Low-risk offenders cross that threshold upon release from prison. Medium-risk offenders cross it ten to fifteen years later. Even high-risk offenders, after twenty years offense-free, pose no more of a threat to the public than does the average man walking down the street. (Doc. # 159-1, at 7–14.)[7]

---

[6] Data discussed in Dr. Hanson's report is published in academic journals. *See, e.g.*, R. Karl Hanson et al., *Reductions in Risk Based on Time Offense-Free in the Community: Once a Sexual Offender, Not Always a Sexual Offender*, 24 Psychol., Pub. Pol'y & L. 48, 53–57 (2018); R. Karl Hanson et al., *High-Risk Sex Offenders May Not Be High Risk Forever*, 29 J. Interpersonal Violence 2792, 2796–2802 (2014). The court, however, relies solely on the reports. The State did not challenge whether Dr. Hanson is an "expert" under Federal Rule of Evidence 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–95 (1993).

[7] The State's expert, Dr. Nicholas Scurich, does not contradict the discussion above. Dr. Scurich's report (Doc. # 156-8) focused on how often recidivists "crossover" to different types of victims. He reports that 11% of recidivists have both adult and child victims. (Doc. # 156-8, at 8–9.) But Dr. Scurich describes those who, by definition, have more than one victim. "Instead of concluding that 1-in-10 individuals with a history of sexual crime will offend against both adults and children, the studies reviewed by Dr. Scurich actually state that *if the individuals were to reoffend sexually*, there is a 1-in-10 chance that it would be against a victim in a different age category." (Doc. # 159-3, at 2.) The court focuses on "the risk of sexual recidivism generally" (Doc. # 156-8, at 12), which Dr. Hanson addresses and which Dr. Scurich largely ignores.

Because they chill a wide swath of protected speech under penalty of felony, ASORCNA's internet-use reporting requirements, Ala. Code §§ 15-20A-7(a)(9), (18), 15-20A-10(e)(1), are facially overbroad in violation of the First Amendment.

**B.     Defendants are entitled to summary judgment on Plaintiffs' Fourteenth Amendment claims.**

The Fourteenth Amendment's Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  That promise has procedural and substantive components.  Procedural due process "guarantees that a state will not deprive a person of life, liberty, or property without some form of notice and opportunity to be heard."  *Doe v. Moore*, 410 F.3d 1337, 1342 (11th Cir. 2005).  Substantive due process "protects fundamental rights that are so implicit in the concept of ordered liberty that neither liberty nor justice would exist if they were sacrificed."  *Id.* (cleaned up).  Plaintiffs claim that ASORCNA's minor-cohabitation rule violates substantive due process.  They claim the residency and employment exclusion zones violate procedural due process.  But under the facts, these Fourteenth Amendment claims fail.

**1.     *Doe 3 and Doe 7 lack standing to challenge the minor-cohabitation rule.***

The Constitution "protects the sanctity of the family."  *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977).  So "when the government intrudes on choices concerning family living arrangements," *id.* at 499, the government's action must

pass strict scrutiny, *see Reno v. Flores*, 507 U.S. 292, 302 (1993).

Doe 3 and Doe 7 claim that the minor-cohabitation rule, Ala. Code § 15-20A-11(d), violates this fundamental right to familial association. The court previously found that Doe 3 and Doe 7 had stated a valid claim because the rule bars them from living with their family members of choice. (Doc. # 51, at 33–40; Doc. # 125, at 17–21.) Doe 3 wants to be able to live with his niece, but she has a thirteen-year-old son and a one-year-old grandson in her home. (Docs. # 140-1, 156-2.) Doe 7 wants to be able to live with his niece, but she lives with her four-year-old daughter. (Docs. # 140-3, 156-7.) Doe 7 would also like to be able to live with his sister, but her five-year-old granddaughter and eight-year-old great-granddaughter stay with her several nights a week. (Docs. # 140-2, 156-6.)[8] The minor-cohabitation rule prohibits these living arrangements even though Doe 3 and Doe 7 never harmed children. Family members agree that Doe 3 and Doe 7 can be trusted with children. None of the reasons that keep parents from living with their children, Ala. Code § 15-20A-11(d)(1)–(5), apply to Doe 3 or Doe 7.

On summary judgment, though, it is not enough to rely on allegations. Actual facts matter. Fed. R. Civ. P. 56(e). And during discovery, facts came out that keep Doe 3 and Doe 7 from advancing their claims.

---

[8] In his deposition, Doe 7 mentioned a third relative. The parties later stipulated that, on summary judgment, "Doe 7 shall not base any alleged infringement of his right to intimate association" on his right to live with that third relative. (Doc. # 156-5, at 2–3.)

A plaintiff must have standing throughout his case. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269–70 (11th Cir. 2006) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The irreducible constitutional minimum of standing" requires a plaintiff to show that (1) he suffered an injury-in-fact; (2) the defendant caused that injury; and (3) it is likely that a favorable court decision will redress the injury. *Id.* at 1269 (quoting *Lujan*, 504 U.S. at 560) (cleaned up). When two laws independently prohibit the same thing but a plaintiff challenges only one law, the plaintiff lacks standing. That is because the challenged law does not cause the plaintiff's injury (the unchallenged law does), and striking down the challenged law would not remedy the injury (because the unchallenged law would still apply).[9]

The Eleventh Circuit applied this rule in *KH Outdoor, L.L.C. v. Clay County*, 482 F.3d 1299 (11th Cir. 2007), and *Maverick Media Group v. Hillsborough County*, 528 F.3d 817 (11th Cir. 2008) (per curiam). Both cases dealt with county ordinances that prohibited advertising billboards. The plaintiffs argued the ordinances were content-based restrictions in violation of the First Amendment. *KH Outdoor*, 482

---

[9] *See, e.g.*, *Delta Constr. Co. v. E.P.A.*, 783 F.3d 1291, 1296–97 (D.C. Cir. 2015) (per curiam); *White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010); *Howard v. N.J. Dep't of Civ. Serv.*, 667 F.2d 1099, 1102 (3d Cir. 1981); *see also* 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.5 (3d ed. 2008 & Supp. 2018) ("Rather than a break in one causal chain, standing may be defeated by finding a different cause. . . . Independent causation may be found when a plaintiff's activity is independently proscribed by two different laws.").

F.3d at 1301; *Maverick*, 528 F.3d at 819. But the plaintiffs lacked standing. In *KH Outdoor*, the plaintiff's application to erect a billboard did not comply with the building code. 482 F.3d at 1304. In *Maverick*, the proposed sign violated a size restriction that was independent of the billboard ban. 528 F.3d at 821. So, the Eleventh Circuit held, the billboard bans had caused no cognizable injuries. Even if those bans were unconstitutional, the plaintiffs could not have built their desired signs. *KH Outdoor*, 482 F.3d at 1304; *Maverick*, 528 F.3d at 821–22.

This principle keeps Doe 3 and Doe 7 from advancing their challenge to the minor-cohabitation rule. That is because each of the relatives that Doe 3 and Doe 7 identified live within a residential exclusion zone. Ala. Code § 15-20A-11(a). Doe 3's niece lives within 2,000 feet of both a school and a childcare facility. (Docs. # 140-1, 156-2, 156-3.) Doe 7's niece lives within 2,000 feet of two childcare facilities. (Docs. # 140-3, 140-4, 156-3, 156-7.) And Doe 7's sister lives within 2,000 feet of a school. (Docs. # 140-2, 156-6.)

Doe 3 and Doe 7 do not currently challenge the 2,000-foot exclusion zones as violating the right to familial association. They brought such a challenge at first, but it was dismissed almost three years ago. (Doc. # 51, at 31–33.) Because the 2,000-foot rule does not directly infringe on the right to family association, and because it is rationally related to Alabama's interest in protecting its citizens, it does not violate substantive due process. *McGuire v. City of Montgomery*, No. 11-cv-1027, 2013

WL 1336882, at *11 (M.D. Ala. Mar. 29, 2013); *Doe v. Miller*, 405 F.3d 700, 710 (8th Cir. 2005). And as explained below, the residency exclusion zone is not vague.

In short, a valid law — the 2,000-foot exclusion zone — independently keeps Doe 3 and Doe 7 from living with their desired relatives. Doe 3 and Doe 7 thus lack standing to challenge the minor-cohabitation rule. *See Covenant Media of N.C., L.L.C. v. City of Monroe*, 285 F. App'x 30, 36 (4th Cir. 2008) (holding that because one challenged policy was constitutional on the merits, plaintiff lacked standing to challenge other policies) (citing *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 893 (9th Cir. 2007)).

### 2. *Plaintiffs cannot prevail on their vagueness claims.*

Count Three of Plaintiffs' complaint alleges that ASORCNA's residency and employment restrictions — specifically, the 2,000-foot exclusion zones — are void for vagueness. The State is entitled to summary judgment on those claims. To see why, it helps to first overview the void-for-vagueness doctrine.

### a. The Fourteenth Amendment prohibits vague laws.

A basic principle of procedural due process is that laws are void for vagueness if their prohibitions are not clearly defined. *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc). "Due process encompasses the concepts of notice and fair warning, and at its core is the principle 'that no man shall be held criminally responsible for conduct which he could not reasonably understand to be

proscribed.'" *Indigo Room, Inc. v. City of Ft. Myers*, 710 F.3d 1294, 1301 (11th Cir. 2013) (quoting *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1349 (11th Cir. 2011)). So if a law either forbids or requires action, the law cannot be so unclear "that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.* (quoting *Mason v. Fla. Bar*, 208 F.3d 952, 958 (11th Cir. 2000)).

A statute can be vague for either of two "connected but discrete" reasons. *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008). A law is also vague if it "is so standardless that it authorizes or even encourages seriously discriminatory enforcement." *Id.*; *see also Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03 (1966). Of these two concerns — notice to the public and guidelines for enforcement — the latter is more important. *Kolander v. Lawson*, 461 U.S. 352, 358 (1983).

Whether the focus is on lack of notice or lack standards for enforcement, the vagueness doctrine keeps people from having to guess what the law prohibits. But the issue is not that "close" or "hard" cases might arise. *See United States v. Nelson*, 712 F.3d 498, 508 (11th Cir. 2013). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating

fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams*, 553 U.S. at 306.

For example, the Supreme Court has held that laws banning "indecent" or "annoying" actions — both subjective judgments, neither statutorily defined — were vague. *Reno*, 521 U.S. at 871–72; *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). In *Kolander v. Lawson*, the Court struck down a law that allowed police officers to arrest anyone who did not present "credible and reliable" identification. 461 U.S. at 353, 358. The law did not specify how officers would decide that an ID was "credible and reliable," so it gave "virtually complete discretion" to officers on their beats. *Id.* at 358. And in *Chicago v. Morales*, a city ordinance required officers to disperse certain people who "remain[ed] in any one place with no apparent purpose." 527 U.S. 41, 47 (1999). The ordinance gave "absolute discretion to police officers" to determine what was illegal. *Id.* at 61 (cleaned up). Thus, it was vague.

But courts do not apply these principles to hypotheticals. "Litigants may not comb the statute books for poorly drafted laws and sue to enjoin their enforcement." *Bankshot*, 634 F.3d at 1349. Instead, courts review laws for vagueness "only when a litigant alleges a constitutional harm." *Id.* Vague laws can harm in two ways. One harm occurs when a person is prosecuted for violating a vague law. *Id.* The other occurs when one is "chilled from engaging in constitutional activity." *Id.* at 1350; *see Dana's R.R. Supply v. Att'y Gen. of Fla.*, 807 F.3d 1235, 1241 (11th Cir. 2015).

Again, though, litigants cannot argue that a law is vague based on how it might apply to a hypothetical scenario. Instead, courts "consider whether a statute is vague as applied to the particular facts at issue." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010). That is because "a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id*. at 18–19 (quoting *Vill. of Hoffman Estates v. The Flipside*, 455 U.S. 489, 495 (1982)) (cleaned up). The vagueness doctrine guards against indeterminacy, but if a law "clearly" proscribes a particular action, then the law is not vague about that action. Put differently, if a law has a core meaning — if it is not vague in its entirety — then a vagueness challenge must wait until a litigant's conduct falls outside that core meaning. *See Ala. Educ. Ass'n v. State Superintendent of Educ.*, 746 F.3d 1135, 1140 (11th Cir. 2014); *Indigo*, 710 F.3d at 1302; *United States v. Di Pietro*, 615 F.3d 1369, 1372–73 (11th Cir. 2010); *cf. Johnson v. United States*, 135 S. Ct. 2551, 2561 (2015).

The Eleventh Circuit recently enforced this limitation in *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164 (11th Cir. 2018). In that case, a city defined "sexually oriented business" to include "a commercial establishment that regularly features sexual devices." *Id.* at 1168. "Feature" meant "to give special prominence to." *Id.* Sexually oriented businesses were closely regulated. The plaintiff argued that the terms "special prominence" and "feature" were impermissibly vague. *Id.* at

1176.  But the Eleventh Circuit held that because the plaintiff "displayed hundreds of sexual devices in its store, devoting to them an entire room plus space in other rooms," it could not advance its vagueness claim.  *Id.*  Even if the law could have been vague as applied to other businesses, the plaintiff's business "clearly [fell] within the zone of prohibited conduct."  *Id.*

Finally, arbitrary and discriminatory enforcement is relevant in vagueness cases.  A statute cannot leave police officers free to decide, case-by-case, what is illegal.  *See Morales*, 527 U.S. at 61; *Kolander*, 461 U.S. at 358.  So if a law is enforced in different ways against different people, that may mean the law is vague.  But at the same time, "discriminatory enforcement does not necessarily mean that the ordinance that is being enforced is itself void-for-vagueness.  The most clearly stated law against running red lights . . . could be enforced discriminatorily by the police, if they so chose."  *Diversified Numismatics, Inc. v. City of Orlando*, 949 F.2d 382, 387 (11th Cir. 1991).  Instead, a vagueness claim must show that the text of the law itself is vague.  *Indigo*, 710 F.3d at 1302.

It is now time to apply these principles to Plaintiffs' claims.

### b.    The residency restrictions are not unconstitutionally vague.

The court previously found that ASORCNA's residency exclusion zones are not void for vagueness.  (Doc. # 125, at 24–28.)  That was for three reasons.  First, the Act defines key terms, especially the word "reside."  Ala. Code § 15-20A-4(20).

Second, the preapproval process lets offenders know where they can live and offers them a total "safe harbor." *Id.* § 15-20A-11(g); *Mason*, 208 F.3d at 959 n.4. Finally, offenders are criminally liable only if they "knowingly" violate the rules. Ala. Code § 15-20A-11(i); *Hill*, 530 U.S. at 732 (holding a scienter requirement "ameliorated" vagueness concerns).

Plaintiffs later sought leave to supplement their complaint to allege that the residency restrictions are "enforced in a shockingly arbitrary and nonsensical manner by local law enforcement." (Doc. # 134-1, at 2.) The court granted leave to supplement the complaint, but it did not judge the merits of Plaintiffs' addition. (Doc. # 137, at 9; *see* Doc. # 125, at 28 n.13.) The court now finds that any arbitrary or discriminatory enforcement does not result from vagueness in ASORCNA's text. The State is thus entitled to summary judgment on this issue.

Plaintiffs claim that two phrases in ASORCNA's legislative findings lead to arbitrary enforcement. One is a statement that offenders have a "reduced expectation of privacy," and the other is a reference to "monitoring and tracking" offenders. Ala. Code § 15-20A-2(1), (5). But those phrases do not prescribe or proscribe anything. Consider the context of the legislative findings:

> Sex offenders, due to the nature of their offenses, have a reduced expectation of privacy. In balancing the sex offender's rights, and the interest of public safety, the Legislature finds that releasing certain information to the public furthers the primary governmental interest of protecting vulnerable populations, particularly children. Employment and residence restrictions, together with monitoring and tracking, also

further that interest. The Legislature declares that its intent in imposing certain registration, notification, monitoring, and tracking requirements on sex offenders is not to punish sex offenders but to protect the public and, most importantly, promote child safety.

*Id.* § 15-20A-2(5). The phrase "reduced expectation of privacy" does not invite law enforcement to violate constitutional rights; it is a justification for publishing an offender's personal information online. And because offenders must report where they live, work, and travel, they are indeed monitored and tracked.

Plaintiffs point out that local police conduct "home checks" to see if offenders live at their reported address. Home checks are unannounced and warrantless. (Doc. # 150-1, at 5, 7–8; Doc. # 150-2, at 4, 8; Doc. # 150-3, at 4, 17.) At least one police officer uses the Act's reference to a "reduced expectation of privacy" to justify home checks. (Doc. # 150-1, at 5.) And during home checks, officers sometimes violate the Fourth Amendment, demand that offenders prove their residence by producing mail or clothing, and treat lawful behavior as evidence of wrongdoing. (*See* Docs. # 150-1, 150-2, 150-3, 150-4, 150-5.)

Plaintiffs try to turn these problems into evidence of vagueness, arguing that ASORCNA does not "provide clear guidance as to the boundaries under which law enforcement shall conduct themselves." (Doc. # 149, at 5.) That misses the point. The vagueness doctrine is concerned with ambiguity in what a law prohibits. It does not require statutes to lay out how police officers may (or may not) investigate potential violations. The problems raised by home checks are "addressed, not by the

doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt," *Williams*, 553 U.S. at 306, and by the Fourth Amendment.[10]

Plaintiffs present evidence that four offenders (each of whom committed offenses against minors) live at noncompliant addresses even though Plaintiffs (none of whom committed offenses against minors) cannot live in exclusion zones. The court refers to the offenders living at noncompliant addresses by their initials: J.B. (Doc. # 150-2, at 39–41, 50; Doc. # 150-9); T.D. (Doc. # 150-1, at 13–14; Doc. # 150-2, at 14–15, 38); F.W. (Doc. # 150-2, at 56); and H.B. (Doc. # 150-2, at 57; Doc. # 150-10; Doc. # 150-14). But the evidence about J.B., T.D., F.W., and H.B. does not show that the residency restrictions are vague. Plaintiffs' attorney deposed police officers responsible for enforcing the law against those four men. Counsel asked whether J.B., T.D., F.W., and H.B. should have been allowed to live at noncompliant addresses. The officers admitted they should not have been allowed to live at noncompliant addresses. (Doc. # 150-1, at 14, 17, 19; Doc. # 150-2, at 18–20; Doc. # 150-11, at 6.) That police officers made mistakes does not mean that the law is vague. In fact, the fact that Plaintiff could tell that four offenders lived at

---

[10] Under the Fourth Amendment, police officers "not armed with a warrant" may "approach a home and knock." *Florida v. Jardines*, 569 U.S. 1, 8 (2013). But "the occupant has no obligation to open the door or to speak." *Kentucky v. King*, 563 U.S. 452, 469–70 (2011). Even if the occupant opens the door, he "need not allow the officers to enter the premises and may refuse to answer questions at any time." *Id.* at 470. And without a warrant, officers may not physically intrude on a home, or the area immediately surrounding and associated with the home, to gather evidence. *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018); *Moore v. Pederson*, 806 F.3d 1036, 1044–45 (11th Cir. 2015).

noncompliant addresses is evidence that the law has a discernable meaning.

Doe 3 also presents evidence that local police denied his request to move to a noncompliant address. The police explained that his chosen address was "approx. 850 feet" from an elementary school. (Doc. # 150-13.) In fact, the house is 750 feet from the school. (Doc. # 150-10, at 3.) Because the address is "clearly" noncompliant, Doe 3 cannot use the police's denial to "complain of the vagueness of the law as applied to the conduct of others." *Hoffman*, 455 U.S. at 495.

Finally, Doe 7 has been the subject of ongoing enforcement efforts in Chilton County. (*See generally* Docs. # 150-3, 150-7, 150-8, 150-9, 159-6.) But he has not shown how those legal troubles arise from any vague provision in the text of the law. He instead argues that, based on the facts of his case, he never violated the residency restrictions. That is not an appropriate argument for a facial vagueness challenge. *See Fla. Businessmen for Free Enter. v. City of Hollywood*, 673 F.2d 1213, 1220 (11th Cir. 1982) ("A facial challenge . . . is not the appropriate time for litigating claims of selective enforcement.").

> ### c. Plaintiffs cannot prevail in their challenge to the employment restrictions.

Plaintiffs challenge the employment exclusion zones based not on selective enforcement, but on the text of the law itself. The court previously allowed their claim to proceed, stating that "registrants can only guess at whether their place of employment falls within a zone of exclusion" and that "the employment restriction

remains confoundingly opaque." (Doc. # 125, at 28–29.) That was at the motion to dismiss stage, however. On summary judgment, Plaintiffs must back up their claims with evidence. But Plaintiffs have presented no evidence that they ever had to guess whether a potential employer was in an exclusion zone. There is no evidence that Plaintiffs cannot tell what the law requires. Most Plaintiffs are disabled. And there is no evidence at all about Doe 1's employment status. The State is therefore entitled to summary judgment.

Only three Plaintiffs — Doe 3, Doe 7, and Doe 9 — describe their attempts to find jobs. Their descriptions show that at least some of their desired places of employment are "clearly proscribed" by the exclusion zones. *Hoffman*, 455 U.S. at 495. That keeps them from claiming that the law is facially vague.

In the complaint, Doe 3 states that he "inquired about working at several auto body and paint [shops] in his city." "None" were ASORCNA-compliant "because of the zones of exclusion." (Doc. # 138, at 30.) In his deposition, Doe 3 described his efforts to get a job at two auto body shops. But rather than state that he was not sure whether the shops were ASORCNA-compliant, he testified that the shops turned him away because of his branded identification. (Doc. # 156-1, at 14–15.)

The complaint states that Doe 7 must "turn down many roofing, framing, brick masonry, and construction clean-up jobs" because he "may only work in areas allowed by ASORCNA's employment zones." (Doc. # 138, at 30.) That statement

implies Doe 7 turns down jobs because he knows some construction sites are within 2,000 feet of a school or childcare facility.[11]  In his deposition, Doe 7 does not even mention the employment exclusion zones.  Instead, he says that he was turned down for a job when the employer saw his branded identification.  (Doc. # 156-4, at 7.)

Finally, Doe 9 alleges that "ASORCNA prohibits [him] from working in the vast majority of businesses in his hometown because of the employment zones of exclusion."  (Doc. # 138, at 31.)  Once again, this shows that the exclusion zones are not vague as applied to Plaintiffs.

There is another problem with Plaintiffs' vagueness claim:  Doe 3, Doe 7, and Doe 10 are disabled and receive Social Security disability payments.  Doe 3 admits that disability payments are his sole source of income, that he proved he was physically unable to work to get those payments, and that he does not foresee his condition improving enough to obtain work.  (Doc. # 156-1, at 7–8.)  Doe 7 likewise admits that he proved he was physically unable to work and that he does not foresee his condition improving enough to work "in the near future."  (Doc. # 156-4, at 7.)  The only evidence about Doe 10's employment status is that he "is disabled" and receives disability payments.  (Doc. # 138, at 15.)  Doe 3 does claim he can work as

---

[11]  At best, Doe 7's statement is ambiguous, failing to specify whether he knows that some jobs are within exclusion zones or whether he avoids some jobs out of an abundance of caution. To the extent the latter interpretation is reasonable, it still does not prevent summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) ("A mere 'scintilla' of evidence . . . will not suffice; there must be enough of a showing that the jury could reasonably find for that party.")

an auto body painter and that he would accept reduced disability benefits if he could work. (Doc. # 156-1, at 14.) Doe 7 also testifies that he cleans construction sites one or two days a week. (Doc. # 156-4, at 12.) But as explained above, those facts do not allow Plaintiffs to bring a vagueness challenge.

Finally, the complaint alleges that some offenders are allowed to work in exclusion zones, even if their crimes were against children. (Doc. # 138, at 42–43.) But there is no evidence supporting that statement. There is no way to tell if it is based on personal knowledge. And again, one "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Hoffman*, 455 U.S. at 495; *see Di Pietro*, 615 F.3d at 1372.

None of this is to say that ASORCNA's employment restrictions are clear in every respect. The statute still lacks a preapproval process. It still does not address what happens when a worker makes a service call, performs intermittent work at different sites across town, or drives a car for a living. But those ambiguities must wait until another day. *See Holder*, 561 U.S. at 22–25. The evidence shows that Plaintiffs' conduct is clearly proscribed by the Act — or else that Plaintiffs have not been chilled from gaining employment. The State is therefore entitled to summary judgment on Plaintiffs' vagueness claims.

## C.  <u>Plaintiffs' claims are not barred by the statute of limitations.</u>

One more thing. The State twice moved to dismiss the claims at issue here.

(Docs. # 44, 87.)  In neither motion did it argue that these claims are barred by the statute of limitations.  So it is a surprise to see the State now argue that every claim in the operative complaint is untimely.  (Doc. # 155, at 17–25.)  But in the end, the State's heel-dragging does not matter.  Plaintiffs' claims are not time-barred.

Because Plaintiffs filed a claim under 42 U.S.C. § 1983 in Alabama, they are subject to a two-year statute of limitations.  Ala. Code § 6-2-38(*l*); *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008).  When that clock starts running is a question of federal law.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007).  In general, "the statute of limitations begins to run from the date the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights."  *Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003) (cleaned up).

But not all injuries are equal.  Sometimes, there is one discrete point at which the injury occurs.  Other times, however, the injury happens over and over again.  When the injury occurs determines when the statute of limitations starts running.

Plaintiffs claim that ASORCNA is unconstitutionally vague and violates their fundamental rights.  If that is true, then ASORCNA afflicts a fresh injury each day that Plaintiffs are subject to the law.  In *Kuhnle Brothers v. County of Geauga*, for example, the Sixth Circuit held that a claim for the deprivation of the right to travel accrues every day while the unconstitutional law is in effect.  103 F.3d 516, 522 (6th

Cir. 1997); *see Hillcrest Prop., LLC v. Pasco Cty.*, 754 F.3d 1279, 1283 (11th Cir. 2014) (citing *Kuhnle* with approval). And in *Beavers v. American Cast Iron Pipe Co.*, the Eleventh Circuit held that each week in which a discriminatory insurance policy was in effect constituted a new Title VII violation. 975 F.2d 792, 798 (11th Cir. 1992); *cf. also Montin v. Estate of Johnson*, 636 F.3d 409, 416 (8th Cir. 2011).

Plaintiffs have an ongoing duty to report their internet activity. They must repeatedly show their branded identification to random strangers. They are forever barred from living with their nieces and nephews. They are bound in perpetuity by allegedly vague laws. Thus, each new day is a new injury. And so far as the law is enforced, Plaintiffs will suffer new injuries. *See Maldonado v. Harris*, 370 F.3d 945, 956 (9th Cir. 2004).

This in no way conflicts with the Eleventh Circuit's pronouncements in *Moore v. Federal Bureau of Prisons*, 553 F. App'x 888 (11th Cir. 2014) (per curiam), and *Meggison v. Bailey*, 575 F. App'x 865 (11th Cir. 2014) (per curiam). In those cases, the plaintiffs alleged that they were not sex offenders but were wrongly registered as offenders. The Eleventh Circuit held their injury accrued when they learned that they had been wrongly registered. *Moore*, 553 F. App'x at 890; *Meggison*, 575 F. App'x at 867; *see also Cibula v. Fox*, 570 F. App'x 129, 136 (3d Cir. 2014); *Romero v. Lander*, 461 F. App'x 661, 668 (10th Cir. 2012). And in *Mims v. Bentley*, a district court found that an *ex post facto* challenge to a sex-offender registration requirement

accrued when the alleged *ex post facto* punishment was imposed — that is, when the plaintiff registered.  No. 15-cv-119, 2015 WL 5736829, at *2 (N.D. Ala. Oct. 1, 2015); *see also Smelcher v. Att'y Gen. of Ala.*, No. 18-cv-1099, 2019 WL 142323, at *4 (N.D. Ala. Jan. 9, 2019) (reaching the same conclusion when another plaintiff attacked the need to register as sex offender).

But the injury caused by wrongful registration is not the same injury caused by the constant deprivation of fundamental rights.  Yes, registration triggers ongoing obligations, but the plaintiffs in *Moore*, *Meggison*, and *Mims* challenged registration itself.  That is different from claiming that certain restrictions on everyday activities violate the First Amendment.  Plaintiffs here are repeatedly compelled to speak and forced to report internet use.  They suffered those injuries within two years of suing (and continue to suffer them), so their claims are timely.

## V.  CONCLUSION

Alabama can prosecute sex offenses to the full extent of the law.  It can also act to protect its citizens from recidivist sex offenders.  But the State denies that ASORCNA is designed to "punish" offenders.  And once a person serves his full sentence, he enjoys the full protection of the Constitution.  *Harris*, 772 F.3d at 572; *accord Packingham*, 137 S. Ct. at 1737.  Sex offenders are not second-class citizens, and anyone who thinks otherwise would do well to remember Thomas Paine's wisdom:  "He that would make his own liberty secure, must guard even his enemy

from oppression; for if he violates this duty, he establishes a precedent that will reach to himself." *Dissertation on First-Principles of Government* 32 (1795).

It is therefore ORDERED that:

1.      Plaintiffs' first Motion for Partial Summary Judgment (Doc. # 139) is GRANTED as to Counts Four and Five and DENIED as to Counts One and Three.

2.      Plaintiffs' second Motion for Partial Summary Judgment (Doc. # 147) is DENIED.

3.      Defendants' Motion for Judgment on the Pleadings, or, in the alternative, Motion for Summary Judgment (Doc. # 154) is GRANTED as to Counts One and Three and DENIED as to Counts Four and Five.

4.      The State of Alabama's branded-identification requirement, Ala. Code § 15-20A-18, is DECLARED unconstitutional as applied to Plaintiffs.

5.      The State of Alabama's internet-use reporting requirements, Ala. Code §§ 15-20A(a)(9), (18), 15-20A-10(e)(1), are DECLARED facially unconstitutional.

DONE this 11th day of February, 2019.

_____
/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE